O9R5freC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    RUBY FREEMAN,
      WANDREA MOSS,
 4
                      Plaintiffs,              New York, N.Y.
 5
                      v.                       24 Civ. 6563 (LJL)
 6
      RUDOLPH W. GIULIANI,
 7
                      Defendant.
 8
      ------------------------------x
 9
                                               September 27, 2024
10                                             2:10 p.m.

11    Before:

12                          HON. LEWIS J. LIMAN,

13                                             U.S. District Judge

14

15                              APPEARANCES

16

17

18    WILLKIE, FARR & GALLAGHER, LLP
            Attorneys for Plaintiffs
19    BY:   AARON E. NATHAN
               -AND-
            PROTECT DEMOCRACY
20    BY:   RACHEL E. GOODMAN

21

22    KENNETH CARUSO LAW
            Attorney for Defendant
23    BY:   KENNETH A. CARUSO

24

25
```

O9R5freC                          conference

1          (Case called)

2          THE DEPUTY CLERK:  Starting with counsel for

3    plaintiff, please state your appearances for the record.

4          MR. NATHAN:  Good morning, your Honor.  Good

5    afternoon.  Aaron Nathan, Willkie Farr & Gallagher, joined by

6    my colleague Rachel Goodman of Protect Democracy, for the

7    plaintiffs and judgment creditors, Ruby Freeman and Wandrea

8    Shaye Moss.

9          THE COURT:  Good afternoon.

10          MR. CARUSO:  Good afternoon, your Honor.  Kenneth

11    Caruso for the defendant, Rudolph W. Giuliani.

12          THE COURT:  Good afternoon.  Good afternoon,

13    Mr. Caruso.

14          MR. CARUSO:  Thank you.

15          THE COURT:  As a preliminary matter, let me address

16    myself to you, Mr. Caruso.

17          MR. CARUSO:  Yes, sir.

18          THE COURT:  I have got a bit of a beef with the letter

19    you sent me dated September 26 and I want to maybe set out some

20    parameters for going forward.  That letter asked, in seemingly

21    innocuous language, for the Court to extend all existing

22    deadlines in the two matters to October 16, 2024, and framed it

23    as a matter of collegiality, professional courtesy among

24    lawyers.  What it omitted to disclose was the fact that, as I

25    have now come to understand the letter, you are not just asking

O9R5freC                        conference

1    for an extension but you are asking for relief not from the

2    plaintiff but from a Court order, a Court order that certain

3    filings were already due and the deadline already expired.  I

4    will entertain that request but it is my expectation from you

5    going forward, and from plaintiff for that matter, that you be

6    more forthright with the Court in that if you are in fact

7    seeking relief from a deadline that has already expired that

8    was set by the Court, you let me know that.

9            MR. CARUSO:  No, your Honor, you are absolutely right

10   and I will do that and I am sorry if you have a beef with it

11   but -- you're right.  I am seeking relief from a Court order

12   but you know what?  I didn't really think of it that way so I'm

13   sorry.

14           THE COURT:  Well, think of it that way.  Mr. Nathan, I

15   am assuming that you will think of it that way.  When there are

16   deadlines that I so order and that have my signature, you don't

17   just need to get consent from the other side, you need to ask

18   me for consent.  And, when you are asking for it, you need to

19   let me know that it is not just a matter of professional

20   courtesy, that you are asking for relief from the Court with

21   respect to an order.

22           MR. CARUSO:  Your Honor, I take your point completely.

23   Forgive me.  I just didn't see it that way when I wrote that

24   letter.

25           THE COURT:  OK.  All right.

O9R5freC                         conference

1          Mr. Nathan, let me turn to you first.  What would be

2    helpful for me is to understand all of the different matters

3    that I am going to need to decide and what the deadlines are

4    and how they relate to one another, and then we will turn to

5    Mr. Caruso and his request for an extension, but put it all

6    together for me, if you would.

7          MR. NATHAN:  Certainly, your Honor.

8          THE COURT:  Maybe if you could speak from the podium,

9    and Mr. Caruso, I am going to ask you to do the same when you

10   address the Court.  It is a little bit easier for the court

11   reporter.

12         MR. CARUSO:  Of course.

13         MR. NATHAN:  Good afternoon.

14         The principal enforcement proceeding is the

15   miscellaneous case which is Docket no. 24 Misc. 353.  That is a

16   proceeding that was initiated when we registered plaintiffs'

17   judgment in this district.  That judgment, as I am sure your

18   Honor is aware, reflects the end of a very lengthy process in

19   the District of Columbia, a jury trial of which my clients were

20   awarded a significant damages number for the defendant's

21   willful defamatory campaign against them that he orchestrated

22   following the 2020 presidential election.  That judgment

23   enforcement proceeding is going to be fairly expansive as

24   things stand.  One of the issues that will need to be decided

25   and which has -- I won't say they're fully briefed but we filed

O9R5freC                              conference

1    a motion and the opposition deadline is the one that passed on

2    Monday.

3                THE COURT:  So that is the turnover motion.

4                MR. NATHAN:  That's right, and maybe I should just

5    take the motions in order.

