# EXHIBIT 5

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   ----------------------------------*
 5   RUBY FREEMAN and WANDREA' MOSS,
 6           Plaintiffs,                Case No.:
 7        vs.                           24-mc-00353
 8   RUDOLPH W. GIULIANI,
 9           Defendant,
10       and
11   ANDREW H. GIULIANI,
12           Intervenor-Defendant.
13   ----------------------------------*
14   RUBY FREEMAN and WANDREA' MOSS,
15           Plaintiffs,                Case No.:
16        vs.                           24-cv-06563
17   RUDOLPH W. GIULIANI,
18           Defendant.
19   ----------------------------------*
20           STENOGRAPHIC AND VIDEO-RECORDED
21             REMOTE VIRTUAL DEPOSITION OF
22                  THEODORE C. GOODMAN
23             Tuesday, December 31, 2024
24                    1:12 p.m.
25
```

Page 2

```
 1
 2         Tuesday, December 31, 2024
 3              1:12 p.m.
 4
 5      T R A N S C R I P T  of the stenographic and
 6  video-recorded remote virtual deposition of THEODORE
 7  C. GOODMAN, taken pursuant to Subpoena, held
 8  virtually from multiple locations via Zoom, on
 9  Tuesday, December 31, 2024, commencing at
10  approximately 1:12 p.m., stenographically recorded
11  by Josephine H. Fassett, a Registered Professional
12  Reporter, Certified Court Reporter, and Notary
13  Public of the states of New York and New Jersey.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2  REMOTE APPEARANCES (cont'd.):
 3  COUNSEL FOR THE WITNESS THEODORE C. GOODMAN:
 4  BY:  DAVID WOLKINSON, ESQ.
          dwolkinson@gmail.com
 5
 6  ALSO PRESENT REMOTELY:
 7      HOWARD BRODSKY, Videographer
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  REMOTE APPEARANCES:
 3  COUNSEL FOR THE PLAINTIFFS:
 4      WILLKIE FARR & GALLAGHER LLP
 5      1875 K Street, N.W.
 6      Washington, D.C. 20006
 7      202.303.1016
 8  BY:  J. TYLER KNOBLETT, ESQ.
 9      tknoblett@willkie.com
10      MERYL GOVERNSKI, ESQ.
11      mgovernski@willkie.com
12      MAGGIE MacCURDY, ESQ.
13      mmaccurdy@willkie.com
14
15  COUNSEL FOR THE DEFENDANT:
16      CAMMARATA & DeMEYER P.C.
17      456 Arlene Street
18      Staten Island, New York 10314
19      718.447.0020
20  BY:  JOSEPH M. CAMMARATA, ESQ.
21      joe@cdlawpc.com
22
23
24
25
```

Page 5

```
 1
 2  ---------------------INDEX----------------------
 3  WITNESS                              PAGE
 4  THEODORE C. GOODMAN
 5      By Mr. Knoblett                    9
 6
 7
 8  --------------------EXHIBITS--------------------
 9  EXHIBIT    DESCRIPTION                 PAGE
10  Exhibit 1   Subpoena to Testify at a    20
11              Deposition in a Civil Matter
12  Exhibit 2   Subpoena to Produce Documents, 27
13              Information, or Objects or to
14              Permit Inspection of Premises in
15              a Civil Action
16  Exhibit 3   Court Order dated December 14, 33
17              2024
18  Exhibit 4   Tweet dated July 19, 2023     69
19  Exhibit 5   Tweet dated July 2, 2023      92
20  Exhibit 6   Tweet dated July 17, 2024     92
21  Exhibit 7   Tweet dated November 15, 2024 103
22  Exhibit 8   Video-audio clip              103
23  Exhibit 9   Tweet dated December 30, 2024 122
24  Exhibit 10  Tweet dated November 27, 2024 136
25  Exhibit 11  Calendar                      150
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 38

1              GOODMAN
2  I could review my paystubs. It's, it's -- I'm not
3  actually, I'm not actually specifically familiar
4  with how, you know, that business side of things.
5  I receive a paycheck every month. I'm on what I
6  would consider a retainer, independent contract.
7  He allows me to do other projects if I have people
8  that want to hire me for other things. So I
9  believe I'm an independent contractor and I
10 receive a monthly retainer.
11     Q. Okay. You just said you have paystubs;
12 is that right?
13     A. I think it's all electronic, so I don't
14 know if I have physical paystubs, no.
15     Q. If I ask, would you be able to, you
16 know, access them?
17     A. I'd be, I'd be willing to look. I don't
18 know how long it would take, but I'd be willing to
19 go look and tell you who is, you know, who's
20 actually pay -- you know, what the name is on the
21 checks, if that's what you're asking, if that's
22 what you're requesting, I could get back to you on
23 that, yes.
24     Q. Okay. But you have access to the
25 paystubs, right?

Page 39

1              GOODMAN
2      A. I don't believe so. I mean, I guess,
3  right, legally I probably have access to them. I
4  don't ask for them. So I'm wired money once a
5  month to my -- that's how I receive my...
6      Q. When you get the wire each month, do you
7  know the entity that's named on there, like where
8  you receive the money?
9      A. At this time I couldn't tell you but,
10 again, I'm sure I could go look.
11     Q. How would you check?
12     A. I'd probably just go to my bank, you
13 know, history and I'm sure there's something that
14 says, you know, money received and I could look at
15 who, what that name or entity is.
16     Q. Okay. Is there a reason why you didn't
17 produce those documents in this case?
18     A. Oh, I -- so, again, didn't have, didn't
19 have legal counsel, requested more time and --
20 that's my answer.
21     Q. But you have access to that now?
22     A. Again, what is the relevance of that, of
23 the --
24     Q. Mr. Goodman, I'm the one asking
25 questions.

Page 40

1              GOODMAN
2      A. I'm just asking for --
3      Q. Okay. What efforts did you take to look
4  for documents that were responsive to the document
5  requests you received?
6      A. Again, didn't have legal counsel and
7  didn't believe I had any documents that fit under
8  the -- I didn't believe I had any documents and
9  admittedly I had requested more time that would
10 be -- that were necessary under the -- what I had
11 been sent over.
12     Q. Mr. Goodman, you just testified that it
13 was your belief you didn't have any documents that
14 were responsive; is that right?
15     A. I don't believe I have any documents
16 that, you know, would -- yeah.
17     Q. But did you actually look to see if you
18 had any responsive documents?
19     A. I read what the order said and -- that's
20 not a question of looking, right, it's just
21 thinking -- did I physically look? I, again,
22 right when I think, I don't think I have anything
23 on this, so.
24     Q. Did you physically look for --
25     A. Sorry, it's kind of an interestingly

Page 41

1              GOODMAN
2  worded question and I don't know how to answer.
3      Q. Did you physically look for documents,
4  Mr. Goodman?
5      A. Did I --
6         MR. WOLKINSON: What does that mean to
7     physically look?
8         MR. KNOBLETT: Let me strike that.
9     I'll rephrase it.
10     Q. Did you take any efforts when you saw
11 the document requests that we sent you, did you
12 take any efforts to actually look for documents
13 that were responsive?
14     A. Did I take any effort to look for that
15 were responsive? I, I took -- did I take any
16 effort? I, I -- I intended and will continue to
17 do my best to adhere to all court orders.
18     Q. Mr. Goodman, it's a yes-or-no question.
19 I'll ask it again.
20        Did you take any efforts to look for
21 documents responsive to the document subpoena you
22 received?
23     A. Again, what my belief is, I don't have
24 anything specific to that order, like I don't -- I
25 guess I don't understand. Like I'm taking mental

11 (Pages 38 - 41)

Page 42

1                    GOODMAN
2  effort to respond in a truthful -- in a truthful
3  manner with the intention of abiding by all court
4  orders.
5     Q.  Mr. Goodman, did you look through your
6  email to see if there were any documents that were
7  responsive to the document subpoena?
8     A.  I'm on my email account multiple times a
9  day and I have had a long communication with you
10 guys, right, and so --
11    Q.  Mr. Goodman, these are --
12    A.  I'm on my email every day.
13    Q.  Mr. Goodman, these are yes-or-no
14 questions.  Did you look through your email for
15 documents?  Yes or no.
16    A.  Have I looked through my email for
17 documents?  I mean, I consider that a very vague
18 question.  I mean yes.  The answer is, of course
19 I'm looking through my email for documents.  For
20 example, you know, I had to read these documents
21 you guys were sending over.  That's a long email
22 chain.
23    Q.  Mr. Goodman, we sent you a document
24 request subpoena.  It had a list --
25    A.  Yes, and I --

Page 43

1                    GOODMAN
2     Q.  -- of document requests.  Do you
3  understand that?
4     A.  Yes.
5     Q.  Did you look for documents that would --
6     A.  I had requested more time.  I didn't
7  have --
8     Q.  Please, Mr. Goodman, please let me
9  finish my question and then you can respond.
10         Did you look at those document requests
11 and then go look for documents that would be
12 responsive to those document requests?  Yes or no,
13 please.
14    A.  I didn't have any documents to like --
15 honestly, I'm trying, I'm trying to answer this
16 question.  I don't really understand it.  I'm
17 trying to be truthful here.  Right.  All I can say
18 is, I took the steps I believe had to be taken to
19 abide by the court order and to -- with the
20 intention of acting in good faith.  I've requested
21 more time.  At this time, I think the illness may
22 not have been a factor for this earlier.  I think
23 there's multiple dates that we're talking about,
24 but I had requested more time.  I didn't have an
25 attorney and made some reasonable requests.