6                THE COURT:  In part what I need to know is what is the

7    relief that you are seeking; what has been briefed, what the

8    deadlines are, how the pieces relate to one another.

9                MR. NATHAN:  Absolutely.

10                After serving various process on the judgment debtor

11    which included an information subpoena, a restraining notice,

12    registering our judgment here, we filed a motion for turnover

13    on August 30.  That motion actually asked for two types of

14    relief under New York execution procedures.  It asked for

15    turnover of the personal property that we are aware of from

16    Mr. Giuliani's disclosures in his bankruptcy case which took up

17    the first eight months of this year.  It also asks for

18    appointment of receivers over the real property.

19                THE COURT:  That's the New York apartment and Florida

20    property?

21                MR. NATHAN:  To be precise it is actually, in the

22    first instance, only the Florida condominium apartment.  Real

23    property is not eligible for turnover under CPLR 5225.

24                THE COURT:  Right.  The condo shares are.

25                MR. NATHAN:  But the co-op shares are treated as

O9R5freC                         conference

1    personal property for purposes of New York judgment enforcement

2    procedures.  Having said that, personal property is eligible

3    for receivership and if Mr. Giuliani does not comply with the

4    turnover order entered by this Court, we have asked that any

5    property that isn't promptly turned over or delivered to

6    plaintiffs is then included in the receivership after a certain

7    period of time.  We have asked for seven days for Mr. Giuliani

8    to execute any documents necessary to deliver that property.

9            THE COURT:  We will, I am sure, get to this after I

10   receive briefing from the other side, but is a receiver really

11   the right remedy for personal property that is not turned over

12   or is it actually arrest of that property by the marshal or the

13   sheriff or law enforcement?

14           MR. NATHAN:  That is a question that we would be happy

15   to address.  We have covered it as a preliminary matter in our

16   opening brief in support of the motion.  Some types of personal

17   property present the classic case for receivership and in this

18   case one of those would be Mr. Giuliani's intangible claim for

19   unpaid attorneys fees that he testified he was owed for work

20   relating to his representation of one of the presidential

21   campaigns in 2020.  There are other types of personal property

22   for which it is sometimes preferred to use the receivership

23   process so that private sale can be effected to maximize the

24   value of that property.  Not everything is value maximizable

25   when it is seized by a sheriff and auctioned as a foreclosure

O9R5freC                         conference

1    auction and that is the basic principal that New York courts

2    look to in that type of case, and we will have arguments for

3    why the property that we are discussing here hits those

4    criteria.

5             THE COURT:  So that is the turnover motion that was

6    filed on August 30.  Refresh me as to what the deadline was.

7             MR. NATHAN:  The deadline to oppose that motion was

8    September 23rd.

9             There were then -- and this I hope will end up just

10   being a footnote to all of this -- as part of plaintiff's

11   judgment enforcement efforts, a restraining notice was served

12   on an account held at a bank in Missouri called Parkside

13   Financial Bank & Trust.  There is an account there held by an

14   entity known as Giuliani Communications, LLC, with which we

15   have become intimately familiar.  That is the entity that

16   Mr. Giuliani characterized as his alter ego in the bankruptcy

17   proceedings.  Those funds held in that account are subject to

18   restraint at the moment, but there is a procedure in New York

19   for claiming exemptions of restrained funds if there is a basis

20   for such a claim.  A couple weeks ago a representative of

21   Mr. Giuliani's hand-delivered exemption claims to, actually, to

22   the offices of Willkie Farr in New York City, and we had no

23   choice but to file motions to quash those claims of exemption.

24   We filed those motions, I believe, on September -- well, I know

25   the deadline.  The deadline is October 1 to respond to our

O9R5freC                    conference

1    motions.  For reasons I am happy to explain, I don't think that

2    there is a serious case for either claim of exemption as things

3    stand but they do stand with very different footing just based

4    on the details of the claims and the funds that are the subject

5    of the claims.  I can get into that if your Honor is

6    interested, although the reality is it may be more constructive

7    for me to discuss those issues with Mr. Caruso first.  That is

8    not something we have had a chance to do since he was retained

9    in this case.  And I'm sorry I didn't mention, the deadline for

10   opposition to those motions is October 1.  That is calculated

11   based on local rules, your Honor has not entered orders with

12   respect to those motions.

13            Last, but certainly not least, is the civil action

14   that we filed also on August 30.

15            THE COURT:  Let me ask you, before we get to the civil

16   action --

17            MR. NATHAN:  Please.

18            THE COURT:  -- do the two motions that you mentioned

19   that take care of the miscellaneous matter resolve the

20   miscellaneous matter?