Page 44

1                    GOODMAN
2     Q.  Okay.  Mr. Goodman, if you wanted to
3  find a particular email that you had sent or
4  received from Mr. Giuliani, how would you do that?
5     A.  Well, usually we're sitting next to each
6  other.  Right.  He'll send it to me and it will be
7  at the top of my email list.
8     Q.  Okay.  But let's say you want to find an
9  email that is like from a month ago, how would you
10 find that email?
11    A.  What kind of email is it?  Am I
12 searching a word.  Right?  Let's say I'm looking
13 for someone's contact information, right, I would
14 search that person's name in the search area,
15 right.  It depends on what kind email.  What is my
16 starting point when I'm going in?  What's my
17 reference point?  Is it a date?  Right?  Am I
18 looking for a specific email because of a date or
19 am I looking for a specific email because of a
20 name?  Let's say I want to recall an email I sent
21 about Green Bay Packers tickets, I would search
22 Packers tickets.  You get what I'm saying?
23    Q.  I understand.  So there's a way for you
24 to search your email with words?
25    A.  Yes.  There's ways to search your

Page 45

1                    GOODMAN
2  emails, yes.
3     Q.  Did you do that with regards to any of
4  the document requests that we sent you?  Yes or
5  no.
6     A.  Did --
7     Q.  Let me strike that.  Let me rephrase.
8         For the document requests we sent you,
9  did you go to the search area for your email and
10 did you use keywords to search for documents
11 responsive to our subpoena?  Yes or no.
12    A.  I don't recall.
13    Q.  Okay.  How do you not recall?  Earlier
14 you said that you --
15    A.  You're asking for a specific --
16    Q.  -- you believe you had any documents.
17    A.  Again, I just don't recall if at any
18 point in the last month, right -- again, I use my
19 email multiple times a day, and my intention has
20 always been to abide by the court order, you know,
21 with -- and to respect this court and the judge,
22 and that's why I asked for more time.  I didn't
23 have legal counsel.  And --
24    Q.  Mr. Goodman, you keep saying this, and
25 you've said this over email that it's your

12 (Pages 42 - 45)

Page 46

1  GOODMAN
2  intention to abide by court orders; is that right?
3  A. Yeah. Yes.
4  Q. Sorry, we just need affirmative yeses or
5  no on the record.
6      Can you please describe the actual steps
7  that you have taken to comply with the court's
8  orders?
9  A. Communicating with -- with opposing
10 counsel, with you guys, explaining my situation at
11 numerous times. Asking for reasonable extensions.
12 I'm not asking for five months here.
13     Explaining why specifically, whether
14 it's because I didn't have legal counsel or I was
15 facing a severe illness. And in each email I am
16 pleasant, I am respectful, I am professional, and
17 I try to explain myself.
18     And I put on the record, right, the
19 respect I have for this, for the court, and
20 wanting to adhere to the court orders and
21 explaining why I at times was having -- you know,
22 explaining why I felt I just needed more time to
23 comply.
24 Q. Okay. Is there anything else you can
25 think of that you did to comply with -- to attempt

Page 47

1  GOODMAN
2  to comply with the court's orders?
3  A. Communicating with multiple attorneys,
4  right, with you guys. Obtaining legal
5  representation. And thinking back to whether I
6  would have any documents relating to the order and
7  not believing that I had the specific documents.
8  But also, but also, you know, but also requesting
9  additional time for legal counsel and to make
10 sure, right. And so, again, that's -- yeah, so I
11 mean, I'm answering your question.
12 Q. Is there anything else that you haven't
13 mentioned that you did to comply with the court's
14 orders?
15 A. Anything that I haven't mentioned?
16 Again, I'd want to spend some time to think about
17 it, see if, you know -- again, I...
18 Q. As you sit here today, can you think of
19 anything else?
20 A. Again, not believing I had documents
21 relating to this but wanting to make sure of that
22 by obtaining legal counsel and by communicating
23 with you guys for additional time, you know,
24 that's kind of -- that's my answer. I guess I
25 don't understand specifically. I mean, I'm here

Page 48

1  GOODMAN
2  today. Does that answer -- I mean, like I'm
3  trying to explain, right, Tyler, I mean, I'm going
4  to keep answering the same way.
5  Q. Okay. Understood.
6      So you said you obtained legal counsel,
7  is that Mr. Wolkinson?
8  A. Yes.
9  Q. When did you retain --
10 A. That's yesterday. Just yesterday. So,
11 again, I am like -- yes, just yesterday.
12 Q. So just so it's clean for the record.
13 When did you retain Mr. Wolkinson as your
14 attorney?
15 A. Yesterday.
16 Q. Why didn't you retain him as your
17 attorney earlier?
18 A. Why didn't -- I'm sorry, what do you
19 mean?
20 Q. Mr. Goodman --
21 A. Again, I was facing a serious illness.
22 I had communicated with you guys. I was thinking,
23 look, they're professional. These guys are
24 professionals, they'll understand, you know, we'll
25 give him some more time and I -- you know, I was a

Page 49

1  GOODMAN
2  little surprised that that wasn't the position of
3  opposing counsel and so I -- you know, in the
4  meantime I went out and spoke with David to ensure
5  that I am abiding by all court orders, and having
6  legal counsel is important. And so, again, I was
7  communicating with you guys multiple reasons why I
8  had requested a reasonable amount of more time.
9  You know, I'm not -- again --
10 Q. I'm going to move to strike that answer
11 as nonresponsive and, Mr. Goodman, Mr. Goodman,
12 Mr. Goodman, please only respond to my questions.
13 A. So what happens now? You move to strike
14 it and is it stricken or how does this work?
15 Q. I'm not here to testify today, your
16 counsel can answer that.
17     THE WITNESS: David?
18     MR. WOLKINSON: He's just declaring it
19 nonresponsive. It's not actually --
20     THE WITNESS: But it's still going to
21 be on -- what I said is going to be on the
22 record?
23     MR. WOLKINSON: Yes, it's on the
24 record.
25 A. And I totally disagree with you that's

Page 50

GOODMAN

1  
2  nonresponsive. Again, you asked me why I hadn't
3  hired David before yesterday, and I responded,
4  look, I had asked for additional time and I --
5      Q.  Mr. Goodman --
6      A.  -- was working under the idea that you
7  would give me that more time. You guys didn't,
8  and I got legal counsel, and I'm here now with
9  David, you know, has been on for less than
10 24 hours.
11     Q.  Mr. Goodman. Mr. Goodman. You are here
12 today to answer my questions. That's how a
13 deposition works. If you do not answer my
14 questions, then I will move to strike those
15 answers because they are nonresponsive. Do you
16 understand that?
17     A.  I don't understand what that means when
18 you say strike, move to strike it.
19         MR. WOLKINSON:  Can you -- can we take
20     a five-minute break?  I just had somebody
21     knocking at my door in the office.
22         MR. KNOBLETT:  Yes, we can take a
23     break.
24         MR. WOLKINSON:  Okay.
25         MR. KNOBLETT:  That's fine.