21            MR. NATHAN:  I wish I could say so.  The miscellaneous

22   matter, it is the docket on which we plan to file all necessary

23   process and all necessary motions to investigate and then

24   enforce against Mr. Giuliani's assets that are within the

25   jurisdiction of this Court.

O9R5freC                         conference

1          THE COURT:  So am I understanding you correctly that

2     what you are hoping to do is get a response to the information

3     subpoena and then continue your investigation, then if there

4     are further turnover motions to make those, is that where you

5     are going?

6          MR. NATHAN:  If I could add a little bit of color?

7          I would say that our hope of receiving a response to

8     the information subpoena, "hope" is maybe a strong word.  We

9     have been through this before with Mr. Giuliani.  In fact, it

10    began in the underlying litigation in the District of Columbia

11    where, ultimately, default judgment was entered as to liability

12    because Mr. Giuliani refused to respond to valid discovery

13    requests or comply with Court orders ordering him to comply

14    with those requests.  That related both to his own individual

15    financial information.  There was an adverse inference ordered

16    against Mr. Giuliani at trial based on his failure to disclose

17    his own personal financial information and the jury was

18    instructed to infer that he did that for the purpose of

19    concealing and minimizing the assets that the jury would know

20    about, at trial.  He also did the same with respect to his

21    controlled entities.  Then there was a bankruptcy and exactly

22    the same thing repeated itself.  That bankruptcy case was

23    thrown out, essentially, for the same reason.

24          We are now in judgment enforcement proceedings where

25    plaintiffs have a lot of freedom under execution procedures to

O9R5freC                        conference

1    seek discovery, not just from the judgment debtor but from many

2    third-parties who may be in possession of relevant information,

3    and that is what we are doing now.  But I would say our

4    optimism of receiving that information from Mr. Giuliani is

5    measured, at best.  We may be more successful and we have been

6    up to this point, with some third-party discovery.  The reality

7    here is that my clients have been waiting a long time for

8    compensation and at this point they're doing everything they

9    can to get it but we are up against a lot of resistance.

10           THE COURT:  Maybe to cut to the chase in the

11   miscellaneous matter, it is not just the information subpoena

12   but it may be other subpoenas and other justification

13   ultimately leading either to expansion, if I authorize a

14   receiver to the receiver's authority, or additional turnover

15   motions.

16           MR. NATHAN:  I think that's a fair prediction.  I will

17   say the property that we know about is the property we have

18   already characterized -- I shouldn't be so absolute.  We have

19   tried to cover a significant portion of the property we know

20   about in the turnover motion that's already been filed but that

21   is just based on Mr. Giuliani's disclosures in the bankruptcy

22   case which we also know we are not complete or always perfectly

23   accurate, so there may be other stuff that would get rolled

24   into that.  There may also be property held by third-parties

25   where a receivership, potentially, would be unnecessary because

O9R5freC                          conference

1    the third-parties in many cases we expect, will just comply to

2    the turnover.

3        THE COURT:  They would be garnishees subject to civil

4    action.

5        MR. NATHAN:  The civil action filed also on August 30,

6    that is the action, Docket no. 24 Civ. 6563.  That is a

7    declaratory judgment action seeking to confirm plaintiffs'

8    rights against the Florida condominium apartment.

9        The backstory here is that there was a moment in the

10   bankruptcy where Mr. Giuliani, as late as I think as July 9,

11   had asked to liquidate all of his non-exempt assets, he

12   essentially asked to convert from Chapter 11 to Chapter 7.

13   That is not what ended up happening but at that moment the plan

14   was that everything that wasn't exempt would be sold.  Then

15   Mr. Giuliani seems to have hatched a new plan which was, on

16   July 15, he executed an affidavit in New Hampshire that said I

17   live in Florida now.  I am summing up but that's the gist of

18   it.  Mr. Giuliani also publicly broadcasts his location on a

19   regular basis and that complaint alleges that, on virtually

20   every day and on every day that we are aware of, his location

21   since Mr. Giuliani changed his mind or purported to change his

22   mind about where he lives he was actually in New Hampshire, in

23   Europe, in Chicago, in Dallas, anywhere but Palm Beach.

24       THE COURT:  So in the civil action what remains is the

25   date for a responsive pleading; is that right?

O9R5freC                          conference

1                MR. NATHAN:  Yes.

2                THE COURT:  And then a case management plan.

3                MR. NATHAN:  I don't know if this will come as good

4      news or bad news but our plan is for things to proceed a little

5      differently than that.  This is also not something that I had

6      an opportunity to discuss with Mr. Caruso, it was on the agenda

7      before the letters materialized yesterday, but as things stand,

8      it is plaintiffs' position that based on the publicly available

9      evidence, we are entitled to judgment as a matter of law and we

10     intend to file a summary judgment motion not later than

11     Wednesday of next week seeking summary judgment.  If

12     Mr. Giuliani wants to contest summary judgment or thinks that

13     there is evidence that could create a material dispute, all

14     that evidence is in his possession, he can disclose it all and

15     we can have a very expedited hearing on the merits.  But, until

16     he does that, it is our position that because the Court in this

17     case where he has been publicly broadcasting his location since

18     he made this claim of residence in Florida, there is really

19     nothing -- summary judgment is appropriate now.