Page 51

GOODMAN

1  
2         THE VIDEOGRAPHER:  The time is 1:58.
3     We are off the record.
4         (Off the record.)
5         (Resumed.)
6         THE VIDEOGRAPHER:  The time is 2:05.
7     We are on the record.
8  BY MR. KNOBLETT:
9     Q.  Before I get into some more questions,
10 Mr. Goodman, just so you know, we are entitled to
11 seven hours of time for this deposition.
12    A.  I'd request that we break that -- I'd
13 request --
14    Q.  Mr. Goodman, please let me, please let
15 me finish what I'm saying.
16        We are entitled under the Federal Rules
17 to seven hours of time. If you want to use the
18 next seven hours responding how you have, then we
19 are entitled or we will move to keep the
20 deposition open, which means we could depose you
21 again, so --
22    A.  Why? What do --
23    Q.  Just so you understand that.
24    A.  How am I responding? Please, please
25 expound on how you feel that I'm responding in an

Page 52

GOODMAN

1  
2  inappropriate manner, please.
3      Q.  Mr. Goodman, when I ask questions that
4  have a yes-or-no answer, you should answer with a
5  yes or no.
6      A.  It's not -- Tyler, that's absolutely not
7  the advice you would give your clients, right? If
8  I don't understand the question or if my intention
9  is to answer truthfully, it's not always as simple
10 as, "Here's the question, now answer yes or no."
11     Q.  Mr. Goodman --
12     A.  Right? Do you agree?
13     Q.  -- you don't get, you don't get to
14 hijack the deposition. When I answer questions --
15 I ask you questions and you provide answers. Do
16 you understand?
17     A.  I totally disagree with your
18 characterization that I'm hijacking this
19 deposition and, again, I disagree.
20        MR. WOLKINSON:  You can disagree, Ted.
21     Ted, you can disagree with his
22     characterization of how it's going, but you
23     have to understand that it's a deposition,
24     which is Tyler's deposition.  He's here to
25     answer -- ask questions and you're merely

Page 53

GOODMAN

1  
2  here to answer them. You get that, right?
3        THE WITNESS:  Yes, I get that.
4        MR. WOLKINSON:  Okay. Okay.
5        THE WITNESS:  That's not what I'm --
6     I'm not contesting that. What I'm simply
7     stating, I'm explaining why it's not --
8        MR. KNOBLETT:  Mr. Goodman, let's get,
9     let's get into, let's get into some
10    questions. Okay?
11 BY MR. KNOBLETT:
12    Q.  When did you first meet Mr. Giuliani?
13    A.  First meet? My first meeting with Mayor
14 Rudy Giuliani was, I believe, October of 2018 when
15 I was the communications director for a U.S.
16 Senate candidate in Michigan named John James who
17 is now a member of the U.S. House of
18 Representatives. But I was John's communications
19 director when he ran a senate race against Debbie
20 Stabenow in 2018 and Mayor Giuliani had come to
21 town in support of John, and I had met him, I
22 believe, in Grand Rapids, Michigan. It was very
23 short, right. He wasn't there to meet me. But
24 that's the first time I had met Mayor Rudy
25 Giuliani in person.

14 (Pages 50 - 53)

Page 54

```
 1                GOODMAN
 2     Q.  Okay.  And how did you come to work for
 3  Mr. Giuliani?
 4     A.  So, again -- all right.  I think part of
 5  your thing earlier was that I'm giving -- I'm
 6  answering and I'm taking too long with my answers.
 7         So through, again, multiple meetings and
 8  communications led me to working with Mayor
 9  Giuliani in October of 2022.
10     Q.  So you started working for him in
11  October of 2022?
12     A.  Yes.
13     Q.  Okay.  How often do you speak with
14  Mr. Giuliani?
15     A.  Quite often.
16     Q.  Would you say every day?
17     A.  Most days.
18     Q.  Okay.  And how do you normally
19  communicate with Mr. Giuliani?
20     A.  Talking.
21     Q.  So you're speaking with him in person;
22  is that right?
23     A.  Correct.
24     Q.  Okay.  Do you ever email Mr. Giuliani?
25     A.  Yes.
```

Page 55

```
 1                GOODMAN
 2     Q.  Okay.  And is that from your Ted Goodman
 3  81 gmail.com account?
 4     A.  Yes, yes.  I would say my email
 5  communications with him are not -- are infrequent
 6  and often pertain to our show.
 7     Q.  Okay.  Does Mr. Giuliani read his email
 8  very often?  Strike that.  That's a vague
 9  question.
10         Does Mr. Giuliani normally communicate
11  over email?
12     A.  I'm sorry, can you -- can you get why
13  that's still a little unclear?
14     Q.  Yeah, understood.  Does Mr. Giuliani
15  send his own emails?
16     A.  Like does he send his -- I believe so,
17  yes.
18     Q.  Okay.  And does Mr. Giuliani read his
19  own emails?
20     A.  He's -- does he -- I believe that he has
21  access to his email and does read his emails.  I
22  can't say to the frequency.
23     Q.  Okay.
24     A.  Yeah.
25     Q.  Do you have access to Mr. Giuliani's
```

Page 56

```
 1                GOODMAN
 2  email account?
 3     A.  I don't believe I have access to his
 4  email accounts on any of my devices.
 5     Q.  Okay.  Do you text Mr. Giuliani?
 6     A.  I text him, I don't always get a text
 7  back.
 8     Q.  That's true.
 9     A.  Right?  Hey, it's --
10     Q.  That could happen sometimes.
11     A.  It can.  Part of it's generational,
12  Tyler.  You know, we're younger.  The mayor's
13  young as well.  We're not saying he's old, right,
14  but I do think some of it is generational, right.
15         20-year-olds are texting now, they don't
16  even talk on the phone, they're afraid to be on
17  the phone.
18     Q.  I understand.  Let's keep it to the
19  questions.  It's New Year's Eve, I don't want to
20  waste anyone's time.
21         When you text Mr. Giuliani, do you know
22  the number that you text?
23     A.  Right now I could -- yeah.  Yes, I'm
24  texting his number.
25     Q.  Do you know --
```

Page 57

```
 1                GOODMAN
 2     A.  You're asking me if I -- wait.  Say
 3  that -- you're asking if I --
 4     Q.  What is the phone number you normally
 5  text when you want to text him?
 6     A.  I can't say it right now.  If you want
 7  me to look at my phone, I can.  I believe --
 8     Q.  That's okay.  That's okay.
 9         So when you email Mr. Giuliani, are
10  those emails that you send, are they accessible on
11  your phone?
12     A.  No.
13     Q.  How do you normally view those emails?
14     A.  Oh, my email.  My email comes on my
15  phone, yes, his email comes not on my phone.
16     Q.  Okay.  And the email account that's on
17  your phone, that would have emails that you've
18  sent to Mr. Giuliani, right?
19     A.  Yeah.  I usually am on -- this laptop
20  issue I have, this is where I keep my -- I use
21  email on there.  I'd have to actually check to
22  make sure that everything is up to date on my
23  phone email.
24     Q.  So it's the email's --
25     A.  It's my laptop.  It's this laptop right
```

15 (Pages 54 - 57)

Page 58

```
 1                GOODMAN
 2  here, yeah.
 3      Q.  Sorry.
 4      A.  Sorry.
 5      Q.  Let's try not to crosstalk.  I know it's
 6  hard over Zoom.
 7          So you can access your emails on your
 8  computer, right?
 9      A.  Yes.
10      Q.  Okay.  And you can access your text on
11  your phone, right?
12      A.  Yes.
13      Q.  Again, just verbal answers for the court
14  reporter.
15          When you email Mr. Giuliani, what's the
16  email address that Mr. Giuliani uses?
17      A.  I believe it's
18  truthandjusticeforyou@protonmail.com.
19      Q.  Are you aware of any other emails that
20  Mr. Giuliani uses?
21      A.  I am not.
22      Q.  And that's the only one you know of?
23      A.  That's the only one, yeah, that's the
24  email I use to communicate with him.
25      Q.  Okay.  And do you have access to that
```

Page 59

```
 1                GOODMAN
 2  proton email account?
 3      A.  I do not.
 4      Q.  Okay.  When was the last time you spoke
 5  with Mr. Giuliani?
 6      A.  When is the last time I spoke with him?
 7  Like verbally?  Like in person?
 8      Q.  Yes, in person.
 9      A.  Yesterday.
10      Q.  Mr. Goodman, are you texting right now?
11      A.  I'm checking my phone, I'm not texting.
12      Q.  Mr. Goodman, please put your phone to
13  the side when we're doing the deposition.
14      A.  You're asking me all these questions
15  about my phone, what do you want me to do?
16  Where's your phone, Tyler?
17      Q.  I'm the questioning attorney, so you
18  don't get to ask me questions.  Okay?
19      A.  You get your phone, I don't.  Got it.
20      Q.  It's just for the court record, we'd
21  very much appreciate if you'd put your phone to
22  the side.
23      A.  And for the record, I put my phone --
24      Q.  You can look at it during breaks but not
25  while I'm asking you questions.
```