20               THE COURT:  So, two follow-up questions and I

21     apologize for interrupting you, but it appears to me that to

22     the extent in the miscellaneous matter you are seeking a

23     receiver for the Florida property, I can't resolve that until I

24     resolve your request for a declaratory judgment in the civil

25     action number.  Am I correct about that?

1          MR. NATHAN:  I'm not sure that that's quite right only

2     because I think, and this is why we filed -- this is why we

3     filed the declaratory judgment action.  We wanted to put this

4     in issue and make sure that this issue was presented and

5     decided conclusively because we weren't sure what defenses

6     Mr. Giuliani might raise to the turnover or receivership

7     motion.  Frankly we weren't sure that he would appear and

8     oppose it and we didn't want to be in a position where we were

9     stuck litigating about these issues without an opponent and

10    without a basis for this Court to enter a real judgment that

11    would have preclusive effect going forward.  I am not really in

12    a position to say or take a position on whether you could take

13    the step of just appointing receivers over the property.  It

14    might be a question of whether the receivers have power to sell

15    without further procedure related to the homestead exemption.

16    Either way, we have tried to clean that up by filing the

17    declaratory judgment action.

18          THE COURT:  So, by your calculation, when is the

19    responsive pleading due in the civil action?

20          MR. NATHAN:  The responsive pleading is due Wednesday,

21    October 2.  That is also the date we plan to file the summary

22    judgment motion.

23          THE COURT:  And then the response to summary judgment

24    motion, according to the Court rules, would be the 16th.

25          MR. NATHAN:  Would be 14 days which would be the 16th.

O9R5freC                          conference

1    I would say this is not somewhere that -- we just didn't get

2    this far with Mr. Caruso when we were discussing scheduling

3    matters.  Where this was headed, at least as far as our own

4    position was concerned, was that to the extent there is a

5    responsive pleading or a responsive motion, it might make sense

6    to roll that into the briefing on the summary judgment motion

7    that is forthcoming.  But the key, from our perspective, is

8    that there is really -- the civil action is something that can

9    be decided really quickly.  What is at issue, from our

10   perspective, is whether Mr. Giuliani established actual

11   residency in the Palm Beach condo during the relevant period.

12   The public record indicates that he was not there at all.  Not

13   to say that we would even have to prove that much.  But I think

14   anybody in this courtroom could figure out where they were

15   physically for the last 90 days, more or less off the top of

16   their head.  It is not an evidentiary-complicated issue that

17   needs to be decided.  We think discovery, if discovery were

18   necessary, could be lightning fast and we could be ready for a

19   merits hearing on that question.  Again, that is assuming that

20   there is even evidence that Mr. Giuliani can come forward with

21   to resist summary judgment in the first place.

22            THE COURT:  So are there any other motions or

23   deadlines?

24            MR. NATHAN:  No.

25            THE COURT:  OK.  If the summary judgment response is

O9R5freC                         conference

1   not going to be due until October 16, and even if, as you

2   suggested, that date might also be the date for the responsive

3   pleading in the civil action number, is there any reason why I

4   wouldn't set a uniform date of October 16 for everything that

5   we have discussed so far, maybe leaving aside the motion to

6   quash?

7           MR. NATHAN:  Yes, your Honor.  And I am sorry to be a

8   stick in the mud on this, but our clients have been around the

9   block with Mr. Giuliani quite a lot.  We filed a turnover

10  motion because -- and maybe I should explain.  The background

11  for the need for speed in this case, as things stand right now,

12  again, this was subject to ongoing discussion at the time

13  Mr. Caruso filed the letter and hasn't continued since but

14  there is no reason it couldn't resume; there are three reasons

15  why we need to move as quickly as we possibly can and can't do

16  piecemeal extensions on every little thing, certainly not

17  without objection.

18          The first and probably most important is that the

19  dismissal of Mr. Giuliani's bankruptcy case came with a

20  one-year bar on refiling.  That dismissal was entered August 2,

21  2024.  We started up in this court on August 5 and we have been

22  pushing since then.  Mr. Caruso only appeared, it is true, a

23  couple weeks ago, but Mr. Giuliani could have hired counsel at

24  any time before that.  He has got counsel in many other matters

25  and, for that matter, he has got the same counsel on his appeal

O9R5freC                        conference

1      for the final judgment in D.C. is appearing in this case.