Page 60

```
 1                GOODMAN
 2      A.  Thank you.  Thank you.  Thank you.
 3      Q.  Okay.  Okay.  When was the last time --
 4      A.  Yesterday.
 5      Q.  So when was the last time you saw
 6  Mr. Giuliani in person?
 7      A.  Yesterday.
 8      Q.  And where was that?
 9      A.  Florida.
10      Q.  Was that at his Palm Beach -- let me
11  start off.  Strike that.
12          If I talk about the Palm Beach condo, do
13  you understand that means his condominium
14  apartment?
15      A.  His residence in Florida, yes.
16      Q.  Okay.  Did you see him at the Palm Beach
17  condo yesterday?
18      A.  Yes.
19      Q.  Okay.  How often are you at the Palm
20  Beach condo?
21      A.  Often.
22      Q.  Would you say it's like a daily visit?
23      A.  We have a visit.  We're working.  We
24  have a -- yes, I would say probably, yes, five,
25  five, yeah.  Yes.
```

Page 61

```
 1                GOODMAN
 2      Q.  So five days a week; is that right?
 3      A.  Give or take.
 4      Q.  Okay.  And you said you're working at
 5  the Palm Beach condo; is that right?
 6      A.  We do our show often from his residence,
 7  yes.
 8      Q.  Is there a studio at the Palm Beach
 9  condo?
10      A.  I mean, we do a live show from the --
11  from his residence and you could, yeah, you could
12  say there's a studio there with all the equipment
13  and stuff that we have, yeah.
14      Q.  And you mentioned shows.  Could you
15  describe what shows Mr. Giuliani has today, like
16  just, you know, currently?
17      A.  We have our 8 o'clock show, America's
18  Mayor Live.
19      Q.  Is there any other shows?
20      A.  Well, we are actually currently
21  transitioning what was the previous 7 o'clock
22  show, so as of right now there's an 8 o'clock
23  show.
24      Q.  Okay.  And is that -- does that
25  8 o'clock show have a different name?
```

16 (Pages 58 - 61)

Page 78

1    GOODMAN
2  answer.
3      A.  Is there a mediator?  How does this
4  work?  So if I'm asking for a break, and you're
5  saying you don't want to give me the break, who
6  then determines if I get a break?
7          MR. WOLKINSON:  Ted, Ted, if you know
8      the answer to question, you have to answer
9      it.  If you don't know, you don't know.
10         THE WITNESS:  I want to talk to my
11     attorney in private.
12 BY MR. KNOBLETT:
13     Q.  Mr. Goodman, when there's a question
14 pending that is unanswered, then we do not take
15 breaks.  Once you answer the question --
16     A.  I can't put a monetary -- I'm answering
17 it -- I can't put a specific monetary value.  For
18 example, in New York --
19     Q.  Mr. Goodman, how much money --
20     A.  -- I would stay with him, and you can't
21 put a monetary value on that, so I'm not
22 prepared --
23     Q.  Mr. Goodman, you discussed receiving
24 paystubs earlier.  You know how much --
25     A.  I did not.  I said, when you said

Page 79

1    GOODMAN
2  paystubs, I said, I'm not sure what
3  compensation --
4      Q.  Mr. Goodman, please let me finish my
5  question.
6          You said you received paystubs earlier.
7  You get money that is put into some account or
8  something; is that right?
9      A.  I am paid a monthly retainer, yes.
10     Q.  How much is your monthly retainer?
11     A.  Again, in addition to that -- and this
12 is why I'm not answering this question.  It's
13 irrelevant.
14     Q.  Mr. Goodman, you have to answer this
15 question because I asked it.
16     A.  And I'm telling you -- all right.  So
17 here's my answer.  Okay.  I have to answer.  I
18 cannot put a monetary value on, for example, in
19 New York I would stay with the mayor --
20     Q.  Motion to strike this answer as
21 nonresponsive.
22     A.  What?  No, I disagree with that.
23     Q.  Mr. Goodman doesn't know how much money
24 he makes from --
25     A.  Because that's not the full compensation

Page 80

1    GOODMAN
2  that I receive monthly from the mayor.
3      Q.  How much money do you receive monthly as
4  compensation, compensation from Mr. Giuliani?
5      A.  Again, I can't put -- I have to go back
6  and calculate based off of a number of, you know,
7  benefits and compensation that I received as part
8  of my work with Mayor Giuliani.
9      Q.  Give me a --
10     A.  Month to month, for example.
11     Q.  Give me a ballpark.  Give me a ballpark.
12 How much -- today's the 31st.  How much money --
13     A.  Under 10,000 -- under -- well, under
14 15,000 a month.
15     Q.  Okay.  Under 15,000 a month.  How about,
16 is it around 10,000 a month?
17     A.  I would say under 10,000 a month.
18 Again, there's a number of factors that played
19 here.  Sorry, something just turned on in my room.
20     Q.  Is it around 5,000 a month?
21     A.  I can't, I can't -- again, month to
22 month I can't get specific on that because of
23 additional compensation, you know, whether it's
24 certain deals through our show, right, that I
25 receive, so that's...

Page 81

1    GOODMAN
2      Q.  Are those -- is that additional
3  compensation, is that stipulated in the contracts
4  that are associated with the show?
5      A.  Frankly, I don't believe I have a
6  written contract with the mayor.
7      Q.  You don't have a written contract with
8  Mr. Giuliani?
9      A.  I can't recall, I can't actually recall.
10     Q.  Do you have -- and I'll get to this
11 later, but do you have a written contract with
12 Standard USA, LLC?
13     A.  I believe that I may have like a
14 2 percent interest in Standard USA.  Again, I
15 think that was brought up to me once and I haven't
16 even heard the name since other than in the court
17 proceedings, but I do believe I was given like a
18 very small percentage of this new entity, but I'm
19 not familiar with anything else in terms of the
20 business operations.
21     Q.  Okay.  So you're a part owner of one of
22 Mr. Giuliani's companies; is that right?
23     A.  Again, I believe I was given a 2 percent
24 interest.  I mean, you can probably tell me if
25 that's the case.

21 (Pages 78 - 81)

Page 82

1                GOODMAN
2      Q.   Why were -- do you know why you were
3   given -- do you know why you were given a
4   2 percent interest?
5      A.   I do not.
6      Q.   What was the discussion around that?
7      A.   I don't recall.  It was very short and I
8   just said okay.
9      Q.   Who told you that you had a 2 percent
10  ownership stake in Standard?
11     A.   I don't recall, but it would be either,
12  you know, it would be one of -- it would be the
13  mayor or Maria.
14     Q.   Okay.  And do you know how much -- do
15  you know if there's any other owners in Standard?
16     A.   I do not.
17     Q.   Do you have --
18     A.   I don't believe so but I don't know for
19  sure.
20     Q.   Do you know if Mr. Giuliani is an owner
21  of Standard?
22     A.   I do not.  I believe so, though, but
23  again, I don't -- but I'm not sure.  I don't want
24  to say these things without knowing.  Again, I
25  don't know these things, I'm not -- go ahead.