2              We only have a year, and at this point only 10 months,

3      from our perspective, before Mr. Giuliani files a new

4      bankruptcy case to throw another wrench in my clients' efforts

5      to get compensation and accountability.  So we are just not

6      willing to slow things.  Two months have gone by already and we

7      are not really willing to slow anything down any more than it

8      absolutely has to be.  That is not to say we haven't and won't

9      extend professional courtesies when they are necessary.  But,

10     we offered a deadline of October 7 for the turnover and

11     receivership motion.  That offer, we didn't get a response, we

12     got this letter instead.  So we think we are extending

13     professional courtesies where they are appropriate.

14          THE COURT:  Putting aside the questions of

15     professional courtesy, I'm not accusing anybody of being

16     professionally incourteous [sic].  So, was there another

17     reason?

18          MR. NATHAN:  I apologize.  There is two more.

19              Another, which it is in our papers but is probably

20     important.

21          THE COURT:  It is not professionally incourteous

22     [sic].  I probably should have said discourteous, but go ahead.

23          MR. NATHAN:  In our papers we pointed this out but

24     just so it is also in the back of everyone's mind, the two

25     principal assets available to Mr. Giuliani's creditors are the

O9R5freC                            conference

1    two apartments.  Each of them comes with pretty hefty monthly

2    maintenance fees.  I think it's about $15,000 in New York and

3    about $10,000 in Florida.  That just means that every month

4    that goes by Mr. Giuliani -- and the bankruptcy established I

5    would say a pattern -- at best he was uneven about making sure

6    the maintenance got paid and as far as we know when we get to

7    those apartments, they may come with pretty substantial

8    obligations to the co-op or to the condominium association,

9    respectively, that the creditors will be left holding the bag

10   with.  That is another reason that we need to move as quickly

11   as we can.

12           And then the third is, as I have been discussing this

13   afternoon, we have been here before.  There is a pattern that

14   we are now familiar with of Mr. Giuliani asking for more time,

15   then coming forward, if he comes forward with anything at all,

16   with something that is just patently insufficient.  Then that

17   needs to be addressed either through motion practice or

18   otherwise.  And the reality is at this point, after years of

19   litigation and eight months of bankruptcy, the amount of

20   complete responsive productions we have ever received from

21   Mr. Giuliani about anything is probably, could be summarized --

22   the number of documents might shock how little we have ever

23   ultimately gotten.

24           Now, having said all of that, that is a problem we

25   have to live with but it also means that my clients are just --

O9R5freC                    conference

1    we are not going to agree to extensions that take us nowhere.

2           THE COURT:  I understand the points that you are

3    making.  The question that is on my mind has to do with the

4    Florida property which is a portion of the request that you

5    have made in the miscellaneous matter and whether it is

6    sensible to have Mr. Caruso respond on the 7th, let's say, to

7    that, or an earlier date to that with respect to the Florida

8    property when his response with respect to the Florida property

9    in the civil action is not going to be due until later.

10          MR. NATHAN:  That I understand and I would say that if

11   your Honor is of the view that the questions relating to the

12   Florida property, including whether the Florida property is

13   eligible for receivership for this reason having to do with the

14   homestead exemption should be decided together, I think what I

15   would suggest, at least from plaintiffs' point of view, is that

16   may be the case but then it would still not be a reason not to

17   decide the other matters raised in the turnover motion and

18   receivership motion on the current schedule.

19          THE COURT:  Is there anything else, Mr. Nathan?

20          MR. NATHAN:  I think your Honor had asked us to --

21          THE COURT:  The information subpoena.

22          MR. NATHAN:  Oh, there is the information subpoena.  I

23   think we will just have to understand from Mr. Caruso what

24   Mr. Giuliani's plan is with respect to that subpoena.  I have

25   to say we are not -- I don't know what kind of assurances we

O9R5freC                    conference

1    could accept at this point that a response that is sufficient

2    will be forthcoming so we may just need to address that in due

3    course.

4              THE COURT:  I gather through a motion to compel at

5    some point.

6              MR. NATHAN:  Yes.  So, maybe to be continued on that

7    one.  The other issue that was raised in your Honor's order was

8    the question of consolidation under Rule 42 and I am happy to

9    address that.

10             THE COURT:  Why don't you address it now.

11             MR. NATHAN:  The short answer is we have no objection.

12   I think it sounds as if we are on the same page.  To the extent

13   that there is significant overlap between the two matters it is

14   not perfect and, as I laid out, the miscellaneous action will

15   end up encompassing a lot more than what is at issue in the

16   civil action.  But, that said, if it is administratively

17   convenient to the Court to consolidate them, we would have no

18   objection, with the understanding that consolidation doesn't

19   affect the separateness of the cases for purposes of appeals

20   from final decisions in either of the cases.

21             THE COURT:  What I am inclined to do, and then I will

22   hear from Mr. Caruso, is for now hold off on consolidation but

23   continue to hold hearings in both matters at the same time with

24   the transcript to be filed in both matters.  But, I will hear

25   from Mr. Caruso.

O9R5freC                         conference

1          Mr. Caruso, I have a couple of questions for you and

2     then I will hear from you on the deadlines.