Page 83

1                GOODMAN
2      Q.   Okay.  When you were -- when you were
3   given a 2 percent ownership stake in Standard USA.
4      A.   In the short conversation I said sure.
5   I believe I signed a document and that was it.
6      Q.   Do you have access to that document?
7      A.   I do not.
8      Q.   Okay.
9      A.   I'm sure if I asked for it, I could.
10  What do you mean access?  If I asked for it, I'm
11  sure I could get it.
12     Q.   So you could get it if you asked for it?
13     A.   I think.  I don't know...
14     Q.   Okay.  So you mentioned you sometimes
15  get extra money from the show, can you -- could
16  you elaborate, like what do you mean by that?
17     A.   Sponsorships.
18     Q.   Okay.  And do you -- do you get like a
19  monthly salary from Mr. Giuliani?
20     A.   I think we classified it as a retainer,
21  didn't we?
22     Q.   I don't know.  I'm asking you.
23     A.   Again, I believe I'm an independent
24  contractor.
25     Q.   Do you get money personally from the

Page 84

1                GOODMAN
2   sponsorships?
3      A.   Do I get money personally from the
4   sponsorships?  In some cases I have received
5   compensation for sponsorships, yes.
6      Q.   Do you receive that directly from the ad
7   company?
8      A.   Through the show.
9      Q.   Okay.  So --
10     A.   I mean -- sorry, yeah, go ahead.
11     Q.   The money you receive from these
12  sponsorships, do you receive that money from
13  Mr. Giuliani?
14     A.   I don't know if it goes through him and
15  then to me or if it goes from the new sponsor to
16  me, right, I'm not, I'm not on the business side
17  of these things.
18     Q.   Do you know if it comes from one of
19  Mr. Giuliani's companies?
20     A.   I don't, I'd have to look.
21     Q.   Okay.
22     A.   I don't believe so, but I'd have to
23  look.  I don't believe so, I'd have to look,
24  though.
25     Q.   How often --

Page 85

1                GOODMAN
2      A.   Well, it may, right.  Again, if I bring
3   in a sponsor, I don't know how the money gets to
4   me, but it gets to me.
5      Q.   Is the money sent to you by check?
6      A.   Wire.
7      Q.   Wired to your checking --
8      A.   Have I received a check in the last two
9   and a half years through my work with the mayor,
10  I'd have to, I'd have to look back and see to
11  answer that.  I don't know for sure if I ever
12  received a physical check for work related to
13  Mayor Giuliani or the show that we served.
14     Q.   So when you receive payment it's direct
15  deposit, right?
16     A.   I believe so, wire or direct deposit.
17     Q.   Okay.
18     A.   It might be the same thing.
19     Q.   Did you make more money in 2024 compared
20  to 2023?
21     A.   Great question.  I can't answer that
22  right off the top of my head.  Believe it or not,
23  Tyler, I'm not in this for the money.
24     Q.   Have you received a raise this year?
25     A.   A raise?  I don't believe so.  As far as

Page 86

```
 1                GOODMAN
 2   my -- I don't believe so.  I wouldn't count any as
 3   a raise.
 4       Q.  Okay.
 5       A.  That's, yeah, my work with the mayor.
 6       Q.  Have you received a bonus of any kind?
 7       A.  Have I received a bonus?  I'd have to
 8   look back.  I'd have to look back.  Frankly, I'm
 9   not -- I don't check -- maybe it's my own fault --
10   my finances on a day-to-day basis.  I'd have to
11   look.
12       Q.  Okay.  Have you received a bonus in
13   December of this month?
14       A.  Bonus December of this month?
15       Q.  Sorry.  This December.
16       A.  I know, I know, I'm thinking.
17           I don't think so, but I don't believe
18   so, no.
19       Q.  So you're saying --
20       A.  Maybe -- I got a thousand dollars.  I
21   did get $1,000, either Thanksgiving, maybe it was
22   for Christmas, there was no discussion what that
23   was for, but I would guess it was one of those,
24   you know, related to one of those two holidays.
25       Q.  But that thousand dollars was separate
```

Page 87

```
 1                GOODMAN
 2   from your normal monthly salary?
 3       A.  Yeah.
 4       Q.  Okay.  So would you consider that a
 5   bonus?
 6       A.  I'd have to look back specifically if
 7   that was related to a speaking engagement or
 8   something, but as of right now I believe that was
 9   a holiday-related bonus.
10       Q.  Okay.  So overall you're saying you
11   don't really remember if you received a bonus this
12   year?
13       A.  I'm not saying that, I'm saying I got a
14   thousand dollars and as of right now we're sitting
15   here I believe that was a bonus related to the
16   holidays.
17       Q.  Okay.  And do you remember who paid you
18   the $1,000?
19       A.  I believe it was the same -- whether
20   it's the mayor or some entity, you know, that pays
21   my monthly retainer.
22       Q.  Okay.
23       A.  I'm happy to go look at where -- I am
24   happy to go look at the name, you know, where I'm
25   getting my money from.  I'm not trying to be
```

Page 88

```
 1                GOODMAN
 2   evasive here, Tyler.  I can look and tell you who
 3   pays my -- this monthly wire, but right now I
 4   couldn't say, right, but it's -- yeah.
 5       Q.  Okay.
 6       A.  Does that make sense?
 7       Q.  You testified a few minutes ago that you
 8   make somewhere around $10,000 a month; is that
 9   right?
10       A.  Nope.  I said under 10,000.
11       Q.  Okay.  Under 10,000.
12       A.  This is my work with the mayor
13   specifically.
14       Q.  Okay.
15       A.  With the mayor and the show.  It's under
16   10,000.  And, again, I couldn't answer you
17   specifically because -- well, I'm going to stop
18   there.
19       Q.  Okay.  How do you check how much money
20   is in your checking account?
21       A.  An app on my phone I believe is usually
22   how I do it.
23       Q.  Okay.
24       A.  I believe.
25       Q.  How often do you check that?
```

Page 89

```
 1                GOODMAN
 2       A.  Honestly, for the last -- not that
 3   often, probably less than I should.
 4       Q.  Okay.  But you could go on your -- you
 5   could go on your phone and go on the app and you
 6   could see exactly how much money you were paid by
 7   Mr. Giuliani; is that right?
 8       A.  I believe, I believe so.
 9       Q.  Okay.  And so you didn't do that in this
10   case; is that right?
11       A.  Again, why would I have done that?  I,
12   again, have requested, again, more time so I could
13   retain legal counsel and to ensure that I was
14   adhering to the court order and I had requested
15   more time.
16       Q.  Okay.  Well, let's move on.
17           Do you travel with Mr. Giuliani as part
18   of your work?
19       A.  I do.
20       Q.  How often?
21       A.  So a few times a month, maybe.
22       Q.  And does -- is that travel usually by
23   car, airline, can you describe it?
24       A.  Plane.
25       Q.  Plane.
```

23 (Pages 86 - 89)

Page 90

```
1                GOODMAN
2      A.  And cars are involved, right, to get to
3  the planes.  Yeah.
4      Q.  Okay.  And who books that travel?
5      A.  I believe Maria Ryan.  For the most
6  part.
7      Q.  Okay.  And do you know how she pays for
8  it?
9      A.  I do not.
10     Q.  Do you know if she uses her personal
11 credit card?
12     A.  I do not.
13     Q.  Do you know if she uses a company card
14 associated with one of Giuliani's businesses?
15     A.  I do not know.
16     Q.  Okay.  How do you coordinate travel?
17     A.  Depends.  If it's some trips I will --
18 well, I don't usually coordinate travel, right.
19 If it's something I put together, then I will
20 provide the information and then it's coordinated
21 and I get an email that's saying this is the time.
22 This is your plane.  Don't miss the plane.  And
23 then -- so I'm not really coordinating travel.  I
24 wouldn't describe that as my role.
25     Q.  So you have emails that show --
```

Page 91

```
1                GOODMAN
2      A.  Plane.  Plane, plane.  I'm not sure
3  exactly when Delta sends emails and when they
4  don't.
5      Q.  With those emails could you identify
6  which trips are with Mr. Giuliani?
7      A.  I believe so.
8      Q.  Okay.  And you have access to those
9  emails?
10     A.  Again, Tyler, I --
11     Q.  Mr. Goodman --
12     A.  I believe so.  I believe so.
13     Q.  -- yes or no, please.
14     A.  Yes, I believe so.
15     Q.  Okay.  And did you look at any of those
16 emails?
17     A.  I didn't believe that was necessary and,
18 again, I requested more time and explained why,
19 and that's my answer.  It's going to be my answer
20 to all these questions about --
21     Q.  Okay.  Let's continue.
22         Have you purchased any of the travel
23 yourself?
24     A.  Have I ever purchased an airline ticket
25 on my own for myself?
```

Page 92

```
1                GOODMAN
2      Q.  Let me rephrase.
3          Have you ever purchased tickets for
4  travel that was with Mr. Giuliani?
5      A.  Have I ever purchased like for myself?
6      Q.  Related to travel with Mr. Giuliani.
7      A.  I'm sure I have.  I can't recall a
8  specific time, but yes, I have.
9      Q.  Okay.  Do you know if you were
10 reimbursed for that purchase?
11     A.  I do not recall, no.
12     Q.  Do you travel with Mr. Giuliani whenever
13 he's traveling for business?
14     A.  I wouldn't say whenever, but a lot of
15 the times.
16     Q.  Okay.
17         MR. KNOBLETT:  Maggie, could we
18     introduce, it's labeled as Tab 17.
19         THE WITNESS:  May I take a couple
20     bites?
21         MR. KNOBLETT:  Sure.  This will take a
22     second, so go ahead.
23         (Tweet dated July 2, 2023, marked as
24     Exhibit 5, as of this date.)
25         (Tweet dated July 17, 2024, marked as
```