3          MR. CARUSO:  Yes, your Honor.

4          THE COURT:  The first question, I am now looking at

5     the turnover order, the various items of property and your

6     letter talks about the apartments, but with respect to the

7     other items of personal property, just to streamline things, is

8     there anything that you are able to tell me today that

9     Mr. Giuliani is going to turn over?  Can we go through this and

10    say he is going to turn over the items of furniture,

11    television, I can sign an order to that effect?

12         MR. CARUSO:  Your Honor, I can't commit to that today.

13    I haven't even read these papers until today and I haven't

14    spoken to the client.  I need some time to get this case

15    organized.  And I am sure -- I am sure -- that there are going

16    to be items where I will come in and say there is no defense

17    and we can give it to receiver.  But, for example, for

18    example --

19         THE COURT:  I heard you say that you are not going to

20    be able to today help me streamline this.  Tell me why it is

21    that you should get any extension, and if you get any

22    extension, why it should be beyond October 7.

23         MR. CARUSO:  Because I need a little more time than

24    that to get everything in this case organized.

25         THE COURT:  I mean, turnover motions are not terribly

O9R5freC                        conference

1   complicated in a case where -- how long have you been

2   representing your client?

3          MR. CARUSO:  I appeared a week ago.

4          THE COURT:  I know how long ago you appeared in this

5   case.  How long have you been representing him?

6          MR. CARUSO:  On an appeal?  Since -- I think it was

7   March?  May?  April?

8          THE COURT:  Judgment collection is not something that

9   has been alien to Mr. Giuliani, but go ahead.  Tell me why you

10  are going to need a lot of time to address the question of

11  turnover of the Mercedes Benz, the furniture, the television,

12  the sports memorabilia, the Reggie Jackson picture, the Joe

13  DiMaggio shirt, the rings.

14         MR. CARUSO:  Because, for example, with respect to

15  property that is unique, of course it can be monetized --

16  priced and monetized, but it also might make sense to put that

17  property into the hands of a receiver so it is out of the

18  defendant's hands but not sold yet pending an appeal.

19         THE COURT:  No, no.  Pending an appeal you would have

20  to bond it.  You are not bonded.

21         MR. CARUSO:  But, Judge, you don't have to bond it.

22  There are plenty of cases under CPLR 5240 that say that a Court

23  has discretion to refrain from --

24         THE COURT:  I'm aware of those cases.  In fact, I

25  dealt with some of them in the *Ramen-Ya* case that I had.  So

O9R5freC                        conference

1    you will brief them to me but you may have a little bit of an

2    uphill battle in saying that those cases, which really talk

3    about protecting somebody's ability to live day-by-day, apply

4    to World Series rings.  I am sure Mr. Giuliani can live without

5    his World Series rings.

6            MR. CARUSO:  Your Honor, I just want to make another

7    point.

8            THE COURT:  Can he?

9            MR. CARUSO:  Excuse me?

10            THE COURT:  Can he live without his World Series

11    rings?

12            MR. CARUSO:  I suppose so.  Who can't?

13            THE COURT:  OK.

14            MR. CARUSO:  I want to make another point because

15    Mr. Nathan said -- this is from his clients -- this is the end

16    of a long process.  No, it isn't.  No, it isn't.  I am filing

17    an appellate brief on Wednesday.  They have a lot to answer

18    for.  OK?  There is a lot more ahead.

19            THE COURT:  No, I understand that but you are not

20    bonded, are you?

21            MR. CARUSO:  No, because what bonding company is going

22    to bond a ridiculous amount of $140 million?  No bonding

23    company is going to do that.  We have to do this on our own and

24    that's exactly what we are doing.

25            THE COURT:  You are speaking to the wrong Court with

O9R5freC                              conference

1    respect to that.

2              MR. CARUSO:  Yes, I understand that.  Although, 5240

3    does use the word "stay" in some of the cases.

4              THE COURT:  I am aware of 5240.

5              MR. CARUSO:  Look, your Honor.  Please.  It seems to

6    me you have three things.  You have an answer to a complaint, a

7    case that was originally filed in front of Judge Hellerstein.

8    I have got the response to a motion for turnover which involves

9    substantive law including Florida homestead law and the law of

10   domicile.  I will come back to that.  And point three, I have

11   got this subpoena, the information subpoena.  The briefing in

12   opposition to the turnover motion is going to call for some

13   research and writing because the law of domicile is not what

14   Mr. Nathan says.  He said there has to be an actual residency.

15   No, it doesn't.  That is not right.  A person can change his

16   domicile instantaneously.  It requires the existence of a

17   residence, which Mr. Giuliani has, and a state of mind to make

18   that new place your permanent home.  That is a fact question.