Page 93

```
1                GOODMAN
2      Exhibit 6, as of this date.)
3          THE WITNESS:  Is this a new exhibit?
4          MR. KNOBLETT:  Yes, this is.  It's
5  Exhibit 6.  It'll be marked as Exhibit 6.
6          THE WITNESS:  It's a good one.
7          All right.  I see it.
8          MR. WOLKINSON:  I only see Exhibit 5.
9          THE WITNESS:  Is Exhibit 5 the one
10     with Bannon?
11         MR. KNOBLETT:  I'm sorry.  It's marked
12     Exhibit 5.
13         MR. WOLKINSON:  Okay.
14         THE WITNESS:  With Steve Bannon and
15     Kari Lake, right?
16         MR. KNOBLETT:  Yeah.
17         THE WITNESS:  Yes, I see it.
18 BY MR. KNOBLETT:
19     Q.  Do you recall when this -- do you
20 recognize this document?
21     A.  Do I recognize my tweet where I say, "I
22 stand with Steve Bannon"?
23     Q.  Yes.
24     A.  Yes, I do recognize that.
25     Q.  Do you know when this -- where this
```

Page 94

1          GOODMAN
2  photo was taken?
3      A.  I don't -- yeah, yeah, yeah.  The
4  mayor's residence in Florida.
5      Q.  Okay.
6      A.  I believe -- yeah.  Just judging by
7  that, yeah, yeah.  Again, we do our show every
8  night but I want to make sure I get that, yes,
9  that was at his residence in Florida.
10     Q.  So are you always with Mr. Giuliani for
11 his shows?
12     A.  For the 8 -- we start an 8 p.m. show.
13 Tonight I believe is Episode 572.  And yes,
14 basically every single one of them I've been with
15 him.
16     Q.  You just said you've been with him for
17 nearly every one of his shows; is that right?
18     A.  The shows pertaining to America's Mayor
19 Live, which is an 8 p.m. live stream.  Not every
20 single one, but yes, the vast majority.
21     Q.  Okay.
22         MR. KNOBLETT:  Let's do a different
23     exhibit.  Tab 17.  Let me make sure it's
24     the right one.
25         Yeah, it should be.

Page 95

1          GOODMAN
2         THE WITNESS:  So why are you guys just
3     showing me these now?  Is this appropriate?
4     Is this how these depositions work where I
5     just see them as we go or were we entitled
6     to these before this deposition?
7         MR. WOLKINSON:  Ted, that's something
8     we'll discuss in private, that's not
9     something to be discussed on the record.
10        THE WITNESS:  So I'm going to --
11        MR. KNOBLETT:  Okay.  It should be
12    open now.  It's Exhibit 6.
13        THE WITNESS:  Yeah, so what is the
14    relevance of all this?  You're just
15    bringing up embarrassing tweets of the
16    mayor, is that what this is about?
17        MR. KNOBLETT:  No.
18 BY MR. KNOBLETT:
19     Q.  Okay.  Do you recognize -- do you
20 recognize this document?
21     A.  I, I -- do I recognize what?
22     Q.  Have you opened Exhibit 6?
23     A.  Yeah.
24     Q.  It starts with "Mayor Rudy Giuliani
25 appreciates everyone's --"

Page 96

1          GOODMAN
2      A.  Yeah, yeah, yeah.
3      Q.  You recognize this?
4      A.  I don't get the relevance.
5      Q.  Were you -- do you recall the context of
6  this tweet?
7      A.  What do you mean "the context of this
8  tweet"?
9      Q.  Why did you, why did you draft --
10     A.  Where is --
11     Q.  -- and send this tweet?
12     A.  Could we take a break, please?  I have
13 some questions for my lawyer.
14     Q.  No, I have a question pending.
15        THE WITNESS:  David, I'd like to take
16    a break.
17        MR. WOLKINSON:  I understand that,
18    Ted, and we should have taken a break
19    before because you had asked for it.  But
20    as the counsel has said, you can't take a
21    break in the middle of a question.  So
22    answer the question and then we'll take a
23    break.  I'm trying to look at the exhibit
24    and read it myself right now.  We're
25    talking about Exhibit 6, right?

Page 97

1          GOODMAN
2         MR. KNOBLETT:  Yes.
3      Q.  It says, "Mayor Giuliani appreciates
4  everyone's concerns."
5      A.  Yes.  The mayor, an 80-year-old man, had
6  fallen because there's a dip on the convention
7  floor of the RNC, a significant dip.  Numerous
8  people had tripped, and he had tripped, and I
9  wanted to correct the record because the video was
10 making the rounds, right.  It's nobody wants to
11 be, you know, viral video falling, right, that's
12 not very graceful.  And I think there was some --
13 I wanted to correct the record on why he had
14 fallen, right, so that there wasn't any, any
15 question about why he had fallen.  There was a
16 significant maybe three-inch dip.  I do not
17 understand that design by the RNC to do it.
18        And look, I wanted to be even more
19 scathing towards the RNC and whoever decided to
20 put a walkway with a three-inch -- with a big dip
21 right where the chairs are.  But obviously it was
22 convention time and I didn't want to make a big
23 deal about it, right.  For political reasons I
24 didn't want to put him on blast.  I should have
25 been -- but yeah, that was -- the purpose of that

25 (Pages 94 - 97)

```
                                                    Page 150                                                    Page 152
 1            GOODMAN                                            1            GOODMAN
 2      A.  You had mentioned that, yes.                         2        THE WITNESS:  It's a little gear,
 3      Q.  Yeah.  And one of those proceedings                  3   yeah, it's the second little icon.
 4   involves his Palm Beach condo?                              4        MR. KNOBLETT:  You can rotate it
 5      A.  His residence in Florida, you did                    5   clockwise.
 6   mention that, yes.                                          6        THE WITNESS:  It starts in February, I
 7      Q.  If I use the phrase "homestead," do you              7   do not see January on here.
 8   know what that refers to?                                   8   BY MR. KNOBLETT:
 9      A.  Generally speaking, but I'm not an                   9      Q.  Okay.  This is marked as Exhibit 11.
10   expert, I'm not a lawyer.                                  10   Are you familiar with this document, Mr. Goodman?
11      Q.  Okay.  Okay.  Let's --                              11      A.  I am not.
12        MR. KNOBLETT:  Maggie, if you could                   12      Q.  I mean, a moment ago you said it was a
13   put up Tab 21, and this will be Exhibit 11,                13   calendar and the way you said that indicated you
14   I believe.                                                 14   did recognize this.
15        (Calendar marked as Exhibit 11, as of                 15      A.  When did I say I recognized it.  This is
16   this date.)                                                16   the first time I'm seeing it.
17        THE WITNESS:  This is a calendar.  You                17      Q.  So it's your testimony that this is the
18   guys got this sideways, though.                            18   first time you're seeing this document?
19        MR. KNOBLETT:  Yeah, I know.                          19      A.  You're now -- you're saying that I
20        THE WITNESS:  So I'd have to put my                   20   previously had referenced this document?
21   head like that.  Is there any way you guys                 21      Q.  My mistake, Mr. Goodman.
22   can flip that 90 degrees?                                  22      A.  Okay.
23        MR. KNOBLETT:  Let me see if this                     23      Q.  When we opened up the document a few
24   flips it for you.                                          24   moments ago, you said, "Oh, this is a calendar,"
25        THE WITNESS:  Do you get what I'm                     25   and I --

                                                    Page 151                                                    Page 153
 1            GOODMAN                                            1            GOODMAN
 2   saying?                                                     2      A.  I said, "Oh, this is a calendar," yes,
 3        MR. KNOBLETT:  Yeah.  Do you see in                    3   literally I'm just voicing that this is a
 4   the Exhibit Share there's kind of a toolbar                 4   calendar.  Yeah, this is a physical calendar.  I'm
 5   next to the --                                              5   not saying I recognize it from any time before,
 6        THE WITNESS:  Yeah.                                    6   I'm just saying, I spoke out loud that I'm looking
 7        MR. KNOBLETT:  -- exhibit.                             7   at a calendar here.
 8        THE WITNESS:  I see the toolbar, yeah.                 8      Q.  So you don't recognize this document?
 9        MR. KNOBLETT:  Do you see the one                      9      A.  I do not.
10   that's like a file with the settings --                    10      Q.  Okay.  Do you -- was there any time when
11        THE WITNESS:  Yeah.                                   11   you were asked to collect dates for Mr. Giuliani's
12        MR. KNOBLETT:  -- like a gear?                        12   location?
13        THE WITNESS:  Yeah.                                   13      A.  I may have assisted in collecting or
14        MR. KNOBLETT:  If you click that, you                 14   like -- or like kind of, and I don't believe I
15   can --                                                     15   ended up doing it, but, you know, looking at what
16        THE WITNESS:  Got it.  Okay.  Perfect.                16   days and where our show was, was done that day,
17        MR. KNOBLETT:  Okay.                                  17   right.  So just, you know -- yeah, you know, we
18        THE WITNESS:  I appreciate your help                  18   have our show five days a week, where was this
19   on that.                                                   19   show done each night.  I believe I delegated that
20        MR. KNOBLETT:  No worries.  We want,                  20   to some volunteer friends of ours and they may be
21   we want a clean record.                                    21   the ones that put this together.  I've never seen
22        MR. WOLKINSON:  How do you do that                    22   this.
23   again?  Is it that one?                                    23      Q.  Do you know who those friends are?
24        MR. KNOBLETT:  There's a toolbar near                 24      A.  I don't want to speculate on who it was.
25   where the --                                               25   I mean, I probably could guess.
```