19   A fact question.  He points to 47 days in which I think the

20   numbers are, 34 of them Mr. Giuliani was out of Florida.  Yes,

21   on business.  He was at the DNC and the RNC.  Being away from

22   your home for business doesn't go against your claim of

23   domicile.  47 days is a pathetically short period of time

24   within which to measure domicile.  It can be changed

25   instantaneously and it doesn't require actual presence or

1    actual residence.  Look at members of the armed forces.  They

2    don't lose their domicile when they go abroad.  Members of big

3    law firms get assigned to the European office, they don't lose

4    their American domicile.  It has to do with the state of mind.

5    Which brings me to the next point about a summary judgment

6    motion.  This is not a word I throw around very -- I'm not

7    going to throw it around.  Surely there is a question of fact.

8    State of mind.  Domicile turns on that.  If he doesn't want to

9    do discovery, that is fine, but summary judgment?  That, to me,

10   sounds ridiculous.  And summary judgment before I answer?

11   That's even more ridiculous.  Right?  Let's -- I would like two

12   more weeks.  It is not asking a lot.  I am new to this case --

13            THE COURT:  Let me ask you this question.  You heard

14   my question to Mr. Nathan about the overlapping in the matters

15   and I now hear you talking about the overlap in the matters a

16   little bit but what is your view on that with respect to the

17   Florida property, request for the turnover.

18            MR. CARUSO:  Your Honor anticipated the point that I

19   was going to make.  I don't see how you can possibly rule on a

20   turnover in the miscellaneous case while the whole question of

21   domicile and homestead exemption is at issue in the civil

22   action.

23            THE COURT:  So why can't you, in your response on the

24   miscellaneous matter with respect to the Florida property,

25   address the question that I addressed to Mr. Nathan?

O9R5freC                          conference

1    Mr. Nathan said he was not sure whether I would have to decide

2    the declaratory judgment matter before a receiver was

3    appointed.  I hear you now arguing you have to -- you, Judge --

4    have to decide whether the Florida property is Mr. Giuliani's

5    homestead before you put it in the hands of a receiver.  I

6    understand the arguments both ways but it strikes me that you

7    could address that law, and then later on addressing for me

8    whatever arguments you have got that the Florida property is

9    his homestead.

10          MR. CARUSO:  I understand, your Honor, and I am not

11    sure where you are going --

12          THE COURT:  Where I am going is whether what I should

13    do is require you, in the miscellaneous matter, to respond on

14    October 7 to the turnover motion which is substantial

15    extension, a very substantial extension from the date that I

16    have set.  Basically it is a two-week extension from the date

17    that I set and gives you four weeks from the date that it was

18    served, and let's leave aside the restraining notice for a

19    second, and then have you respond on the 16th in the civil

20    action with an answer and an opposition to the motion for

21    summary judgment, if you are intending to oppose it.

22          Why isn't that generous?

23          MR. CARUSO:  Now I see where your Honor is going.  How

24    about Friday, the 11th for the turnover, and I ask that because

25    my one and only associate will be out for Rosh Hashanah up to

1    October 7.  I just don't think it is asking a lot, your Honor.

2    October is not far away.  Your proposal regarding October 16

3    for the civil action with an answer and an opposition to the

4    motion for summary judgment is fine.  That is fine.  That is

5    what I asked for.  Can I have a little more than the 7th?  I

6    have a major filing due on Monday in state court.  I have got a

7    brief in this very case due on Wednesday.

8           THE COURT:  When are you going to respond to the

9    motion to quash?  And really, frankly, do you have any

10    opposition to the motion to quash?

11           MR. CARUSO:  Oh, the motion to quash.  Sorry.  I

12    misunderstood.  To me, that should be the least of our concerns

13    because the money is frozen.  The bank is holding it.  It is

14    out of Mr. Giuliani's hands.  Now, it is not in their hands, of

15    course, but it is out of Mr. Giuliani's hands.

16           THE COURT:  The effect of an exemption is that you are

17    exempt from the restraining notice; isn't that right,

18    Mr. Nathan?

19           MR. NATHAN:  Yes, your Honor.

20           THE COURT:  So if you are telling me that you are

21    going to withdraw the exemption request then that makes life

22    easy, then you don't have to respond so here is what I have in

23    mind:  You will respond on October 1 to the motion to quash.

24    Taking into account Rosh Hoshanah, you will respond on

25    October 8 to the motion to enforce.  And on the 16th, you will

O9R5freC                          conference

1   respond to the motion for summary judgment and you will file a

2   responsive pleading.

3           MR. CARUSO:  May I just look at my book for a moment?

4           THE COURT:  Yes.  Go ahead.

5           MR. CARUSO:  Again, please, your Honor, considering

6   what else I am doing, especially in this case between Monday

7   and Wednesday of next week, can we make that October 1st date

8   the 4th?  It is three days and it makes a big difference to me

9   and the quality of my work.

10          THE COURT:  No.  It's pretty simple.  You can do it on

11  October 1st.  You have got a weekend, you can work on it.

12          MR. CARUSO:  I have got a weekend to work on my

13  appellate brief.