Page 154

```
 1                GOODMAN
 2      MR. CAMMARATA:  No.
 3      A.  I don't know for sure who ended up
 4  putting this together.
 5      MR. CAMMARATA:  Please, don't guess at
 6  anything.  It's a deposition.
 7      MR. KNOBLETT:  Mr. Cammarata,
 8  Mr. Goodman can respond how he wants.
 9      MR. CAMMARATA:  I understand that,
10  but --
11      THE WITNESS:  Yeah, but it's his job.
12      Q.  Okay.
13      A.  I don't, I don't know who put this
14  together.
15      Q.  Okay.
16      MR. KNOBLETT:  Maggie, could you bring
17  up Tab 46.
18      Actually, I think we introduced this
19  already -- no, we didn't.  So yeah, Tab 46,
20  and this will be Exhibit 12.
21      (Defendant Rudolph W. Giuliani's
22  Pretrial Disclosures Pursuant to Federal
23  Rule of Civil Procedure 26(a)(3) marked as
24  Exhibit 12, as of this date.)
25
```

Page 155

```
 1                GOODMAN
 2  BY MR. KNOBLETT:
 3      Q.  Okay.  This is somewhat of a long
 4  document.  It's like 400 pages but we're only
 5  concerned with some of it.
 6      A.  Okay.
 7      Q.  This might take a moment.  I need to
 8  find where we're talking about.
 9      Okay.  If you scroll about, I don't
10  know, 30 percent of the way down.
11      A.  Give me a page number.
12      Q.  Roughly page 91, and there'll be a
13  series of photos.
14      A.  Yeah.  Yes, those are pictures of our
15  show.  Like I said, I do recall, yeah, being asked
16  to help kind of determine where our shows were
17  done and so these -- that's what these pictures
18  show.
19      Q.  Okay.  Do you recognize these photos?
20      A.  I do.
21      Q.  Okay.  Did you take these photos?
22      A.  I believe a lot of them I did.
23      Q.  And are these photos located on your
24  phone?
25      A.  I believe my work -- well, I have
```

Page 156

```
 1                GOODMAN
 2  multiple phones.  I believe so, yes.
 3      Q.  You said you have multiple phone; is
 4  that right?
 5      A.  I only have one that I use for work, so
 6  yeah.
 7      Q.  Okay.  But you have a personal phone
 8  too; is that right?
 9      A.  I don't really, I don't class -- I don't
10  necessarily separate it like that, but yeah.
11      Q.  You have two phones; is that right?
12      A.  I have one working phone number, that's
13  what I'll say.
14      Q.  All right.  Do you communicate with --
15      A.  I take pictures.  I have one working
16  phone number.
17      Q.  Okay.  Do you communicate with
18  Mr. Giuliani on more than one phone?
19      A.  I do not.
20      Q.  How many physical phones do you have?
21      A.  I have old phones from years ago that
22  aren't relevant to this.
23      Q.  How many --
24      A.  I have one phone.
25      Q.  How many --
```

Page 157

```
 1                GOODMAN
 2      A.  One physical phone.
 3      Q.  Okay.  How many phones are next to you
 4  right now?
 5      A.  One phone.
 6      Q.  Okay.  Were these photos taken on that
 7  phone?
 8      A.  I believe so, yes.
 9      Q.  Okay.  So you -- are those photos -- are
10  these photos that we're looking at -- and you can
11  scroll down if you want.
12      A.  Yes.
13      Q.  -- are they located on that phone today?
14      A.  I don't, I don't know, I'd have to look.
15      Q.  Okay.  Is it your understanding that
16  these photos show Mr. Giuliani's location at
17  various times?
18      A.  I mean, any phone -- any photo is
19  portraying -- can you please rephrase that?
20      Q.  Okay.  So if you look at the first, if
21  you look at the first photo here, it says January
22  of 2024, you see that?
23      A.  February 8, 2024, yeah.
24      Q.  Okay.  So what -- I'm going to ask a
25  slightly different question.
```

Page 158

```
 1                   GOODMAN
 2       What was the purpose of you collecting
 3   these photos?
 4       A.  Originally, I --
 5       MR. WOLKINSON:  Objection.
 6       A.  I take pictures every day, a lot of
 7   days, right, in the general course of business.
 8   I'm very proud of the show I started with Mayor
 9   Rudy Giuliani, America's Mayor Live, and
10   oftentimes I'll use these photos.  A lot of these
11   are photos of us on our set, right, and I'll use
12   those as thumbnails for that day's show and I'll
13   go on and post it.  Or maybe I'll send it to
14   somebody who's coming on our show so they can
15   tweet it out, you know, X post it out to tease
16   their audience, "Hey, I'm going to be on with
17   Mayor Giuliani tonight."  There's a lot of reasons
18   why.
19       I believe Mayor Giuliani is a historic
20   figure and even just for posterity purposes I like
21   to take pictures.
22       Q.  Okay.  So my question wasn't really why
23   you took the photos, my question -- and I'll
24   rephrase it -- is why were --
25       A.  It was.  That was the question.
```

Page 159

```
 1                   GOODMAN
 2       Q.  My question, my question was why you
 3   collected these photos.
 4       A.  Why did you collect, yeah.  You got to
 5   collect the photo, you got to take the photo,
 6   right.
 7       Q.  Let me rephrase.
 8       Were you asked to collect these photos
 9   by Mr. Giuliani's counsel?
10       MR. CAMMARATA:  Objection.
11       A.  I wasn't.
12       Q.  But these photos are from your phone?
13       A.  I believe most of them are, yes.
14       Q.  Okay.  This set of photos -- let's
15   scroll through them.
16       So this first one's January 8, 2024.
17       A.  There's a lot prior.  Yes.
18       Q.  There's about 30 of these.
19       A.  Okay.
20       Q.  Do you recognize taking this photo?  Yes
21   or no.
22       A.  Yes.  I don't -- again, I take a lot of
23   photos.
24       Q.  Do you recognize --
25       A.  I recognize the style.  If you notice,
```

Page 160

```
 1                   GOODMAN
 2   it's the computer screen, right, and he's
 3   beyond -- you cut off part of the photo -- maybe I
 4   cut off part of the photo.  But if you notice
 5   above, right, it's him, so it's like a creative
 6   shot.  I'm getting a picture of the screen and
 7   then he's beyond the screen, and it's just
 8   something that I do each night for posterity
 9   purposes for the show, right.
10       Q.  When you take photos of Mr. Giuliani, do
11   you only take those photos when you're in Florida
12   with him?
13       A.  Do I only take -- what kind of question
14   is that?  What do you mean?
15       MR. CAMMARATA:  Objection.
16       Q.  Mr. Goodman, please answer.  I can
17   rephrase it, if you want.
18       A.  Yes.
19       Q.  Do you only take photos of Mr. Giuliani
20   when you are in Florida with him?
21       A.  No.
22       Q.  Do you take photos of Mr. Giuliani when
23   he's in New York?
24       A.  I do have photos of myself with Mayor
25   Giuliani in New York just as I do in -- yes.  Yes.
```