14          THE COURT:  One other matter.  I am wondering if I

15  should have you in shortly after October 16 to talk about

16  future dates in this case.  Among other things, I want to move

17  on a quick basis so if it looks like you are going to be filing

18  a Rule 56(d) application with your motion for summary judgment,

19  it may be that we should at least have some provisional dates

20  on the calendar for discovery and for what I presume, under

21  homestead, would be Mr. Giuliani's deposition and deposition of

22  others.

23          MR. CARUSO:  That's what I would expect.

24          THE COURT:  So, I assume he is keeping himself -- he

25  will be available for deposition in late October and early

O9R5freC                     conference

1  November.

2         MR. CARUSO:  Let's fix a date and I will make sure he

3  is available.

4         THE COURT:  OK.

5         MR. CARUSO:  I agree with you, your Honor.  After the

6  16th let's have a conference and fix these dates, and maybe

7  between now and then counsel can come up with some suggestions.

8         THE COURT:  And frankly, it may be that we don't need

9  discovery.  I am not prejudging the issue of discovery.  What I

10  want to avoid is the circumstance where the motion is fully

11  briefed and then I decide that there is a question of fact and

12  it turns out that you are going to come to me and say, well,

13  you know, Mr. Giuliani is a busy man and he can't make himself

14  available for deposition and where the plaintiff can't get the

15  documents that they want so that's what I am trying to avoid.

16         MR. CARUSO:  I will try to avoid that as well.

17  Mr. Nathan is talking about a pattern of conduct.  I wasn't

18  part of that.

19         THE COURT:  I'm not going to make a judgment with

20  respect to that.  What I do have in front of me right now is

21  something of a deadline and the need for this case to go

22  quickly.  Judgment enforcement actions are not supposed to be

23  extended, lengthy proceedings.  The plaintiffs have their

24  judgment.  Your client owes them money.  Your client has an

25  obligation, imposed by law, imposed by a Court, to satisfy that

O9R5freC                        conference

1    judgment.  Your client has to turn over to them all of the

2    assets that he has in order to satisfy that judgment, except to

3    the extent those assets are exempt.  That should move quickly.

4            Mr. Nathan, do you have a view -- you can answer

5    without going to the podium -- about how I manage things so

6    that the case is not delayed if there is a need for discovery?

7            MR. NATHAN:  Your Honor's suggestion makes perfect

8    sense to us.  I think scheduling a date for a conference

9    following any opposition that is filed to the motion for

10   summary judgment would be useful and the time frame that you

11   sketched out sounds right to us.  As we said before, if there

12   is a question of fact, the relevant evidence is all going to be

13   in the defendant's possession and it will not or should not be

14   complicated to produce and then sit for deposition.

15           THE COURT:  OK.  Matt, let's come up with a date.

16           MR. CARUSO:  Your Honor, can we go through the dates

17   again for avoidance of doubt?

18           THE COURT:  No.  You will have them on a piece of

19   paper that I will issue so it will be abundantly clear from an

20   order that I will issue.

21           MR. CARUSO:  Can I take one more run at this?  The

22   date of the 8th, can you move that to Friday the 11th, please?

23           THE COURT:  No.  You asked for that and I ruled.

24           We need a date after October 16.

25           (Court and Deputy Clerk confer)

O9R5freC                          conference

1          THE COURT:  How is October 17 at 10:00 am?

2          MR. NATHAN:  Unfortunately the holidays are all in the

3    middle of the week this year.  The 17th and 18th I am

4    unfortunately unavailable, and the same goes for the 24th and

5    the 25th, but Monday through Wednesday of each of those weeks.

6    Having said that, if that's --

7          THE COURT:  Mr. Nathan, is there somebody else that

8    can cover?  I have an obligation the beginning of the following

9    week and I don't want to do it too close to when I receive the

10   papers.  The 17th and 18th you are out.  How is the 16th?

11         MR. NATHAN:  I am available on the 16th.

12         THE COURT:  Late in the day the 16th?  Does that work

13   for you, Mr. Caruso?

14         MR. CARUSO:  For another conference, your Honor?

15         THE COURT:  Yes.

16         MR. CARUSO:  Yes.  That's fine.

17         (Court and Deputy Clerk confer)

18         THE COURT:  I think we are going to have to keep it as

19   the 17th at 10:00.  Does that work, Mr. Caruso?

20         MR. CARUSO:  Yes, your Honor.

21         THE COURT:  Mr. Nathan, you have a big firm.  I am

22   sure somebody else can cover for you.

23         MR. NATHAN:  We will be OK.

24         THE COURT:  Anything else from plaintiff?

25         MR. NATHAN:  No, your Honor.

O9R5freC                    conference

1          THE COURT:  Mr. Caruso, anything?

2          MR. CARUSO:  Nothing, sir.

3          THE COURT:  Have a good weekend, everybody.  Thank

4    you.

5                              o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25