Page 161

```
 1                   GOODMAN
 2       Q.  What about New Hampshire?
 3       A.  Presumably.
 4       Q.  What about when you were in Wisconsin
 5   for the RNC?
 6       A.  Yes.
 7       Q.  And Chicago for the DNC, what about
 8   there?
 9       A.  Yes.
10       Q.  Do you take photos of Mr. Giuliani when
11   he's in D.C. for legal proceedings?
12       A.  Not inside the courtroom.  If the judge
13   says no camera, I don't, I'm not breaking the law
14   there.
15       Q.  Have you taken --
16       A.  You're not getting me on that one,
17   Tyler.
18       Q.  Have you taken a photo of Mr. Giuliani
19   in D.C.?
20       A.  I believe so, yes.
21       Q.  Okay.  So let's go through these photos.
22       A.  Okay.
23       Q.  So we did the first one there.  Let's go
24   down to the second one that says January 9th.
25       A.  I believe that is Harry from Harry's.
```

Page 162

1  GOODMAN
2  Q. And what is -- what is Harry's?
3  A. I believe it's -- isn't it a nice
4  establishment in New York and then he opened one
5  here in West Palm Beach.
6  Q. Do you know --
7  A. Good guy.
8  Q. Was this photo taken in New York?
9  A. No. The photo was taken in Florida.
10 That's at Harry's new location in Florida.
11 Q. How do you know this was taken in
12 Florida?
13 A. I do believe I took this photo and I was
14 at that meal.
15 Q. Okay. So this -- okay. So you took
16 this photo?
17 A. I believe so, yes.
18 Q. Okay. Let's move on to the next one.
19 A. Okay.
20 Q. That says, "Is Hunter Biden
21 intentionally sabotaging, et cetera." Do you
22 recognize this one?
23 A. I don't think that was case looking
24 back, by the way. Yeah, I guess I recognize it.
25 Q. Did you take this photo?

Page 163

1  GOODMAN
2  A. I think so.
3  Q. But you can't say for sure?
4  A. I mean, it's my style, right. I'm going
5  to go ahead and guess, yeah, people don't take
6  pictures like I do.
7  Q. Okay. Let's move on to the next one,
8  it's a photo of Mr. Giuliani in a blue shirt.
9  A. Yep.
10 Q. Do you recognize it?
11 A. I recognize it and you can recognize the
12 railing in the back, right, that's his Palm Beach
13 residence.
14 Q. Do you see at the top of the photo it
15 sort of has like a toolbar that you'd see on a
16 phone?
17 A. Yeah.
18 Q. Is that the same toolbar on your phone?
19 A. I'd have to look, I believe so.
20 Q. Okay. What type of phone do you have?
21 A. Android.
22 Q. Okay.
23 A. I'm not trying to mislead you on this.
24 I'm pretty sure --
25 Q. No, I know, I know. I'm just asking

Page 164

1  GOODMAN
2  questions.
3  A. Okay. Okay.
4  MR. CAMMARATA: What exhibit are you
5  guys looking at because I can't see that
6  photo?
7  MR. KNOBLETT: Okay. It's Exhibit 46
8  but it's quite a ways down. It's your,
9  Mr. Cammarata --
10 MR. CAMMARATA: Can you give us a page
11 number?
12 THE WITNESS: I'll look.
13 MR. KNOBLETT: We're currently on 70.
14 THE WITNESS: 69 or 70, yeah.
15 MR. CAMMARATA: I have marked exhibits
16 that only go up to Exhibit 12.
17 MR. KNOBLETT: Yeah, this is
18 Exhibit 12.
19 THE WITNESS: Exhibit 12, page 70.
20 MR. KNOBLETT: Mr. Cammarata, this is
21 the disclosed witnesses that Mr. Giuliani
22 filed on the 23rd.
23 MR. CAMMARATA: Okay. Yeah. And
24 you're on page 70 where the photos are?
25 MR. KNOBLETT: Yes. Yes.

Page 165

1  GOODMAN
2  MR. CAMMARATA: All right. Let me --
3  MR. KNOBLETT: And I apologize. I
4  think I said Exhibit 46 earlier but this is
5  Exhibit 12.
6  MR. CAMMARATA: Yeah, I was going to
7  say I'm missing --
8  MR. KNOBLETT: We have internal
9  numbering too.
10 MR. CAMMARATA: Okay. Hold on.
11 THE WITNESS: And this is confusing.
12 You have a different numbering system
13 internally.
14 MR. KNOBLETT: Yeah, we don't know
15 what order we're going to state.
16 THE WITNESS: It gets confusing.
17 MR. CAMMARATA: That's why you got to
18 be real smart to work in the firm.
19 MR. KNOBLETT: Yeah, we're on page 69
20 or 70, so let me know when you're there,
21 Mr. Cammarata.
22 MR. CAMMARATA: Oh, 69. Exhibits --
23 okay. Yeah, I got it.
24 MR. KNOBLETT: Okay.
25 MR. CAMMARATA: I'm there.

42 (Pages 162 - 165)

Page 218

```
 1              GOODMAN
 2       THE WITNESS:  Why isn't this part of
 3   the record?  Let the record show that I was
 4   cut off at the end here.
 5       THE VIDEOGRAPHER:  Because there's no
 6   question pending.
 7       MR. KNOBLETT:  Mr. Goodman.
 8   Mr. Goodman, you're represented by counsel.
 9   I did not ask a question.
10       THE WITNESS:  As a professional
11   courtesy, Tyler, if you're allowed to make
12   some comments at the end for the record,
13   I'm asking out of professional courtesy --
14       THE VIDEOGRAPHER:  Actually, that's
15   your counsel.
16       THE WITNESS:  I would also like to
17   make some comments --
18       MR. KNOBLETT:  Mr. Goodman, no.
19       THE WITNESS:  -- for the record.
20   Okay.  And you're saying no.
21       Let the record show that Tyler has
22   declined my reasonable request to have a
23   few comments made here.
24       MR. KNOBLETT:  Mr. Wolkinson, could
25   you please control your client.
```

Page 219

```
 1              GOODMAN
 2       THE VIDEOGRAPHER:  If there are no
 3   further questions, counsel, I will conclude
 4   the video recording for this proceeding.
 5       Here ends Media Unit No. 4.  This
 6   concludes the video-recorded virtual remote
 7   deposition of Theodore Goodman taken by the
 8   plaintiffs on Tuesday, December 31, 2024.
 9   The time is 5:27 p.m. Eastern Standard
10   Time.
11       We are going off the record.
12       (Off the record.)
13       (Stenographic and video-recorded
14   deposition adjourned 5:27 p.m.)
```

Page 220

```
 1
 2            C E R T I F I C A T E
 3
 4       I, JOSEPHINE H. FASSETT, a Registered
 5   Professional Reporter, Certified Court Reporter, and
 6   Notary Public, do hereby certify that the witness,
 7   whose stenographically recorded remote virtual
 8   deposition is hereinbefore set forth, was first duly
 9   sworn by me on the date indicated, and that the
10   foregoing stenographically recorded remote virtual
11   deposition is a true and accurate record of the
12   testimony given by such witness.
13       I FURTHER CERTIFY that I am not employed by nor
14   related to any of the parties to this action by
15   blood or marriage, and that I am in no way
16   interested in the outcome of this matter.
17       IN WITNESS WHEREOF, I have subscribed my hand
18   this 2nd day of January, 2025.
19
20
21   _____
     JOSEPHINE H. FASSETT, RPR, CCR
22   NCRA License No. 32148
     CCR License No. 30XI00098400
23   New York Notary Public
     New Jersey Notary Public
24
25
```

Page 221

```
 1
 2         CERTIFICATION OF WITNESS
 3
 4       I, THEODORE C. GOODMAN, hereby certify that I
 5   have read the transcript of my testimony taken under
 6   oath in my stenographically recorded remote virtual
 7   deposition on December 31, 2024, and that the
 8   transcript is a true, complete and accurate record
 9   of my testimony, and that the answers on the record
10   as given by me are true and correct, subject to the
11   changes and/or corrections, if any, shown on the
12   attached page.
13
14
         _____
15            THEODORE C. GOODMAN
16
17   Subscribed and sworn to before me this_____ day
18   of_____, 2025.
19
20       _____
             Notary Public State of
21
22
23
24
25
```