# EXHIBIT 12

P163FRE1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   RUBY FREEMAN and WANDREA MOSS,

4                Plaintiffs,

5          v.                          24 CV 6563 (LJL)
                                       24 MC 353 (LJL)
6   RUDOLPH W. GIULIANI,

7                Defendant.            Hearing
    ------------------------------x
8                                      New York, N.Y.
                                       January 6, 2025
9                                      10:00 a.m.

10  Before:

11                     HON. LEWIS J. LIMAN,

12                                     District Judge

13                         APPEARANCES

14  WILLKIE FARR & GALLAGHER LLP
         Attorneys for Plaintiffs
15  BY:  AARON E. NATHAN
         MERYL GOVERNSKI
16       MICHAEL GOTTLIEB
                   -and-
17  PROTECT DEMOCRACY
    BY:  RACHEL E. GOODMAN
18
    CAMMARATA & DE MEYER P.C.
19       Attorneys for Defendant
    BY:  JOSEPH CAMMARATA
20

21

22

23

24

25

P163FRE1

1          (Hearing resumed; case called)

2          MR. NATHAN:  Good morning.  Aaron Nathan from Willkie

3  Farr & Gallagher for the plaintiffs.  I'm joined again by my

4  colleagues Meryl Governski, Michael Gottlieb, and Rachel

5  Goodman from Protect Democracy, and a law clerk from our firm

6  who will be assisting us with the presentation.

7          THE COURT:  Good morning.

8          MR. CAMMARATA:  Joseph Cammarata, Cammarata & De Meyer

9  P.C. for the defendant Rudolph W. Giuliani.  And with me I have

10  my law partner Suzanne De Meyer just to assist me and also my

11  paralegal.  Good morning.

12          THE COURT:  Good morning, Mr. Cammarata.  And I see

13  Mr. Giuliani on the monitor.

14          Mr. Giuliani, can you see us and can you hear us or

15  can you see me?

16          THE WITNESS:  I can, your Honor.  I can see you fine

17  and I can see the lawyers also.

18          THE COURT:  And Mr. Giuliani, if at any point you

19  cannot see us or you cannot hear us, you'll let us know; is

20  that correct?

21          THE WITNESS:  I will, your Honor.

22          THE COURT:  If you do not, then we are going to assume

23  you can see and hear the proceedings.  Is that understood?

24          THE WITNESS:  Understood.

25          THE COURT:  Mr. Cammarata, I understand that your

P163FRE1

1    client is appearing today remotely at your request.  Is that

2    correct?

3              MR. CAMMARATA:  That's correct, your Honor.

4              THE COURT:  And you waive any objections based upon

5    the fact that he's not here present in person; is that right?

6              MR. CAMMARATA:  I do.

7              THE COURT:  Then unless the parties have anything for

8    me, we can proceed with Mr. Cammarata's redirect.

9              Mr. Nathan, do you have anything for me before we

10   proceed?

11             MR. NATHAN:  No, your Honor.

12             THE COURT:  Mr. Cammarata, do you have anything before

13   for me before we proceed?

14             MR. CAMMARATA:  There may be one issue I'd like to

15   bring to the Court's attention.  There might be one or two

16   documents I may have to, if possible, call Mr. Nathan, recall

17   him to testify on one or two documents.  Otherwise I may have

18   to try and introduce those documents myself, if I intend to.

19             THE COURT:  Well, I'll address that when the time

20   comes, but you'll have to justify for me why it is that you're

21   entitled to recall him.  That's assuming that the plaintiffs

22   object to that.  But let's proceed with Mr. Giuliani's

23   examination.

24             MR. CAMMARATA:  I understand, thank you.

25             THE COURT:  You may proceed.

P163FRE1

1          THE WITNESS:  Your Honor?  Do you want me to report to

2     you on the efforts that I made about finding what I could over

3     the weekend and the efforts I made or do you want me to wait?

4     It's up to you.

5          THE COURT:  I want you to play witness and not lawyer.

6     Mr. Cammarata will choose to ask the questions that he chooses

7     to ask.

8          THE WITNESS:  Okay.  Thank you.  I just want you to

9     know I have them.  Some.

10         MS. GOVERNSKI:  The only question is whether we're

11    dealing with the turnover at all and if he's eliciting

12    questions, should we do all of that today?

13         THE COURT:  I'm not inclined to do that today.  But

14    I'll hear from you.  In other words, if they offer testimony

15    about compliance with the turnover order, I'm not going to

16    require the plaintiffs to cross-examine Mr. Giuliani.  I made

17    it clear on Friday that you would be under no obligation to

18    cross-examine Mr. Giuliani, and I'm going to stick to that.

19    But, depending on where we stand in terms of time, if you want

20    to do it, I'll listen to you.

21         Mr. Cammarata, why don't you proceed.  And please

22    proceed from the podium.

23         MR. CAMMARATA:  From the podium?

24         THE COURT:  Yes.  You can move the podium if it is

25    easier for you with the electronics.

1              Is there a way we can have a simple backdrop of

2    Mr. Giuliani without the flag behind him?  Can you take that

3    down, sir?

4              THE WITNESS:  Sure.  It might take a moment or two.

5    But, a different -- that's just the one we use for the show.

6    But okay.  Find a simple background.

7              THE COURT:  Just a simple background.  Or the

8    background where you are.

9              THE WITNESS:  We could just keep it black.

10             THE COURT:  Any objection to keeping it black,

11   Mr. Nathan?

12             MR. NATHAN:  Objection to a black background?  No.

13             THE COURT:  Go ahead, Mr. Cammarata.  Thank you,

14   Mr. Giuliani.

15             THE WITNESS:  Is that okay?

16             THE COURT:  Yes.  Thank you, sir.

17    RUDOLPH W. GIULIANI,

18        having been previously sworn, testified as follows:

19   REDIRECT EXAMINATION

20   BY MR. CAMMARATA:

21   Q.  Good morning, Mayor Giuliani.

22   A.  Good morning, Mr. Cammarata.

23   Q.  Regarding your prior counsel Kenneth Caruso, were you asked

24   to provide documents to your prior attorney Kenneth Caruso?

25   A.  Yes, sir.

P163FRE1                          Giuliani - Redirect

1    Q.  What were you asked to provide to your prior attorney, if

2    anything?

3    A.  I was asked to provide documents to him, particularly at

4    the beginning, but I can't tell you exactly which ones.  I also

5    at times, he explained things to me and I raised questions with

6    him, and then there came a period of time I'm a little hazy

7    about when, when he literally stopped calling me and was

8    communicating with me through other lawyers and through

9    Dr. Ryan.  And I tried to get him directly, and he just

10   wouldn't return my calls.

11   Q.  Okay.

12   A.  So it broke down, it broke down.  For half the time it

13   worked and half the time it broke down.  That's about the best

14   I can do in giving you an analysis of.

15   Q.  Please explain the relationship between you and Kenneth

16   Caruso in October 2024 and November 2024.

17            THE COURT:  Can we be a little more precise in terms

18   of the time?  That's a pretty broad time frame in terms of this

19   case.

20   Q.  Mayor Giuliani, please explain the relationship between you

21   and Kenneth Caruso during the first two weeks of November 2024.

22   A.  I'm -- could you help me with when he first entered the

23   case?  Just give me that date.  Because I could use that date

24   and that would help me divide up the months.

25            MS. GOVERNSKI:  Objection, your Honor, to --

```
 1          THE COURT:  Sustained.
 2   A.  I can't tell you exactly what it was like on November on
 3   July -- do a calculation of how long the relationship seemed
 4   perfectly normal and then when the relationship changed.
 5          I'll do it backwards.  It would seem to me that by the
 6   beginning of November, we were in a situation where he wasn't
 7   communicating, he wasn't returning my calls or taking my calls.
 8   Q.  How often did you attempt to call Mr. Kenneth Caruso?
 9   A.  Sometimes one time a day, sometimes two.  Possibly three.
10   But one or two for sure, and I can't say every day, but almost
11   every day.  And then I would receive messages from him, from
12   Gary Rosen, and I would receive messages from him from
13   Dr. Maria, possibly seems to me someone else gave me a message
14   from him too, but I can't remember who it was.
15   Q.  And those messages, those messages were never directly sent
16   to you; is that correct?
17          MS. GOVERNSKI:  Objection.  Leading.
18          THE COURT:  Sustained.
19   Q.  Were those --
20   A.  They were indirectly.  I'm sorry.
21   Q.  I have to repeat the question.
22          Were any of those messages that you just described
23   sent to you directly?
24   A.  Well, they weren't face-to-face or voice-to-voice.  They
25   were sent through another person for me, and I received it in
```

P163FRE1                           Giuliani - Redirect

1   that form.

2   Q.  Explain why the documents in this matter were produced to

3   plaintiffs after I became your counsel.

4           MS. GOVERNSKI:  Objection.  Leading.

5           THE COURT:  Sustained.  Both because it's leading and

6   it presumes facts not in evidence.

7   Q.  Mr. Giuliani, what actions did you take after learning

8   about the Court order for providing documents for discovery?

9           MS. GOVERNSKI:  Objection.  Vague.

10          THE COURT:  Sustained.

11  A.  Well, it would depend.

12          THE COURT:  The objection is sustained, Mr. Giuliani.

13          THE WITNESS:  Oh, I'm sorry.  Excuse me, your Honor.

14  Q.  When you learned about the Court order regarding discovery

15  in this proceeding, what did you do?

16          MS. GOVERNSKI:  Objection.  Lack of foundation,

17  leading.

18          THE COURT:  Let's establish that there came a time

19  that he learned of an order and what the order was that you're

20  saying that he learned of.

21          MR. CAMMARATA:  Okay.

22          Your Honor, I have this 429-page document up on the

23  screen shared with the Court and my client.  I would like

24  marked as Plaintiff's Exhibit A -- I'm sorry, I mean

25  Defendant's Exhibit A for identification.

P163FRE1                    Giuliani - Redirect

1           THE COURT:  Do you have a copy for me?  Or do you want
2    to identify it for me?
3           MR. CAMMARATA:  Yes.  It is docket no. 143.
4           THE COURT:  In which case?
5           MR. CAMMARATA:  In the homestead action CV 6563.
6           THE COURT:  Hold on for a second.  That's
7    Mr. Giuliani's declaration, is that right, plus the
8    attachments?
9           MR. CAMMARATA:  Yes.
10          THE COURT:  Any objection?
11          MS. GOVERNSKI:  Yes.  We would object to his
12   declaration as hearsay.
13          THE COURT:  Didn't I already receive his declaration?
14   I think I did.  It's already in evidence.  The declaration is
15   in evidence and the documents are not in for the truth of the
16   matter but for authenticity purposes until you establish, offer
17   them for the truth.
18          MS. GOVERNSKI:  We don't understand how he can offer
19   an out-of-court statement to his client for the truth.
20          THE COURT:  He testified to it on Friday.  He affirmed
21   to the truth of all of the statements that were in it, and you
22   had the opportunity to cross-examine him.  It's already in
23   evidence.
24          MS. GOVERNSKI:  Okay, your Honor.
25          MR. CAMMARATA:  Your Honor, for housekeeping I'm going

P163FRE1                          Giuliani - Redirect

1    to be referring to the exhibits in here.  Would you like me to

2    individually put each exhibit that I intend to use from the

3    declaration into separate evidence?

4              THE COURT:  Well, if you're going to offer them for

5    anything other than the fact that I gather these were documents

6    that your client says were produced.

7              MR. CAMMARATA:  Yes.

8              THE COURT:  That's the sole purpose for which you're

9    offering them.  Not for the truth of any statements contained

10   in them.

11             MR. CAMMARATA:  No, just for what was produced.

12             THE COURT:  Any objection to the document being

13   treated as a whole?

14             MS. GOVERNSKI:  No, as long as it's not for the truth.

15             THE COURT:  Okay.  Go ahead, Mr. Cammarata.

16   Q.  Mayor Giuliani, what's on the screen right now is a

17   document that's been premarked or is Defense Exhibit A.

18   A.  Yes, sir.

19   Q.  Do you see that up on the screen?

20   A.  I see it.

21   Q.  What do you recognize that document to be?

22   A.  That was, I see the first page of it, and that is the

23   document, the declaration that I submitted and testified about

24   on Friday.

25   Q.  Now, I'm going to slowly scroll down to page 5.  Is that

P163FRE1                        Giuliani - Redirect

1   your signature on the document?

2   A.  Yes, sir, that's my Docusigned signature.  I can always

3   tell.

4   Q.  I'm going to direct your attention to the top-right portion

5   of the document whereby it is Bates stamped.  Do you see where

6   it says Defendant's Exhibits 1/6/2025 007?

7   A.  At the very top?  Yes, I do see that.

8   Q.  What do you recognize this document to be?

9   A.  This was a response.  As it says, this is an amended

10  response, so some additional responses to the plaintiffs' first

11  set of interrogatories.  Some additional information that they

12  asked for that originally we objected to and then provided.

13  Q.  When you say "they," what do you mean?

14  A.  Oh.  The plaintiffs.

15  Q.  If we go down, going to scroll down to page 13.  Can you

16  please tell me the date of that document.

17  A.  It looks like I signed it on December 7, 2024.

18  Q.  I'm sorry.  One more page.  Can you tell me what this page

19  is.

20  A.  The page I'm looking at now is the title, the title page

21  with the title of the action and the beginning of -- this is

22  the verification page.

23  Q.  Is that your signature on the page?

24  A.  If you move it up just a little.  I know it's my signature,

25  but I'm only looking at it.

P163FRE1                    Giuliani - Redirect

1            Now I can tell you for sure it's my signature.

2    Q.  What's the date next to your signature?

3    A.  It says December 7, 2024.

4    Q.  You recall providing this response?

5    A.  Yes, I do, I recall providing it and testifying about it.

6    Q.  Mr. Giuliani, as I scroll within this document, I'm going

7    to scroll and just -- I'd like to direct your attention to

8    interrogatory 3.

9    A.  Yes, I see that, sir.  I see the question.  The

10   interrogatory.

11   Q.  Okay.  Please read into the record what was provided under

12   interrogatory 3(a.)?

13            MS. GOVERNSKI:  Objection.

14            THE COURT:  Sustained.  I don't need him to read the

15   record.

16            MR. CAMMARATA:  All right.

17   Q.  Mr. Giuliani, it seems that there is Exhibits 1 to 17 in

18   this interrogatory response.  Do you see that?

19   A.  Yeah, I don't see it.  I remember it.  I've gotten to

20   Exhibit 13 in what you've shown me, but I do remember we

21   testified about this quite a bit on Friday.  This is Exhibit 1

22   to 17.

23   Q.  Did you provide these documents in response?

24   A.  Either I did or one of my associates who found it, right.

25   More or less I did, but couple of these were probably found by

P163FRE1                          Giuliani - Redirect

1    Ted or Dr. Maria.

2    Q.  And these documents were provided to plaintiffs; is that

3    correct?

4              MS. GOVERNSKI:  Objection.  Leading.

5              THE COURT:  Overruled.  Overruled.

6    Q.  Who were these documents provided to?

7    A.  To plaintiffs.

8    Q.  I'm sorry.  We can go back to the previous question.

9              Were these documents provided to plaintiffs?

10             THE COURT:  I've got it.

11             MR. CAMMARATA:  I didn't hear what he said, I'm sorry.

12             THE COURT:  He said "yes."

13   Q.  Okay.  Mayor Giuliani, I'd like to direct your attention to

14   the screen and it is --

15   A.  Yes, sir.

16   Q.  -- top-right corner.  It's Bates stamped Defendant's

17   Exhibits 1/6/2025 at 176.  Do you see that?

18   A.  I do.

19   Q.  Can you tell me what this document is, please.

20   A.  It's the response to the first set of interrogatories.

21   Plaintiffs' first set of interrogatories.  It is a verification

22   page apparently.

23   Q.  Can you please tell me if that's your signature on this

24   document?

25   A.  If you just move it down, I bet I can.  Yes.  That's my

P163FRE1                    Giuliani - Redirect

1   signature.

2   Q.  Please tell me the date on this document.

3   A.  That's December 1, 2024.

4   Q.  Were these responses submitted to plaintiff?

5   A.  Yes, yes, they were.

6   Q.  Mayor Giuliani, I'd like to direct your attention to the

7   screen whereby it's projecting Bates stamp 184.  Do you see

8   this document?

9   A.  I do, I do, 1/6/2025, 184.  Is that it?

10  Q.  Yes.

11  A.  Okay.  I have it, yes, sir.

12  Q.  Can you please tell me what document this is.

13  A.  Well, this would be the second amended response to

14  plaintiffs' first set of interrogatories to provide the

15  information that was in dispute in the first.

16  Q.  Regarding interrogatory 4, did you provide a response?

17  A.  Number 4.

18  Q.  Did you provide a response?

19  A.  Yes, sir, I see it.  May I ask is that the first one in

20  this affidavit?  Yes.  Okay, thank you.  Okay.

21  Q.  Regarding interrogatory 4, do you see where it says a

22  second amended response on the screen?

23  A.  Well, I don't because my screen is smaller, but I remember

24  it, yeah.

25  Q.  Now, was this response provided to plaintiffs?

P163FRE1                           Giuliani - Redirect

1    A.  Yes, sir.

2    Q.  I'm going to scroll a little bit further down.  Do you see

3    where it says interrogatory number 8?

4    A.  I do.

5    Q.  Did you provide a response to interrogatory number 8?

6    A.  Yes, sir, it's right there.  It's right under second

7    amended response.

8    Q.  Okay.

9    A.  I had originally objected to this --

10   Q.  Okay.

11   A.  -- and you convinced me that it fell within the judge's

12   order and there was no --

13           THE COURT:  So, let me --

14   A.  -- privilege or whatever.

15           THE COURT:  Either I'm going to strike that testimony

16   or --

17           THE WITNESS:  I'm sorry, your Honor.

18           THE COURT:  Or you've waived your privilege.

19           MR. CAMMARATA:  You can strike.  I consent to striking

20   that.  I actually move to strike it on my own, your Honor.

21   Thank you.

22           THE WITNESS:  I apologize, your Honor.

23   Q.  The portion of the screen that I have up, can you please

24   tell me what this document is.

25   A.  Yeah.  That's the verification to the first set of

P163FRE1                    Giuliani - Redirect

1   interrogatories.

2   Q.  What's the date on that?

3   A.  I'm sorry, but I don't see a date on what I have in front

4   of me.

5   Q.  If I move up the screen.

6   A.  Mine is not -- there it is.  December 17, 2024.

7   Q.  Is that your signature to the right of it?

8   A.  Yes, sir.

9   Q.  Thank you.

10  A.  You're welcome.

11  Q.  Bear with me.  I'm pulling up another document.

12          Mayor Giuliani, do you see the document on the screen

13  that I have up right now?

14  A.  If you can make it a little bigger, yes, I do.

15  Q.  Can you tell me what this document is.

16  A.  The document says defendant's third amended response to

17  plaintiffs' first set of interrogatories.

18  Q.  Now, can you tell me under where it says third amended

19  responses to interrogatories, what interrogatory was answered?

20          MS. GOVERNSKI:  We would object to the use of this

21  document as not in evidence yet.

22          MR. CAMMARATA:  That's fine.  This is separate.  I'll

23  introduce it into evidence.

24          Your Honor I have this three-page document I would

25  like premarked as Defendant's Exhibit B for identification.

P163FRE1                          Giuliani - Redirect

1    Let the record reflect it is up on the screen for the Court and

2    for Mayor Giuliani to see.

3              THE COURT:  Do you have a copy for me?

4              MR. CAMMARATA:  Yes, I do, your Honor.

5              THE COURT:  You may approach.

6              Do plaintiffs have a copy of Defense Exhibit B?

7              MR. CAMMARATA:  Let the record reflect I'm passing a

8    copy of the proposed Exhibit B and passing one to the bench.

9              THE COURT:  What is the purpose for which you're

10   offering this?

11             MR. CAMMARATA:  The purpose I am offering this is to

12   show that it was submitted to plaintiffs' counsel and in

13   compliance with the request and the Court order to respond to

14   said interrogatories.

15             THE COURT:  In other words, you're not offering this

16   for the truth, but you are offering this as a document you

17   produced to the plaintiff.  Is that correct?

18             MR. CAMMARATA:  Yes, in compliance with your Honor's

19   order.

20             THE COURT:  That's to be seen.

21             MR. CAMMARATA:  Okay, I understand.

22             THE COURT:  Is there any objection to it being

23   received not for the truth, but for the fact it was turned over

24   to the plaintiffs?

25             MS. GOVERNSKI:  We object because it's outside of the

1    scope and irrelevant to the current proceeding before the

2    Court, because the record on the interrogatories is closed and

3    the current proceeding before the Court is relating to his

4    responses or his deficient responses to the RFPs.

5           THE COURT:  That is true that I closed the record with

6    respect to the rogs.  But I'll permit you to ask some questions

7    about it on the basis of it being a motion to reopen, and then

8    I'll consider after I hear the testimony whether I'm prepared

9    to reopen.

10          MR. CAMMARATA:  So your Honor, I'm offering it to

11   show --

12          THE COURT:  I understand the reason why you're

13   offering it.  Go ahead.

14   Q.  Mayor Giuliani, do you see where it says interrogatory

15   number 4?

16   A.  Yes, sir, I do.

17   Q.  Did you provide a response to interrogatory 4 within this

18   document?

19   A.  Yes, it's right below, third amended response.

20   Q.  If I scroll a little bit further down, do you see where it

21   says interrogatory 8?

22   A.  No.  If I move my document I can.  I do, I see it now, yes.

23   Q.  Did you provide a response to interrogatory 8?

24   A.  Yes.

25   Q.  If I scroll a little bit further down, can you tell me what

P163FRE1                    Giuliani - Redirect

1    page this is.

2    A.  That's the verification page.

3    Q.  Did you sign this page?

4    A.  I did.

5    Q.  What's date on this page?

6    A.  December 31, 2024.

7    Q.  Mayor Giuliani, do you see I put what's been previously

8    admitted into evidence which is Defense Exhibit A back on the

9    screen.  The declaration of Rudolph Giuliani.  Do you see that?

10   A.  I do, yes.  Yes, sir, I have the first page of it.

11   Q.  Can you please tell me what this document is.

12   A.  Well, that's the document that was the --

13   Q.  Do you want me to move it up a little bit?

14   A.  No, no.  It is what it says it is.  That's the first

15   response to their -- to the plaintiffs' set of interrogatories.

16   I think it is the first response.  That's what it says.

17          THE COURT:  It is the document request and I can take

18   notice of that.

19          MR. CAMMARATA:  Yes, thank you, your Honor.

20   Q.  I'd like to direct your attention to Bates stamp

21   page 189 of --

22   A.  I see it.

23   Q.  -- of Exhibit A.

24   A.  Yes, sir.

25   Q.  Okay.  Did you respond to this document request?

P163FRE1                        Giuliani - Redirect

1   A.  I did to the best of my ability and my understanding of

2   whatever privileges I had.

3           THE COURT:  Mr. Cammarata, if all you're doing is just

4   authenticating the document, then you've already authenticated

5   the documents as his responses.

6           MR. CAMMARATA:  Okay.  Within the whole --

7           THE COURT:  In other words, I'm prepared to accept

8   that a document that says defendant's responses to the first

9   set of document requests were defendant's responses to the

10  first set of document requests.

11          MR. CAMMARATA:  Appended to the declaration is

12  acceptable?

13          THE COURT:  Yes.

14          MR. CAMMARATA:  Thank you, your Honor.  Okay.

15          Your Honor, I would like document number 165 in the

16  homestead case 6563 marked as Defense Exhibit B.

17          THE COURT:  You already have Defense Exhibit B.

18          MR. CAMMARATA:  I'm sorry, C.  Defense Exhibit C.

19          THE COURT:  Okay.  165?  Is that what you said?

20          MR. CAMMARATA:  Yes, your Honor.

21          THE COURT:  Any objection?

22          MS. GOVERNSKI:  Well, your Honor, this is a court

23  document.  We would suggest it should be treated the same way

24  as the other court documents, which is taken for judicial

25  notice as filed on the docket.

P163FRE1                    Giuliani - Redirect

1          THE COURT:  I'm prepared to do that, but I'm also

2     prepared to allow counsel to mark it as an exhibit, again, not

3     for the truth of the matter but for the fact that it is a

4     document that was filed on the docket and that it represents a

5     letter that Mr. Cammarata sent to the Court.

6          Go ahead, you can use it as Defense Exhibit C for the

7     proposition that this is a letter that you sent to the Court

8     with Exhibits 1 to 22 attached.

9     Q.  Mr. Giuliani, I'd like to direct your attention to what's

10    been marked as Defendant's Exhibit C.  You see this document?

11    A.  Yes, sir.

12    Q.  Do you recognize this document to be a letter that was

13    uploaded on ECF in connection with this case?

14    A.  Well, I can't tell you where it was uploaded, but I see it

15    is a letter in the case, yes.

16    Q.  I'd like to direct your attention to page 3, Bates stamped

17    003.  Do you see that?

18    A.  No, I don't.  I see the last page up on the top.  It is

19    page 3 of 3?

20    Q.  Yes.  That will work.

21    A.  Okay, I have that page.  I have page 3 of 3.

22    Q.  Now, if you look at letter (a), can you please read letter

23    (a) into the record.

24          THE COURT:  No.  I can read it.

25    Q.  So, Mayor Giuliani, letter (a) --

P163FRE1                        Giuliani - Redirect

1          THE COURT:  I'm sensitive to everybody's time

2     including your time, the witness's time, my time and

3     plaintiffs' counsel's time.  You don't need to read documents

4     into the record.

5     Q.  Mayor Giuliani, regarding letter (a) to letter (g), these

6     are appended exhibits to this letter.  Did you provide this,

7     these responses to plaintiffs?

8     A.  Yes, although they say they were mine, I worked with you in

9     answering them, yes.

10    Q.  You recognize these documents to be ones provided to

11    plaintiffs you just testified to; is that correct?

12         MS. GOVERNSKI:  Objection.  Asked and answered.

13         THE COURT:  Overruled.

14    A.  Yes.

15    Q.  These documents are in the same and similar condition as

16    when you transmitted them to plaintiffs as filed on ECF; is

17    that correct?

18         MS. GOVERNSKI:  Objection.  Leading, lacks foundation,

19    lack of personal knowledge.

20         THE COURT:  Sustained.  Also on 401 grounds.

21    Q.  Mayor Giuliani, did you make any efforts to comply with

22    orders of this Court?

23         MS. GOVERNSKI:  Objection.  Leading.  Vague.

24         THE COURT:  Overruled.

25    A.  Yes, many.

P163FRE1                    Giuliani - Redirect

1    Q.  And you made efforts to comply with discovery orders; is

2    that correct?

3    A.  I tried each time to do it to the best of my ability, yes.

4    Q.  Can you explain whether you willfully violated any court

5    orders.

6            MS. GOVERNSKI:  Objection.  Leading, calls for legal

7    conclusion.

8            THE COURT:  Overruled.  You can cross on it, but it's

9    also of limited weight.  The witness's self-serving statement

10   is of limited weight.  But it's relevant.  Go ahead.

11   A.  I never purposely tried to hide or leave out a document.

12   There were somewhere I engaged in long conversations about the

13   propriety of --

14           THE COURT:  Hold on a second.  Mr. Cammarata, your

15   client is about to again talk about conversations with you, I

16   gather.  Because he didn't have conversations with me about his

17   discovery obligations, and ethically he could not have had

18   conversations with plaintiffs' counsel.  So I assume when he

19   says he had lengthy conversations, he was talking about with

20   you.  Which I'm perfectly prepared to hear about, but it comes

21   with consequences.

22           MR. CAMMARATA:  I'll withdraw that question.

23           THE WITNESS:  I could limit it.

24   Q.  You could respond.

25   A.  I had questions about some of them as to the propriety, the

P163FRE1                    Giuliani - Redirect

overbreadth.  It seemed very similar to what was done in the

first part of this litigation with massive requests, very hard

to answer, where no matter what you do you would give an

incomplete answer.

        That wasn't true of all the interrogatories.  But

there were some that, in my experience, were traps.  So those I

was wary about, and the rest I answered and attempted to get

more clarification on the others.

Q.  Did anyone instruct you to disregard discovery court

orders?

        MS. GOVERNSKI:  Objection.  Leading, hearsay.

        THE COURT:  Well, if that question is asked, then I'm

going to permit inquiry into the discussions between

Mr. Cammarata and Mr. Giuliani.

        MR. CAMMARATA:  I'll withdraw that question.

Q.  Who assisted you in complying with discovery court orders?

A.  Well, my lawyers, first -- mostly Mr. Caruso.  I didn't

deal with his associate, rarely, and then again, with

Mr. Caruso, at first, fairly normally and then rarely.  With

you, Mr. Rosen, and then I had assistance from some of my

co-workers, Dr. Maria Ryan and Ted Goodman.  That would be the

main ones.

        There might have been someone else or two that I

called to ask if they knew where a document was or from my past

life to help me try to find documents that I either found or

P163FRE1                        Giuliani - Redirect

have yet to find.  I could go back and try to probably figure

out who they are.

There was no conversation other than do you remember

where a certain document was, because some of them go back to

when I left my first law office, my second law office,

Washington, and even when I left mayor.  And different people

conducted those, those endeavors.  So I talked to several of

them.

Q.  Mayor Giuliani, how many cases are you a defendant in

currently?

A.  I'm going to get it wrong.  But I'll try to do my best.

I'm in two criminal cases, in Arizona and Georgia in a

RICO case.  I'm in a longterm litigation with Dominion for a

couple of billion dollars in damages.  There are two parts to

that case, so it's more like two cases.  But I've been served

with lots of document requests and I've never been deposed and

it's been 4 years.

Smartmatic is a similar case, less, the damages are

less.  The allegation's similar.  And I have been deposed in

that case, and I have, I think we've completed, I think we're

at the summary judgment stage in that case.  Dominion we've

gone nowhere with it.  Meaning they've gone nowhere with it.

I'm in a case with an employee of Dominion named

Mr. Coomer, along with many, many other people whose names

would be familiar as the people who represented and worked with

P163FRE1                     Giuliani - Redirect

 1   President Trump.  President Trump may be in that case as well

 2   as he is in the Georgia case.  And that involves, it involves

 3   more than this, but I think with regard to me, it only, it

 4   involves statements that I made that he believes were untrue,

 5   and it's a broader case than this, but as to me it is a case

 6   with defamation.

 7          I'm also involved in -- I was involved for a long

 8   period of time while this was going on, a case brought by

 9   Hunter Biden in I think it was the Middle District of

10   California.

11          THE COURT:  How many cases was the witness a defendant

12   in.  Is that right?

13          THE WITNESS:  These are all the ones in which I was a

14   defendant, not just a co-conspirator, your Honor.  These are

15   ones in which I had to produce documents or answer in some way.

16          THE COURT:  The question is where you were a

17   defendant.

18          THE WITNESS:  Okay.  Same thing.

19          THE COURT:  Let's try to limit the witness's answers

20   to the questions being asked and avoid the volunteering.

21   Q.  Please quantify the amount of cases you're actively

22   involved in.

23   A.  I'm trying to do that.  The one in California had been

24   dismissed.  But I was involved in it coterminous with the

25   discovery obligations in this case.

P163FRE1                    Giuliani - Redirect

1              I was involved in a case, I was a defendant along with

2    ex-President Trump and his son Donald J. Trump and Professor

3    Goodman and numerous other people in the District of Columbia

4    brought by the J6 Committee.  That one, that one, after

5    discovery and a motion for summary judgment was dismissed as to

6    me.  So that one is gone.

7    Q.  Is it safe to say that there --

8    A.  There is also a case in the New York Supreme Court brought

9    by a woman who claims she worked for me.  She is suing me for

10   various kinds of abuse when she worked for me, and I'm required

11   to do discovery in that case.  But this is the third time she's

12   brought such a case against people, and she's well known for

13   doing this, and we're at the stage now in making a motion to

14   dismiss.

15             So for summary judgment.  I probably am missing during

16   the period of time, well, no, he just asked me which ones was I

17   a defendant in.

18             There also were several investigations that required a

19   great deal of discovery during this period of time of a

20   criminal or regulatory nature.

21   Q.  Okay.

22   A.  I think that completed it.  I will just ask for leave to

23   amend it when I read it.  I might remember another case or two.

24   Q.  Are there any active cases that are on appeal?

25   A.  Yes.  Well, this case of course and the brief has been

P163FRE1                    Giuliani - Redirect

 1    submitted but, so yes, it's on appeal.  The Coomer case, the

 2    one in Arizona is on appeal.  Some portion of the Smartmatic

 3    case is on appeal.  Probably another one.

 4              My present recollection would be that group of cases

 5    are on appeal, others are at some portion of motion for summary

 6    judgment, and some others haven't been started yet.  Even

 7    though they're 4 years old.

 8              I'm sorry, there is also a case that I brought in the

 9    State of New Hampshire against President Biden for defamation

10    when he referred to me in the last debate in the 2020 election

11    as having produced the hard drive as an agent of the Russian

12    government.  Which I was absolutely not.  That is awaiting him

13    stepping down as president, for there has been a complaint and

14    answer and discovery will start after the president leaves the

15    office.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

P16VFRE2                    Giuliani - Redirect

1           (Answer continued)

2    A.  Also two bar association proceedings that were very active,

3    in some cases more active than the cases in the -- sorry, in

4    the 1st Dept. Appellate Division, New York Supreme Court, and

5    in the District of Columbia.

6    BY MR. CAMMARATA:

7    Q.  Mayor Giuliani, describe how these proceedings have

8    impacted you, if at all.

9           MS. GOVERNSKI:  Objection.  Vague.

10          THE COURT:  Sustained.

11   Q.  Describe the day-to-day -- your day-to-day life in

12   responding to discovery demands in these cases.

13          MS. GOVERNSKI:  Objection.

14          THE COURT:  Sustained.

15          The useful way of asking the question is beginning

16   with a who, what, when, sometimes how, not describe, which

17   calls for a narrative.

18   Q.  How has your day-to-day life been -- how is your day-to-day

19   life in responding to discovery in these cases?

20   A.  It's varied, because as all of you lawyers know, things go

21   up and down, up and down.  So some days -- some days it's

22   completely impossible, because there are conflicting demands

23   for material or even appearances on the same day.  And then

24   there will be a period of time in which it's less -- I can't

25   say that every day is hell.  I could say that 30 or 40 percent

P16VFRE2                        Giuliani - Redirect

1   make it impossible to function what you would like to call an

2   efficient way.  And particularly as I ran out of money, to have

3   the kind of staff that Willkie Farr has.

4           MS. GOVERNSKI:  We would move to strike that last

5   answer.

6           THE COURT:  Motion is granted.

7           There's a reason why Willkie Farr has as many lawyers

8   they have in this case.  The docket in this case demonstrates

9   it.

10  Q.  Mayor Giuliani, I have up on the screen, which I would like

11  marked as Defense Exhibit D, I'd like to direct your attention

12  to the Bates stamp, Defendant's Exhibit, January 6, 2025, page

13  003.  Do you see that?

14  A.  I do see that, yes.

15          THE COURT:  What are we using this document for?  Is

16  this with respect to the turnover motion?

17          MR. CAMMARATA:  It's just to further show compliance

18  with discovery.

19          THE COURT:  Okay.  Go ahead.

20          MR. CAMMARATA:  And I believe this was also offered in

21  this case as well.

22          THE COURT:  Go ahead.

23          MR. CAMMARATA:  Okay.

24  Q.  Mayor Giuliani, do you recognize this document?

25  A.  Well, I recognize it because I saw it in court the other

P16VFRE2                        Giuliani - Redirect

1   day.  I don't recognize it contemporaneous with the dates

2   there.

3   Q.  Okay.

4   A.  But I do recognize it either in court or in preparation for

5   court.

6   Q.  I'm just going to scroll through this document.

7        What do you recognize this to be?

8   A.  Well, after the fact, I can do with it what you can do with

9   it, which is I can read it.  And it looks like -- I don't know

10  if you'd call it an invoice, a packing order, a bill.  It looks

11  like charges for the work that they did in collecting my

12  property and putting it in the warehouse, or possibly putting

13  it in one warehouse because there was too much of it, and then

14  moving it to a second.  That's the best I can make of it, on a

15  number of different dates or several different dates.

16  Q.  I'd like to direct your attention to page 007.  Do you see

17  007 on your screen?

18  A.  Not yet.  Now I do.

19  Q.  What is the title of this document?

20  A.  Well, that's Mickey Mantle's number.

21  Q.  No, the title of the document at the top.

22  A.  I'm sorry.  I was just -- the title of the document is

23  "Inventory Summary."

24  Q.  And this was presented to the plaintiffs --

25        MS. GOVERNSKI:  Objection, your Honor.

1              THE COURT:  Overruled.

2              Is there any dispute that this was part of the

3    discovery?

4              MS. GOVERNSKI:  No, your Honor.

5    Q.  You can answer the question.

6    A.  As far as I know, I mean, obviously I either signed it or

7    signed off on it; and then somebody else did the filing of it,

8    which I assumed happened.

9              Of the document, I have to tell you, I hope I made it

10   clear last time when I saw it, I don't remember the pictures

11   here at the end.  Number one, I don't remember them.  And

12   number two, they seem kind of indistinct to me.

13   Q.  Okay.  I'm going to pull up another document.

14   A.  I'd just add to it, I can probably identify them, but I

15   have to do some work looking at them very carefully only

16   because I know them.

17   Q.  We're not going to do that in this proceeding.

18   A.  Okay.  I just want you to know that.

19             THE COURT:  Mr. Cammarata, I can take judicial notice

20   of -- and I think it will be stipulated, I'm sure plaintiffs

21   will stipulate as to the documents that were turned over in

22   discovery and when they were turned over.

23             MR. CAMMARATA:  Okay.

24             THE COURT:  Am I wrong about that, that the plaintiffs

25   will stipulate as to the documents that were turned over in

P16VFRE2                    Giuliani - Redirect

1   discovery and when they were turned over?

2            MS. GOVERNSKI:  We would stipulate to when they were

3   turned over.  But to that particular document, it's a little

4   bit thornier than that, your Honor.

5            THE COURT:  Okay.  All right.  I was wrong.

6            Mr. Cammarata, maybe you can work on moving it along.

7   Long pauses --

8            MR. CAMMARATA:  I will.  It's just a little cumbersome

9   with the computer screen.

10           Your Honor, I'm holding a document that I am sharing

11   on the screen.  If the Court needs a hard copy of it --

12           MS. GOVERNSKI:  I don't have a copy of it.

13           MR. CAMMARATA:  I'll move on from this document right

14   now.

15   BY MR. CAMMARATA:

16   Q.  Mayor Giuliani, what is your explanation for not complying

17   with any court orders requiring you to respond to discovery?

18   A.  In some cases I couldn't find the documents.  In some

19   cases -- well, going back earlier, I wasn't aware of some of

20   them.  More lately, since you've been involved, the only ones I

21   didn't respond to were ones that I can't find or I wanted

22   clarification of, because I thought that a -- well, I think

23   I've explained that when I testified, I thought they were

24   either too broad and would require me to give an answer that

25   necessarily had to be false — and as you know, I don't trust

P16VFRE2                    Giuliani - Redirect

1    the plaintiffs not to use that as some form of perjury or -- or

2    possible discovery for other cases, like when they ask me for

3    all the lawyers that I talked to in the last five years.  Many

4    of those were highly sensitive conversations having absolutely

5    nothing to do with this case.  So I had real concerns about

6    that.  Doctors less so, but also wondered why.

7            Those are the ones that -- two types:  Ones where I

8    can't find it; and the second where there was a -- at least

9    from my point of view, a principal objection that I stated.

10   But the vast majority of things I turned over, and I think

11   we've turned all that -- I think now we've turned all that

12   over.  But a few more items, some of which I have found, some

13   of which I haven't found.  But maybe with one exception, I'm

14   pretty confident I can figure out where they are by using my

15   prior expertise as a detective.  I'm pretty certain we can

16   supply them with almost everything they asked for.  I can't

17   promise everything, but very, very close to it.  And some of

18   it --

19           THE COURT:  Mr. Giuliani, there's not a question

20   pending.

21           THE WITNESS:  I'm sorry.

22   Q.  What steps have you taken to diligently comply with

23   discovery in a reasonable manner?

24           MS. GOVERNSKI:  Objection.  Leading.  Vague.

25           THE COURT:  No.  Overruled.

P16VFRE2                         Giuliani - Redirect

1    A.  Well, it begins with trying to get to understand the nature

2    of the discovery.  Some of it's very easy, some of it I would

3    give directly to Ryan Medrano, because he would have

4    possession, particularly economic documents, particularly with

5    regard to Giuliani, my prior businesses.

6         In the case of my current business, Dr. Ryan and Ryan

7    Medrano have almost overlapping information.  Probably Ryan has

8    more about the economics of it, and Dr. Ryan does about the

9    contracts and production, although Ted Goodman also.

10        So if the things related to things that they know

11   about and I don't, I would give it to them.  And then some of

12   them go back to my prior life.  So I would ask them to call --

13   to call someone who has knowledge of my papers or -- I mean,

14   that's basically what I would do.  Or I would go through my own

15   papers, like when I was in New York, in New York; and when I

16   was here, here.

17        Oh, and also -- yeah, that's it.  I think that's --

18   may have missed something, but that's basically what I would

19   do.  I would ask people to help me, I would help myself, and

20   then we'd isolate the things that we couldn't find or the

21   things where we thought there was a privilege or abuse in the

22   asking of a question.

23   Q.  So your testimony indicated that you relied on others to

24   help you in this action; is that correct?

25   A.  Of course.  I followed the procedure here that I followed

P16VFRE2                    Giuliani - Redirect

1    in every one of the other cases.  And when I say "in this

2    case," I mean the original case in the District of Columbia and

3    this case.  And this is the only case in which there have been

4    motions for contempt with regard to discovery.  In all the

5    others, which are very heavily litigated and required a lot of

6    discovery, I didn't have that problem.

7            THE COURT:  Is there a motion to strike that last

8    testimony?

9            MS. GOVERNSKI:  Yes, I would move to strike.

10           THE COURT:  All right.  That's granted.

11           Let me instruct you, Mr. Cammarata, to instruct your

12   client to just answer the question being asked.

13   Q.  Mayor Giuliani, if you could just stick to answering as

14   succinct as possible, the Court would appreciate it for a clean

15   transcript and making its determination.

16   A.  I'm sorry.

17   Q.  What other times in your life have you utilized the

18   assistance of others to help in day-to-day document retrieval

19   requests?

20           MS. GOVERNSKI:  Objection.

21           Leading.  Calls for a narrative answer.

22           THE COURT:  Overruled.

23   A.  Oh, my goodness.  Probably from the time I became the chief

24   of staff to the deputy Attorney General, increasingly the scope

25   of what you do becomes greater and greater.  You get more

P16VFRE2                    Giuliani - Redirect

1    assistance and you tend to rely on them to do almost anything

2    but the final decision-making.  So that progressed.  Certainly

3    not when I was an assistant U.S. Attorney or law clerk; had to

4    do the work yourself.

5           But when I became -- when I became the chief of staff

6    to Judge Tyler in the Justice Department, there were thousands

7    of people reporting to us.  And I had to direct his people, so

8    I relied on them.

9           And then when I became -- when I became the U.S.

10   Attorney, the same thing was true in the Southern District.

11          Then when I became mayor, it got to a degree almost

12   impossible to describe.

13          And then when I was in business, I ran -- my law firm

14   I started five years after I left practice.  I originally

15   started a security business that was worldwide and the second

16   most highly rated security business in the world.  And I had a

17   large staff and I relied on them for everything.  I mean,

18   that's been true throughout this situation.

19          So if I got a request for something, I'd give them as

20   much information as I had about it and I would say, Handle it.

21          It becomes a habit.

22   Q.  Regarding your representation -- the representation of your

23   prior attorney, Kenneth Caruso, what was the time frame he told

24   you that discovery responses were due?

25   A.  I don't remember.

P16VFRE2                          Giuliani - Redirect

1          Can I make a general comment to put that in proper

2     context --

3               THE COURT:  No.

4     A.  About Mr. Caruso?

5               THE COURT:  No.

6     A.  No?  All right.

7               THE COURT:  You can just answer the questions that are

8     being asked.

9               THE WITNESS:  Yes, your Honor.

10              MR. CAMMARATA:  I withdraw that question.

11              THE COURT:  No, you've asked it and it was answered.

12              MR. CAMMARATA:  I'm sorry.

13              THE COURT:  Next question.

14              MR. CAMMARATA:  I apologize.

15              THE COURT:  Mr. Cammarata, are we coming close to

16    conclusion?

17              MR. CAMMARATA:  Yes.

18    BY MR. CAMMARATA:

19    Q.  Was there ever a time -- withdrawn.

20              Can you explain whether you were acting in good faith

21    in responding to plaintiffs' discovery demands and

22    interrogatories?

23    A.  Yes, absolutely.  I did the best I could given the

24    reservations that I said that I had, which I expressed and

25    tried to work out.

P16VFRE2                        Giuliani - Redirect

1    Q.  Were there any circumstances that prevented you from

2    complying with court orders?

3    A.  That's a very hard question to answer.  There were times in

4    which there were competing demands where you could -- and it

5    was -- yes, there were times in which there were.  But I'm

6    not -- I can't even be certain, because there were so many

7    cases and so much confusion that it involved this case or

8    another case.  But there were times where two things were due

9    at the same time or a lawyer -- a lawyer -- a lawyer quit and

10   we had to -- I don't think I've described that either, the

11   chaos of lawyers getting threatened and quitting.

12            So, yes, there were times in which maybe it was

13   theoretically, but practically impossible to comply with the

14   demands, particularly in this case, which were more overbroad

15   and more abusive than in the others.

16            MS. GOVERNSKI:  Move to strike the reference to

17   abusive.

18            THE COURT:  No.  I mean, I -- it goes to his state of

19   mind, so I'm going to permit it.

20   Q.  Was there ever a period of time where the discovery

21   schedule became overwhelming to you?

22   A.  Sure.  Well, discovery schedule, deposition schedule,

23   testimony schedule, numerous times.  I shouldn't say numerous

24   times.  Four or five times.

25   Q.  How many depositions have taken place in the homestead

P16VFRE2                    Giuliani - Redirect

1   proceeding?

2   A.  I don't know how to distinguish the homestead proceeding.

3   Could you help me with that?

4   Q.  Sure.

5   A.  Are we talking about in this case in general or just on the

6   issue of homestead?

7   Q.  Okay.  I'll rephrase that.

8          Do you know how many depositions have taken place in

9   this matter in the last 30 days?

10          MS. GOVERNSKI:  Objection.  Relevance.

11          THE COURT:  Sustained.

12  A.  Of me?

13          THE COURT:  The objection is sustained.

14          MR. CAMMARATA:  That's fine.

15          THE COURT:  Do you think you can bring it to a close

16  in ten minutes?

17          MR. CAMMARATA:  Yes, yes, yes, I can.

18          I have a document I'm bringing up right now.

19          Do you need to use the rest room?

20          THE COURT:  Why don't we -- why don't you finish your

21  examination, then we'll take a break.

22          MR. CAMMARATA:  Okay.  I have one or two more

23  questions.

24  BY MR. CAMMARATA:

25  Q.  What, if any, documents did you find over the weekend?

P16VFRE2                    Giuliani - Redirect

1   A.  I found -- I found a title to the -- a title to the

2   Mercedes hidden away here — or I might say Dr. Ryan found it —

3   which I executed and gave to Gary Rosen to give to you.  I

4   didn't have to find, but I got my watch.  Here it is so you

5   know I have it in my possession.

6   Q.  That's not necessary.

7   A.  Okay.  But I mean -- and I was going to suggest that I give

8   it to you and you figure out how it gets delivered.  I don't

9   want to mail it.

10          I also found a -- Dr. Ryan found also a lease, but I

11  think it was for this apartment, not for New York.

12          And I have --

13  Q.  So is it your testimony today that you are continually and

14  diligently looking for any documents that may have either --

15  that you may not have put forward out of being misplaced or

16  missing?

17          MS. GOVERNSKI:  Objection.

18  A.  I am --

19          THE COURT:  Overruled.

20  A.  I'm sorry.

21  Q.  You could answer it.

22  A.  Okay.  I put my hands on several of the documents we talked

23  about on Friday.  I'm confident I'm going to be able to get two

24  others shortly this week.  Confident, 90 percent.  The only one

25  I'm having difficulty with is the Joe DiMaggio jersey, because

P16VFRE2                    Giuliani - Redirect

1    I do not -- I do not know where it is and I don't know -- it's

2    hard to recreate who took it.  But I -- I am personally

3    conducting my own investigation of that.

4                MS. GOVERNSKI:  Your Honor, I would ask --

5    A.   And I'm personally conducting my own investigation of that

6    is what I said.

7                MS. GOVERNSKI:  Your Honor, I would ask for this --

8                THE COURT:  Yes, counsel.

9                MS. GOVERNSKI:  I would ask for this Court's guidance.

10   If we're doing redirect on the turnover, then we should do the

11   full redirect on the turnover.  But it's unclear to us the

12   scope of what we're dealing with today, if he's talking about

13   turnover and not just discovery, which we understood --

14               THE COURT:  Well, let me ask -- let me ask

15   Mr. Cammarata a question:  First of all, are you done with what

16   you intended to do?

17               MR. CAMMARATA:  Yes, I'm done with what I intended.

18   It was just to further show compliance with discovery orders.

19               THE COURT:  Okay.

20               MR. CAMMARATA:  Subject to --

21               THE COURT:  Then the objection is overruled.  You can

22   cross-examine on that bit of testimony and any other testimony

23   with respect to the turnover when we continue that portion of

24   the hearing.

25               All right.  So, Mr. Cammarata, you're done with the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P16VFRE2                    Giuliani - Recross

1    examination --

2                    MR. CAMMARATA:  Yes, I am done.

3                    THE COURT:  -- of Mr. Giuliani?

4            All right.  It's now 11:30.  Is a ten-minute break

5    sufficient for the witness?

6                    THE WITNESS:  It is for me, your Honor, yes.

7                    THE COURT:  All right.  So we'll take a ten-minute

8    break until 11:40.  And then we'll -- I'll hear any further

9    examination from the plaintiffs.  And then either we'll -- then

10    we'll have argument, depending on how long that goes, the

11    examination of Mr. Giuliani goes, we may take another break.

12            Okay.  See you in a bit.

13            (Recess)

14                    THE COURT:  Okay.  Counsel, you may inquire.

15                    MS. GOVERNSKI:  I'm not sure the witness is back.  I

16    don't see him on the screen.

17                    THE COURT:  Oh, you're right.

18                    THE WITNESS:  I'm back.  Here we are.

19                    THE COURT:  All right.  Good.

20    RECROSS EXAMINATION

21    BY MS. GOVERNSKI:

22    Q.  Good morning, Mr. Giuliani.  You recall during your

23    lawyer's questioning you testified that you -- there was a

24    period of time when you weren't communicating with your former

25    counsel, Mr. Caruso; is that right?

P16VFRE2                    Giuliani - Recross

1   A.  Well, I was communicating with him, and he wasn't

2   communicating with me, that's the way I would put it.

3   Q.  When exactly did that lack of communication begin?

4   A.  Probably in the last -- I have to estimate it.  Last two --

5   minimum of the last two weeks, maximum the last four weeks of

6   our relationship.

7   Q.  Can you pinpoint any closer an exact date when he stopped

8   communicating with you?

9   A.  I can't, because I don't know the reason for it.

10  Q.  You can't recall?

11          MR. CAMMARATA:  Objection.

12  A.  Well, it just stopped.

13          THE COURT:  Sustained.

14  A.  I can't tell you -- it was like he said to me we're not

15  going to talk or I said to him we're not going to talk.

16          THE COURT:  Sustained.

17  A.  It just stopped.  So I can't tell you when that happened.

18          THE COURT:  Mr. Giuliani --

19          (Indiscernible crosstalk)

20  A.  -- two-to-four-week period.

21          THE COURT:  -- what's your best approximation of the

22  calendar date — month/day — when you made a communication that

23  was not responded to, either directly to you or to one of your

24  assistants?  Month and day.

25          THE WITNESS:  Hang on.

P16VFRE2                        Giuliani - Recross

1          My best recollection is it would have been in -- would

2     have been in late October.

3          THE COURT:  Go ahead, counsel.

4     BY MS. GOVERNSKI:

5     Q.  Mr. Giuliani, I wanted to talk about your -- you recall

6     that your counsel showed you your responses to various

7     interrogatories, do you recall that?

8     A.  Yes, I do.

9          MS. GOVERNSKI:  I want to pull up on the screen,

10    please, docket number 127 in the docket 6563.

11         THE WITNESS:  Uh-huh.

12         THE COURT:  Hold on for a second.

13         MS. GOVERNSKI:  Yup.

14         THE COURT:  Let me pull that up.

15         You're posting on the screen, that's fine.  If you

16    want to hand it up, that's also fine.  You may approach.

17    Q.  Mr. Giuliani, do you see on your screen "Plaintiffs' First

18    Set of interrogatories to Defendant Rudolph Giuliani"?

19    A.  Yes.  Just help me make them bigger.  I do, yes.  I see the

20    first page.

21    Q.  You understand that this is the interrogatories that

22    plaintiffs served on you in this matter?

23    A.  Yes.

24    Q.  If I can direct your attention to the bottom of this page,

25    you'll see a paragraph that states:  The definitions and

P16VFRE2                         Giuliani - Recross

1    instructions that appear below form an integral part of

2    interrogatories that follow and must be read in conjunction

3    with them and followed when responding to the interrogatories.

4              Do you see that?

5    A.  I do.

6    Q.  Did you do this?

7              MR. CAMMARATA:  Objection.

8              THE COURT:  Overruled.

9    A.  I'm sure I did.  I don't remember doing it, but I'm sure I

10   did.

11   Q.  Let's go to the next page.

12   A.  I did so many of these, it's hard to distinguish this one

13   from 30 others maybe.

14   Q.  You've mentioned that a few times.  So it's your testimony

15   that it's difficult for you to keep track of the specific

16   requests in this case as opposed to all of the others in which

17   you are a defendant?

18             MR. CAMMARATA:  Objection.

19             THE COURT:  Overruled.

20   A.  Some of it merges together.  The fine details do, sure.

21   Q.  Sure.  So it's hard for you to remember -- I'm sorry, I

22   thought you were finished.

23             So it's hard for you to remember what exactly you've

24   done in this case as opposed to any of the others?

25   A.  Sometimes.  Sometimes it's clear, sometimes it's --

P16VFRE2                          Giuliani - Recross

1    sometimes it's cloudy or confused or I might -- I mean, it's

2    happened before in these depositions and other cases where I've

3    confused one case for another.

4    Q.  If I can direct your attention to the next page, please, of

5    docket 127-1 as paragraph 5, where plaintiffs explain:   In

6    answering these interrogatories, you must furnish all

7    information available.  Do you see that?

8    A.  I do.

9    Q.  And this is part of the definitions and instructions that

10   we just discussed were integral to your responses to the

11   interrogatories?

12   A.  Yes.

13   Q.  And if we could look, please, at paragraph 8, which it

14   states:  If you cannot answer an interrogatory in full after

15   exercising due diligence to secure the necessary information,

16   so state and answer the interrogatory to the extent possible,

17   specifying your inability to answer the remainder and stating

18   whatever information or knowledge you have concerning the

19   unanswered portions.  Do you see that instruction?

20   A.  I do.

21   Q.  And that was part of the definitions and instructions that

22   were integral to your responses to plaintiffs' interrogatories?

23   A.  Yes, they were.

24   Q.  Okay.  Now let's please turn to what your client -- what

25   your counsel marked as Exhibit B, please.

P16VFRE2                     Giuliani - Recross

1          MS. GOVERNSKI:  If we can put that up on the screen.

2    Q.  And you recognize this document, Mr. Giuliani, as your

3    third amended response to plaintiffs' first set of

4    interrogatories?

5    A.  Yes, that's what it says, ma'am.

6    Q.  Okay.  Let's go to the second page, please, the date.

7    You'll see the date here is December 31st, 2024; is that

8    correct?

9    A.  Yes, ma'am.

10   Q.  And that was after your deposition, right?

11   A.  Yeah.  Deposition on the 27th; correct?

12   Q.  It's your recollection that the deposition occurred before

13   December 31st?

14   A.  Yes.  I was just asking for clarification, but yes.

15   Q.  Okay.  And if we can look up to your third amended

16   response.

17          MS. GOVERNSKI:  We can take that off the screen

18   because it does give an email address.

19   Q.  Mr. Giuliani, you see that the --

20          MS. GOVERNSKI:  Joanne, if we can take it down.

21   Thanks.

22   Q.  Mr. Giuliani, you see that this response lists a single

23   Proton Mail email address?

24   A.  Yes, that's the one that I use.

25   Q.  You use that regularly, right?

P16VFRE2                    Giuliani - Recross

1    A.  Yeah, that's the one I use.

2    Q.  But you also have a gmail account, don't you?

3            MR. CAMMARATA:  Objection.

4            THE COURT:  Overruled.

5    A.  Honestly, I'm not sure.  I had one and it hasn't worked

6    since I got it back from the FBI until about four or five days

7    ago.  But I'm not sure -- I've been trying to get it to work

8    because of some of the old apps, but I'd have to check if it's

9    working now.

10   Q.  So it's your testimony --

11   A.  It hasn't been working for several years.

12   Q.  For several years.  Your testimony is that your gmail

13   account has not been working for several years?

14   A.  Well, rhelen0528@gmail.com, that's the one I'm talking

15   about.  I also have other gmail accounts that were set up for

16   specific things that I'm not really aware of, they're just

17   there.  Somebody set them up.

18   Q.  And if you wanted to access those, you could, right?

19           MR. CAMMARATA:  Objection.

20           THE COURT:  Overruled.

21   A.  If I wanted to what?

22   Q.  If you wanted to access those other email accounts, you

23   could, right?

24   A.  I'd probably have to ask somebody.  No, I couldn't.  I

25   wouldn't know how to do it sitting here.  I would have to ask

P16VFRE2                          Giuliani - Recross

1    somebody to do that.

2    Q.  You could ask someone to do that, if you wanted to, right?

3    A.  I could.  I could have.  I'm not sure I could do it now,

4    but I could have.

5    Q.  And in terms of this Proton email address, what steps have

6    you taken to ensure that emails sent to and from that Proton

7    Mail account are preserved?

8    A.  I don't -- I don't remove any of those -- I don't remove

9    any -- my original practice had been to remove emails way back,

10   just to have space.  I don't remove those that are connected

11   with any of the cases, which means the subject -- the subject

12   matter involving Trump and those things related to the *Trump*

13   case, *Trump* cases.

14   Q.  Why do you use Proton Mail as opposed to another form of

15   email?

16              MR. CAMMARATA:  Objection, your Honor.

17              THE COURT:  Overruled.

18              THE WITNESS:  I'm supposed to answer that, your Honor?

19              THE COURT:  Yes.

20              THE WITNESS:  I didn't hear.

21              THE COURT:  Yes, you're supposed to answer that.

22   A.  It was at -- it was recommended to me after the FBI seized

23   my account.  And I found out that for three years they had been

24   monitoring my iCloud account without my knowledge, from the day

25   that I began representing Donald J. Trump.  And I thought it

P16VFRE2                          Giuliani - Recross

1   was safer if I use something different than gmail.  And one of

2   my security -- former security employees recommended them as

3   being highly secure.

4   Q.  What is your understanding of Proton's preservation policy?

5         MR. CAMMARATA:  Objection.

6         THE COURT:  Overruled.

7   A.  I don't know the exact details of their preservation

8   policies.

9   Q.  Do you know whether they automatically preserve emails?

10  A.  They do for some time, because I've been able to go back

11  and get some.  I think -- what I can't tell you is exactly how

12  long.

13  Q.  Did you turn off any preservation -- did you turn on any

14  preservation settings to ensure that your documents were

15  preserved?

16        MR. CAMMARATA:  Objection, your Honor.

17        THE COURT:  Overruled.

18  A.  I'd have to go look.

19  Q.  You're not sure?

20  A.  I'm not sure.  I'm sure I didn't turn any that wouldn't.  I

21  don't have a recollection as to whether I -- it was set up for

22  me and I did answer a few questions, I remember, quickly.  I

23  don't remember that.

24  Q.  So you didn't -- you can't recall as you sit here today any

25  steps that you took to ensure that your emails at this email

P16VFRE2                        Giuliani - Recross

1   address were preserved, right?

2   A.  I can't recall exactly what I did with this.  It was done

3   very quickly right after the FBI had raided my apartment.  I

4   just needed another account.

5   Q.  You set that up very quickly, that was back in 20 -- what

6   date was that?

7   A.  Whatever -- it was within about two or three days of the

8   FBI taking all of my electronics, except for the Hunter Biden

9   hard drives.

10          THE COURT:  When was that, Mr. Giuliani, that your --

11  it was seized, your emails were seized?

12          THE WITNESS:  It was in 20 -- oh, the emails.

13          THE COURT:  The devices.  When was it that your

14  devices were seized by the FBI?

15          THE WITNESS:  That would be in April of 2022.

16  Q.  And that's when you set up your Proton Mail, in 2022?

17  A.  Probably within -- I started doing it within two days,

18  however long it takes to do it.  So, yeah, approximately then.

19  I would only have set it up after that happened.

20  Q.  And you've just testified that since 2022, you can't recall

21  altering any of the preservation settings in your Proton Mail

22  account, is that right?

23  A.  No, I don't think I know how to do it.  Somebody would have

24  to do it for me.

25                  (Continued on next page)

P16RFRE3                          Giuliani - Recross

1           MS. GOVERNSKI:  If we can please -- I want to go back

2      to this amended response.  Joanna, can you try to put it up and

3      cover up the -- okay.  If you can please put it back on the

4      screen, Exhibit B?

5           THE COURT:  I wouldn't have a problem if you want to

6      take a magic marker and just mark out everything that goes

7      before ProtonMail.

8           MS. GOVERNSKI:  I don't know if he sees the ELMO.

9           THE DEPUTY CLERK:  He doesn't.

10     BY MS. GOVERNSKI:

11     Q.  Let's see if I can do this without showing you.

12     Mr. Giuliani, do you recall that your December 31 response to

13     what messaging accounts you used, you said none?

14     A.  I do recall that, and I -- I'm sure I thought they were

15     something different than the ProtonMail account.  Since I

16     disclosed it so often, there would be no point in leaving it

17     out of that answer.

18     Q.  But you use social media, right?

19     A.  I mean, I use -- ProtonMail is basically --

20     Q.  Mr. Giuliani?

21          THE COURT:  Is there a reason why he's frozen?

22     Mr. Giuliani, do we have you back?

23          THE WITNESS:  Can you hear me?

24          MS. GOVERNSKI:  Now we can hear you.

25          THE COURT:  Let's start with the question again.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P16RFRE3                        Giuliani - Recross

1   BY MS. GOVERNSKI:
2   Q.  Mr. Giuliani, my question was whether you use social media.
3   You're frozen again.
4           THE COURT:  Let's bring back the audio.
5           MR. CAMMARATA:  Your Honor, I'm noticing on the Teams
6   he's moving, and I think -- but not on the internal court
7   monitors, if that helps.
8           THE COURT:  I see that also.  Let's see if we can
9   handle that.
10          Mr. Giuliani, can you hear us?
11          THE WITNESS:  I can hear you.
12          THE COURT:  We couldn't hear the last answer.  We'll
13  try the question and the answer question.
14          Go ahead, counsel.
15  BY MS. GOVERNSKI:
16  Q.  My question, Mr. Giuliani, was whether you use social
17  media.
18  A.  I was going to ask you to define social media so I know
19  what you're talking about.  It's very broad.  I think it means
20  a lot of things to different people, a lot of different things.
21  Q.  You have an account on X, right?
22  A.  I do.
23  Q.  And you can receive instant messages there?
24  A.  I can and I message from it, but I most often use it for my
25  broadcast at night.

P16RFRE3                          Giuliani - Recross

1    Q.  And you have Instagram, right?

2    A.  Yes.

3    Q.  You can message from there?

4    A.  Yeah.  I do that less often, but I do, yes.

5    Q.  And what about WhatsApp?  Do you have the WhatsApp

6    application?

7    A.  Yeah, I haven't used that in a long time.

8    Q.  What's "a long time"?

9    A.  A couple years.

10   Q.  Okay.  Do you have Sigma?

11              MR. CAMMARATA:  Objection.

12              THE COURT:  Overruled.

13   A.  I do have it but I use that even less rarely.

14   Q.  What's "less rarely"?

15   A.  Rarely, it has to be at least three years.  And the times

16   that I've used it would be when somebody -- I would use it when

17   somebody else wanted to use it.

18   Q.  Do you text message?

19   A.  Text messages?

20   Q.  Yes.

21   A.  Yes, I do text messages on my iPhone.

22   Q.  How often do you text message?

23   A.  Oh, gosh, it's hard to say.  It changes quite a bit.  It

24   could be as little as two or three times a day or as much as 15

25   times a day.

P16RFRE3                    Giuliani - Recross

1   Q.  And do you use iMessage?

2   A.  I don't think I know what that is.

3   Q.  Can you access text messages on your computer?

4   A.  I don't use a computer until now.  I just got a computer

5   for this new kind of broadcasting we're doing.  But the only

6   way I'd use a computer is to do our live casting.  I don't -- I

7   use an iPhone and an iPad.

8   Q.  Understood.  And so, can you access your text messages both

9   on your iPhone and on your iPad?

10  A.  Not always.  They're more consistent on my iPhone than on

11  my iPad.

12  Q.  So you receive all of your text messages on your iPhone and

13  some portion of text messages on your iPad?

14  A.  Yes.  I mean, it's possible I receive some on the iPads

15  that I don't receive on the iPhone, but I don't think so.  I

16  think the way you said it is the way it happens.

17  Q.  Did you provide your iPhone to a discovery vendor in this

18  case?

19              MR. CAMMARATA:  Objection, your Honor.

20              THE COURT:  Overruled.

21  A.  Well, I -- I did in an agreement with the FBI, yes.

22  Q.  When was your agreement with the FBI?

23  A.  Well, obviously after they raided my apartment and law

24  office.

25  Q.  In 2022?

P16RFRE3                         Giuliani - Recross

A.  In 2022.  And the court appointed former Judge Barbara

Jones as a master to determine privilege, which was sort of

complicated because you had different privileges, right.  My

law office involved about 12 different clients other than

President Trump, and I kept some of my legal work at home.  So

there was the attorney-client privilege, the work product

privilege, and then, of course, there was the attorney-

privilege with President Trump.  And then the other privileges

that pertain --

Q.  I'm sorry to interrupt.

A.  -- to the president.  So we had to have --

          THE COURT:  Mr. Giuliani, the question simply had to

do with the date of your agreement with the FBI.

          THE WITNESS:  Oh, I don't -- it's a matter of record,

your Honor.  I'm going to give you my best estimate that it was

a month to two months after the seizure.  So that would have

put it in May or June of 2022.

Q.  So other than the FBI, you have not provided your iPhone to

any discovery vendor?

          THE COURT:  Is that correct?

A.  I'm not sure.

Q.  What about your iPad?

A.  Well, they have my iPad, too, so whatever they did with my

iPhone, they did with my iPad.  And remember, the FBI had my

iCloud account.

P16RFRE3                    Giuliani - Recross

1    Q.  My question is:  Other than the FBI, in this case, did you

2    provide your iPad to a discovery vendor?

3    A.  I don't recall.  I may have.

4    Q.  Mr. Giuliani, would you recall if you didn't have access to

5    your iPhone for an extended period of time?

6              MR. CAMMARATA:  Objection, your Honor.

7              THE COURT:  Overruled.

8    A.  Well, I didn't.

9    Q.  I'm not talking about 2022.

10   A.  I went -- I got -- I went and purchased another iPhone and

11   then didn't use that for two years.

12   Q.  In 2024, was there a period of time that you were without

13   your iPhone for an extended period of time?

14   A.  I don't think so, but I seem to recall that I -- I cannot

15   reject the responsibility that I -- in my head, in my mind, my

16   recollection, that at some point, I gave my iPhone so that it

17   could be checked or looked at, and it would not have been gone

18   for that period of time but for a shorter period of time.  The

19   FBI hit for over a year.

20             THE COURT:  We're not talking about the FBI.  We're

21   actually talking about the time period from, what is it?  Is it

22   September to November?  Why don't you give a time frame?

23             MS. GOVERNSKI:  One moment.

24   BY MS. GOVERNSKI:

25   Q.  Between August 30, 2024, and today.

P16RFRE3                    Giuliani - Recross

1           THE COURT:  Can you ask a question?

2   Q.  Yes.  Mr. Giuliani, did you provide your iPhone to a vendor

3   between the dates of August 30, 2024, and through today?

4   A.  I don't believe so.

5   Q.  Did you provide your iPad to a vendor between August 30,

6   2024, and today?

7   A.  August, August 20 -- no, I don't believe so.

8   Q.  Did you provide anyone with access to your Proton email

9   account between August 2024 and today?

10  A.  Yes.

11  Q.  Who?

12  A.  People that work with me.

13  Q.  Anyone other than people who -- well, who?  Who works with

14  you?  What specific people did you provide your Proton email

15  passwords to?

16  A.  Ted Olsen.  Oh, my gosh, I'm sorry.

17  Q.  Ted Goodman?

18  A.  Ted Goodman.  Dr. Ryan, a few -- my son, my son's wife.

19  Q.  Did you provide any discovery vendor with access to your

20  ProtonMail?

21          MR. CAMMARATA:  Objection, your Honor.

22          THE COURT:  Let's put a timeframe on it.

23  A.  During that period of time?

24  Q.  Thank you.  Yes, between August 2024 and present day.

25  A.  Not that I recall.

P16RFRE3                     Giuliani - Recross

1   Q.  Mr. Giuliani, do you have a Telegram account?

2   A.  I'm not sure.  I may have.  I don't think I have it now,

3   and I'm not sure I ever used it.

4   Q.  Do you have a Truth Social account?

5   A.  Truth?

6   Q.  Truth, do you have a Truth account?

7   A.  Yes, I do.

8   Q.  Can you receive messages via your Truth account?

9   A.  Sure.

10          MS. GOVERNSKI:  Okay.  If we can please --

11   Q.  So in your response to plaintiffs' interrogatories when

12   they asked for messaging accounts, it was not accurate to list

13   none; was it?

14   A.  Oh, I'm sorry.  I didn't think of that.  That's all public.

15   I don't do messaging on Truth like, you know, me to a person.

16   I put out statements and then people make statements back to me

17   that are part of the media.  So I thought of messaging as

18   private messaging, not the things that I do as part of media or

19   promoting my shows.  That's primarily what I use Truth, X, and

20   I don't -- I don't do private messaging with those social

21   accounts.

22   Q.  But you've testified you do private messaging via text

23   messaging, right?

24   A.  No, no, I don't.  I don't do private messaging.  I do broad

25   messaging to everyone.

P16RFRE3                    Giuliani - Recross

1    Q.  Via text, you do broad messaging?

2    A.  If I'm going to communicate with someone privately, I would

3    do it with the -- with my phone or very rarely email.  I don't

4    use email that much.  But I would do it by text.  So if I

5    wanted to ask a question of one of my associates, I would never

6    do it through public -- or anybody else.  I don't do individual

7    messaging through social media.

8    Q.  Let's go back to Exhibit B, the cover page.  You'll see

9    that interrogatory four asks for you to identify any financial,

10   medical, or legal professional or firm who you have consulted

11   during the period of January 1, 2020, through the present.

12           We'll put it up on the screen.  Can you please share

13   it?  There we go.

14           You see that this is your answer that you served on

15   plaintiffs on December 31, right?

16   A.  Yes, ma'am.

17   Q.  And you see under medical professionals, you just list five

18   last names, right?

19   A.  Yes, yes.

20   Q.  And you don't provide full names here?

21   A.  Well, I -- I guess that's right, yeah.

22   Q.  But you have access to the full names, right?

23   A.  Sure, sure.  I think we just did it to do it quickly.  We

24   were running out of time.

25   Q.  And you didn't provide any identifying information about

P16RFRE3                    Giuliani - Recross

1  these individuals, right, other than their last names?

2  A.  Well, I mean I -- I don't think it asks for it.  But okay,

3  no, we didn't.

4           MS. GOVERNSKI:  Okay.  Let's go to docket 143, which

5  your counsel used today, and we're going to go to page 393.  We

6  can put that up on the screen.

7  Q.  You recall this document we talked about, 143.  We're going

8  to go to page --

9  A.  Could I just go back to the -- all I see --

10           THE COURT:  Why don't you show him the --

11           MS. GOVERNSKI:  Yeah, we'll go back --

12           THE WITNESS:  I have a transfer document.

13  Q.  We'll go back to the first page, Mr. Giuliani, to orient

14  you.

15  A.  Okay.  Good.

16  Q.  You recognize this is your declaration that you spoke with

17  your lawyer about?

18  A.  I do.

19  Q.  Now let's go to page 393 of this document.

20  A.  Okay.

21  Q.  I believe your testimony is that you don't know very much,

22  if anything, about this document, right?

23           MR. CAMMARATA:  Objection, your Honor.  I think that

24  mischaracterized the testimony.

25           THE COURT:  Sustained as to form.

P16RFRE3                    Giuliani - Recross

1              MR. CAMMARATA:  Thank you.

2   BY MS. GOVERNSKI:

3   Q.  Mr. Giuliani, do you recall that you were deposed in this

4   matter on December 27?

5   A.  Yes.  Yes.  Oh, I had the date right, good.

6   Q.  Do you recall that my partner Aaron Nathan asked you what

7   you knew about this document and that you responded not much?

8              MR. CAMMARATA:  Objection, your Honor.

9              THE COURT:  Overruled.

10  A.  Correct.  I think I said it was the first or second time I

11  saw it.

12  Q.  Are you aware of how this document came into your

13  possession?

14  A.  No.  I think my lawyers first showed it to me.

15  Q.  Are you aware of how your lawyers received this document?

16             MR. CAMMARATA:  Objection, your Honor.

17             THE COURT:  Sustained.

18  A.  I would have to --

19             MR. CAMMARATA:  Don't answer the question,

20  Mr. Giuliani.

21             THE COURT:  Sustained.  If you have knowledge other

22  than through communications with counsel, you can answer that

23  question.  If the answer is that the only information I have

24  would be from counsel, then so state.

25             Let me ask it a different way, Mr. Giuliani.  Aside

P16RFRE3                        Giuliani - Recross

1    from any information that you may have learned from counsel, do

2    you have any information as to how this document came into your

3    possession?

4              THE WITNESS:  Well, I got information about it after

5    my counsel handed it to me.

6    BY MS. GOVERNSKI:

7    Q.  Are you aware that plaintiffs received this document

8    originally from Corporate Transfer and Storage directly?

9              MR. CAMMARATA:  Objection.

10             THE COURT:  Overruled.

11   A.  I am not.

12   Q.  Are you aware that plaintiffs' counsel then provided your

13   counsel with a copy of this document directly?

14             MR. CAMMARATA:  Objection.

15             THE COURT:  Overruled.

16   A.  I don't know that.

17             MS. GOVERNSKI:  If you could please, Joanna, go

18   further down on this document where we see those red notations?

19   Q.  Are you aware, Mr. Giuliani, that your counsel sent this

20   document back to plaintiffs' counsel with these red text

21   annotations added?

22             MR. CAMMARATA:  Objection, your Honor.

23             THE COURT:  Overruled.

24   A.  As I said, I don't -- I recall seeing the other part of the

25   document.  I don't recall seeing these, or at least when I saw

P16RFRE3                          Giuliani - Recross

1    them, they were clearer than they appear to be now.

2    Q.  So earlier today when your counsel suggested that you

3    produced this email, do you understand that you produced an

4    email -- strike that question.

5           Mr. Giuliani, are you aware of who applied the red

6    annotations?

7              MR. CAMMARATA:  Objection.

8              THE COURT:  What's the basis of the objection?

9              MR. CAMMARATA:  It could be attorney work product

10   privilege.

11             THE COURT:  Mr. Giuliani, where respect to all of

12   these questions, consider them amended by the preface:  Aside

13   from anything that you might have learned from counsel, are you

14   aware.

15   A.  I'm actually not aware of how this was prepared.  When I

16   testified that I produced it, I meant in the -- I thought she

17   meant in the technical sense of produced it as part of the

18   discovery.  I've always made it clear that this document was

19   not known to me from the first moment I saw it.

20   Q.  Do you understand that you produced this in response to a

21   court order relating to the turnover proceeding?

22   A.  Yes, that's exactly what I did, but I didn't produce it in

23   any other way.  I didn't create it or have anything to do with

24   it.

25   Q.  Understood.

P16RFRE3                        Giuliani - Recross

1   A.  The first time I saw it, it was given to me.  I looked at

2   it.  It actually made some sense to me, and we turned it over.

3   I don't recall -- just to my recollection, I don't recall all

4   these pictures attached to them.

5   Q.  And you don't recall making any personal effort to attach

6   these descriptions to this document?

7             MR. CAMMARATA:  Objection, your Honor.

8             THE COURT:  Overruled.

9   A.  I don't recall the document except in turning it over.  It

10  could have been there and I went through it quickly, but I

11  don't -- somehow when I see these pictures, it doesn't -- it

12  doesn't trigger a recollection in my head.

13            MS. GOVERNSKI:  Okay.  I'm going to have my colleague

14  put up two emails on the screen.  I'm going to hand them out.

15  They are two separate emails.  I'll mark them as exhibits.  I

16  believe we're at 13 and 14.

17            Your Honor, may I approach?

18            THE COURT:  You may approach.

19            MS. GOVERNSKI:  I'm not going to put the email on the

20  screen but then that means Mr. Giuliani can't see the email.

21  Your Honor, I'm not quite sure.  I need to ask Mr. Giuliani

22  questions regarding the specific recipients of this, but I

23  can't show the recipients on the screen, which is how he's

24  accessing it.

25            THE COURT:  What do you want me to do?

P16RFRE3                        Giuliani - Recross

1          MS. GOVERNSKI:  Can we email Mr. Giuliani a copy of

2     these two documents via the chat?

3          Your Honor, for the record, Mr. Giuliani just

4     testified that his email is public.

5          THE WITNESS:  I have no objection to using my email.

6          THE COURT:  All right.  Then let's proceed.

7          MS. GOVERNSKI:  All right.  Let's please start with

8     the March 6 email on the screen, Joanna.

9          THE WITNESS:  You are going to send me an email of

10    that?

11         MS. GOVERNSKI:  We're going to put it up on the screen

12    because all the other emails are public.

13    BY MS. GOVERNSKI:

14    Q.  Do you see this email, Mr. Giuliani, dated March 6, 2024,

15    from Maria Ryan, Heath Berger, and others?

16    A.  Yes.  It's from Maria Ryan.  It goes back to March '24.

17    Those would be my bankruptcy counsel.  I see it, yes.

18    Q.  Do you recognize this document?

19    A.  I -- no.  I'd have to read it to see if it refreshes my

20    recollection.

21    Q.  Do you have any reason to doubt that you received a copy of

22    this email to your ProtonMail account?

23    A.  I don't know how to answer that.  I don't remember it, but

24    it does say it went to the account.  Right now, I don't

25    remember it.

1          MR. CAMMARATA:  Objection.  Your Honor, I'm going to

2   object to this line of questioning.

3          THE WITNESS:  I can't argue with the fact that it says

4   it on there.  But if you are asking me to independently say do

5   I remember it, no.  If you give me a chance to read it, maybe I

6   would.  Do you want me to read it?

7          MR. CAMMARATA:  I'm going to object to these emails --

8          THE COURT:  Hold on for a second, Mr. Giuliani.

9          MR. CAMMARATA:  -- for several reasons.  These emails

10  are way outside the scope of -- it wasn't raised on cross and

11  redirect, and these are outside the scope.  I'm going to ask

12  that these not be permitted to be questioned on.  This line of

13  questioning is absolutely outside the scope.

14         THE COURT:  Overruled.  It's within the scope.  The

15  client gave very broad testimony.  Go ahead.

16         MS. GOVERNSKI:  I move to admit as Exhibit 12 this

17  March 6 email.

18         THE COURT:  No.  You marked it as Exhibit 13, I think.

19         MS. GOVERNSKI:  Thank you.  13.

20         THE COURT:  It's received.

21         (Plaintiffs' Exhibit 13 received in evidence)

22  BY MS. GOVERNSKI:

23  Q.  Mr. Giuliani, you did not produce this email, right?

24         MR. CAMMARATA:  Objection.

25         THE COURT:  Overruled.

P16RFRE3                    Giuliani - Recross

1    A.  I don't -- well, I don't remember producing it, but I mean,

2    it may have gone in some kind of discovery that I gave.  But

3    I'm not the one who found it and gave it to them if that's what

4    you mean.

5    Q.  Okay.  Well, over the course of the last two days of

6    testimony, we've looked at the sum of what you've produced, and

7    there were no communications, no emails, in the sum of those

8    materials, right?

9                MR. CAMMARATA:  Objection.

10               THE COURT:  Overruled.

11   A.  I'm not sure I know what you're talking about.

12   Q.  Okay.  Let's look at the last sign of this email where

13   Ms. Ryan states, When the team had to travel to Florida

14   recently for business, we did have the business pay for it.  Do

15   you see that?

16   A.  I do see that, yes.

17   Q.  So this document included information relevant to your

18   travels in 2024, right?

19   A.  Well, it says -- I haven't read it.  You're asking me to

20   assume something, but you haven't given me a chance to read it.

21   So I don't know what the document says.

22   Q.  Well, I read you the sentence:  When the team had to travel

23   to Florida recently for business, he did have the business pay

24   for it, right?

25   A.  We do do that.  The team doesn't always necessarily mean me

P16RFRE3                    Giuliani - Recross

```
 1   if that's what you're getting at.  I don't want to give you a
 2   false impression.
 3   Q.  Okay.  Let's go to the document.
 4   A.  It could mean three other people.  Not always.
 5   Q.  Not always, but it could?
 6   A.  It could and it often does but not always.  So without
 7   reading this, I can't tell you.
 8   Q.  Okay.  Let's go to a document which I'll mark as exhibit
 9   14.  You'll see it's another email from Mr. Berger to Ms. Ryan,
10   and then you're cc'd on this email.  Do you see that?
11   A.  If you don't mind, I have to make it a little bigger so I
12   can see it?
13            I do see that, yes.
14   Q.  Do you have any reason to dispute that this email went to
15   you at Truth -- at your Proton email account?
16   A.  No.  If it says it there, I -- I can't tell you that it
17   did, but I have no reason to dispute that it did, given what it
18   says there.
19            MS. GOVERNSKI:  I would enter this email dated --
20            THE COURT:  Exhibit 14 is received.
21            (Plaintiffs' Exhibit 14 received in evidence)
22   BY MS. GOVERNSKI:
23   Q.  If you could direct your attention, please, to the middle
24   of this page.  It's an email from Maria Ryan on April 7, and
25   she says, Hello, Rudy, which refers to you, and Ted, which
```

P16RFRE3                          Giuliani - Recross

1  refers to Mr. Goodman, are up in the great north woods in NH

2  for the eclipse.  NH is New Hampshire?

3  A.  Yes, it is.

4  Q.  And the next line says, My family and I will be joining

5  them tomorrow.  Monday we'll be out.  The last line states, We

6  can do Tuesday at noon from the car driving to NY.  Do you see

7  that?

8  A.  I do see that.

9  Q.  This document has information relevant to your travels in

10  the summer of 2024 -- I'm sorry.  Strike that.

11          This email has information relevant to your travelers

12  in the spring of 2024; is that right?

13          MR. CAMMARATA:  Objection.

14          THE COURT:  Overruled.

15  A.  Yes, to cover the eclipse for America's Mayor Live, which I

16  did for two days.

17  Q.  And you did not produce this email?

18          MR. CAMMARATA:  Objection, your Honor.

19          THE COURT:  Overruled.

20  A.  I don't know if I did or I didn't.  You would know better

21  if I did or I didn't.

22          MS. GOVERNSKI:  You can take this down, thank you.

23  Q.  Mr. Giuliani, you recall during your direct exam, you made

24  various references to questions about the propriety of document

25  requests and about reservations that you had with respect to

P16RFRE3                         Giuliani - Recross

1    the discovery requests, right?

2    A.  Yes, I do.

3    Q.  And so, you chose not to produce materials based upon your

4    own personal questions about the propriety of the requests,

5    right?

6              MR. CAMMARATA:  Objection.

7              THE COURT:  Overruled.

8    A.  I explained to you what they were, yes.

9    Q.  I'm sorry.  Was the answer to my question yes?

10             THE COURT:  You got an answer.  Go ahead.  Next

11   question.

12   Q.  Mr. Giuliani, do you recall in the underlying litigation

13   you relied on a vendor called Trustpoint?

14             MR. CAMMARATA:  Objection, your Honor.

15             THE COURT:  Overruled.

16   A.  Yes.  We did.  We did rely on Trustpoint at one point.

17   Q.  But you haven't used Trustpoint in this matter, right?

18   A.  I don't think so.

19   Q.  Okay.  And, Mr. Giuliani, you recall that you testified

20   regarding a number of different cases in which you're a

21   defendant, right?

22   A.  That is correct.

23   Q.  Do you have the same lawyer in all of those cases?

24   A.  I do not.

25   Q.  Do you have the same lawyer in any of those cases?  I

1    withdraw the question.

2            Mr. Giuliani, does Mr. Cammarata represent you in any

3    other cases?

4    A.  No, he does not.

5    Q.  Mr. Giuliani, does Mr. Caruso represent you in any other

6    cases other than the appeal in this case?

7    A.  No.

8    Q.  So neither Mr. Caruso nor Mr. Cammarata represent you in

9    any of the other cases which you testified are in active

10   discovery, right?

11           MR. CAMMARATA:  Objection, your Honor.

12           THE COURT:  Yes, the objection is sustained.  It

13   misstates the witness's testimony about active litigation.

14   Q.  Are you in active discovery in other matters?

15           THE COURT:  I'm sorry.  Active discovery.

16   A.  I don't think I am right now, no.

17   Q.  When did that stop?

18   A.  A month ago.

19   Q.  At the point when you were in active discovery in other

20   matters, were you represented in any of them by Mr. Caruso or

21   Mr. Cammarata?

22   A.  No.

23   Q.  Mr. Giuliani, throughout your testimony today I've noticed

24   that there appears to be other people in the room with you; is

25   that true?

P16RFRE3                         Giuliani - Recross

1              MR. CAMMARATA:  Objection.

2   A.  That is true.

3   Q.  Who is in the room with you?

4   A.  My assistant, Ted Goodman, and Stephen Schumacher, who

5   assists us in doing my broadcast, and Vanessa Ryan, who are in

6   and out and helped me set this up.

7   Q.  Only those three individuals?

8   A.  That's correct.  At some point, somebody delivered

9   something, but he walked right out.

10  Q.  Mr. Goodman is your employee, right?

11             MR. CAMMARATA:  Objection, your Honor.

12             THE COURT:  Overruled.

13  A.  Yes.  Mr. Goodman is the producer of my show and my

14  colleague, yes.

15  Q.  He works --

16  A.  He's an employee of Standard.

17  Q.  He works for you full time?

18  A.  He does, yes.

19  Q.  And would he be able to assist you in -- strike the

20  question.

21             And you pay Mr. Goodman?

22  A.  Well, Standard does.

23             MR. CAMMARATA:  Objection, your Honor.  Relevance.

24             THE COURT:  How many more questions on this particular

25  line?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P16RFRE3                          Giuliani - Recross

1              MS. GOVERNSKI:  I'm winding down, but this is directly

2      relevant to his testimony about not being able to comply with

3      discovery.

4              MR. CAMMARATA:  I would disagree, your Honor.

5              THE COURT:  I'm not going to hear argument.  Let's see

6      where it goes.  There's no question pending at the moment.

7      BY MS. GOVERNSKI:

8      Q.  Mr. Giuliani, does Mr. Goodman work for you full time?

9      A.  He does, yes.

10     Q.  Do you pay Mr. Goodman?

11             MR. CAMMARATA:  Objection, your Honor.

12             THE COURT:  Sustained as asked and answered.

13     A.  Standard does.

14     Q.  Mr. Giuliani, would Mr. Goodman be able to assist you with

15     your discovery obligations if you asked him to?

16             MR. CAMMARATA:  Objection.

17             THE COURT:  Overruled.

18     A.  It would depend on the subject.  He has only worked with me

19     for a year and a half.  So the answer is yes and no.

20     Q.  So if you asked him to log into your ProtonMail and do a

21     search, he could have done that for you, right?

22             MR. CAMMARATA:  Objection.

23             THE COURT:  Overruled.

24     A.  Yes.  He could do that, yes.

25     Q.  You mentioned Stephen Schumacher.  Does Stephen Schumacher

1   work for you?

2   A.  No, he doesn't.

3   Q.  Do you pay Mr. Schumacher in any way?

4          MR. CAMMARATA:  Objection, your Honor.

5          THE COURT:  Overruled.

6   A.  I'd have to go and check to see whether Standard hasn't

7   paid him as an outside contractor.  I'm not aware of that, but

8   it's possible because he has done photographic work for us, for

9   example, on the eclipse and some other things.

10  Q.  You mentioned Vanessa Ryan.  That's Maria Ryan's daughter;

11  is that right?

12  A.  Correct.

13  Q.  And you had mentioned earlier that she's the individual

14  from whom you leased an apartment in New Hampshire in 2024; is

15  that right?

16  A.  She's the one that I -- yeah.  It was a two- or three-month

17  lease, yes.

18  Q.  Did you coordinate that lease with her via email?

19          MR. CAMMARATA:  Objection.

20  A.  I doubt it.

21  Q.  How did you communicate with her about that lease?

22  A.  Talked to her about it.

23  Q.  Okay.  How did you receive the copy of the lease?

24  A.  Any number of ways.  I'm not sure.

25  Q.  It could have been over email?

P16RFRE3                        Giuliani - Recross

1  A.  It could have -- it could have been, yeah, or it could have

2  been just left on my desk when I got there.

3  Q.  You mentioned Maria Ryan.  Does Maria Ryan work for you?

4  A.  She works with Standard, yes.

5  Q.  Does she work for Standard full time?

6          MR. CAMMARATA:  Objection, your Honor.

7          THE COURT:  Overruled.

8          MR. CAMMARATA:  How would he know?  Okay.

9  A.  I would say three-quarters of the time.

10 Q.  And you said Maria Ryan helps you with a lot of the tasks

11 in your day-to-day life; is that right?

12 A.  She does, yes.

13 Q.  And that she has access to your ProtonMail, right?

14 A.  Yes.  Both of them do.

15 Q.  So Dr. Ryan could have accessed your ProtonMail and

16 conducted the search if you had asked her to do it, right?

17 A.  If I asked her to do it and gave her the information, she

18 could.  She has limited knowledge of it, but she could do it,

19 yes.

20 Q.  Okay.  And you mentioned Ryan Medrano as well, right?

21 A.  That is correct.

22 Q.  And Ryan Medrano works for you; is that right?

23 A.  He works for Standard, yes.

24 Q.  And when you say "Standard," you mean it's one of the

25 corporations in which you're a majority owner, right?

P16RFRE3                          Giuliani - Recross

1    A.  Correct.

2    Q.  And does Mr. Medrano work for Standard full time?

3    A.  No, he does not.

4    Q.  About how much of his time does he work for Standard, if

5    you know?

6              MR. CAMMARATA:  Objection.

7              THE COURT:  Overruled.

8    A.  I honestly don't know.  You'd have to ask him that.

9    Q.  You testified earlier that Mr. Medrano would have a number

10   of your corporate documents; is that right?

11   A.  Yes, he has some.  He has my corporate documents because at

12   times when I've needed them over the years, I've gotten them

13   from him.

14   Q.  Okay.  I'd like to ask you about that.  So if you wanted to

15   receive a corporate document, you could just ask Ryan Medrano

16   to give it to you?

17             MR. CAMMARATA:  Objection, your Honor.

18             THE COURT:  Overruled.

19   A.  It might begin that way, sure.  Yeah, that might be the

20   first person I would ask, and then he would tell me he has it

21   or he can get it for me.

22             MS. GOVERNSKI:  Your Honor, if I can just consult with

23   my colleagues for a moment?

24             THE COURT:  Yes.

25             MS. GOVERNSKI:  I have no further questions.  Thank

P16RFRE3                          Giuliani - Redirect

1    you.

2            THE COURT:  Mr. Cammarata, any redirect?

3            MR. CAMMARATA:  A few questions.

4    REDIRECT EXAMINATION

5    BY MR. CAMMARATA:

6    Q.  Mayor Giuliani, do you consider yourself technologically

7    savvy?

8            MS. GOVERNSKI:  Objection.

9            THE COURT:  Overruled.

10   A.  I'm sorry.  I did not hear the Judge's ruling.

11           THE COURT:  The question, Mr. Giuliani, was whether

12   you considered yourself to be technologically savvy.

13           THE WITNESS:  Thank you, your Honor.  Was there an

14   objection?

15           THE COURT:  Yes.  There was an objection, and I

16   overruled the objection, so I'm permitting you to answer.

17   A.  Okay.  I will use an Italian expression, mezza mezza.

18           THE COURT:  That means so-so?

19           THE WITNESS:  It means -- yes, so-so would be perfect.

20   There are certain things I can do, but there are a lot of

21   things I can't do and don't understand.  I certainly am not as

22   good as my children or Ted or -- but I can do the basic.  I can

23   do the basic things.  Hard to describe, and I get confused a

24   lot.

25   Q.  And was it your prior testimony that your response to

P16RFRE3                    Giuliani - Redirect

1    discovery regarding messaging applications did not apply to

2    social media?

3    A.   Yeah, I don't message on social media.  I never have.  I

4    message -- I have always used iPhones, I think.  A short while

5    I didn't; that goes way back.  So I've always used their text

6    message service, which was extremely convenient for the FBI

7    because it's all in my iCloud account.  And they went and took

8    it without telling me for three years, as soon as I began

9    representing Donald Trump.

10            MR. CAMMARATA:  No further questions, your Honor.

11            THE COURT:  Okay.  Mr. Giuliani, you're excused as a

12   witness.

13            (Witness excused)

14            THE COURT:  Is there anything, Mr. Cammarata, further

15   on the contempt motion in the homestead action with respect to

16   the production of documents and responses to discovery?

17            MR. CAMMARATA:  I'm sorry.  I didn't hear the last

18   sentence.

19            THE COURT:  Is there anything further from the defense

20   with respect to the contempt motion in the homestead action

21   regarding responses to discovery?

22            MR. CAMMARATA:  No, not at this time.

23            THE COURT:  All right.  Is there any rebuttal from

24   plaintiff on that contempt motion?  I'm not asking about the

25   turnover action.  I'm asking about the contempt with respect to

P16RFRE3                      Giuliani - Redirect

1    the responses to discovery and the homestead action.

2              MS. GOVERNSKI:  I'm sorry.  Can I just have one

3    moment, your Honor?

4              THE COURT:  Yes.

5              MR. CAMMARATA:  Your Honor, just to clarify, you're

6    not talking about oral argument on the issue?

7              THE COURT:  Correct.

8              MR. CAMMARATA:  Oh, I would like to orally argue.

9              THE COURT:  And I'm going to give you an opportunity

10   to do that.

11             MR. CAMMARATA:  Thank you.

12             MS. GOVERNSKI:  No rebuttal, your Honor.

13             THE COURT:  Okay.  So the record is closed with

14   respect to the contempt motion in the homestead action.  I will

15   hear oral argument.  It's now 12:43.  Hold on for a moment.

16   We're going to take a break, and I'm going to tell you how long

17   a break we're going to take.  Does 45 minutes work for the

18   parties?  For the plaintiff?

19             MR. NATHAN:  Yes, your Honor.

20             MR. CAMMARATA:  Yes, your Honor.

21             THE COURT:  Okay.  Be back here at 1:30, and

22   Mr. Giuliani can participate remotely if he wishes to do so, or

23   he can listen in remotely if he wishes to do so.  We'll see you

24   back here in a little bit.

25             (Recess)

P16VFRE4

1               A F T E R N O O N   S E S S I O N

2                           1:30 P.M.

3          THE COURT:  I'll hear oral argument on the motion for

4   contempt.  I'll hear first from the plaintiff and then from the

5   defendant; and then if the plaintiff wants to reserve some time

6   for rebuttal, I'll do that.

7          My hope is that you could each limit yourselves to

8   half an hour.  Does that work from plaintiffs' perspective?

9          MR. NATHAN:  Certainly, your Honor.

10         THE COURT:  From defendant's perspective?

11         MR. CAMMARATA:  Yes, your Honor.

12         THE COURT:  Mr. Nathan, are you presenting the

13  argument?

14         MR. NATHAN:  Yes.

15         THE COURT:  How much time do you want for rebuttal?

16         MR. NATHAN:  Five minutes should be fine.

17         THE COURT:  Do you want us to give you a warning once

18  you've gone to 20 minutes?

19         MR. NATHAN:  Your Honor, I think 20 minutes for my

20  initial presentation would be more than enough.  I can save the

21  ten for rebuttal.  That may be a better division.

22         THE COURT:  We'll give you the two-minute warning.

23         So we'll give you notice after 15 minutes.

24         I don't see, Mr. Cammarata, your client.  He's not

25  required to be on for this, but do we need to wait for him?

P16VFRE4

1          MR. CAMMARATA:  I don't believe so.

2          THE COURT:  We're not going to wait for him.

3          MR. CAMMARATA:  Of course.

4          THE COURT:  Okay.  Mr. Nathan, I'll hear from you.

5          MR. NATHAN:  Thank you, your Honor.

6          And one quick point of clarification.  I would prefer

7   to start with the issue relating to the interrogatory

8   responses, which I think may in some ways be logically prior to

9   some of the RFP issues that are also a basis --

10         THE COURT:  That's fine with me.  I should tell you my

11  instinct with respect to the interrogatories and response, the

12  third amended response, is that while I did not -- while I

13  issued an order requiring a response to the order to show cause

14  by a deadline that was not met, I do think that the third

15  amended response is relevant, not so much with respect to

16  whether the order has been violated, but with respect to

17  whether any discovery sanctions should be imposed and what

18  those discovery sanctions should be.  So that is my current

19  inclination.

20         MR. NATHAN:  I'm happy to address the third amended

21  interrogatory responses.  But I will --

22         THE COURT:  We'll start your time going now.

23         MR. NATHAN:  I will begin there.

24         Your Honor, this case is ultimately quite

25  straightforward.  After a day and a half of evidentiary

P16VFRE4

1    presentations, there are very few disputes, if any, relating to

2    the facts that would be necessary for this Court to enter all

3    of the relief requested by the plaintiffs in their motion for

4    civil contempt and sanctions.

5         With respect to the interrogatories, the plaintiff

6    ignored and refused to respond to two key interrogatories here;

7    those initial responses were due on November 20th.  Plaintiffs

8    filed a motion to compel those responses.  That motion was

9    granted on December 17th.  Defendant was ordered to respond by

10   December 20th.

11        Had he responded in a timely fashion, including by the

12   deadline given in this Court's order granting the motion to

13   compel, plaintiffs could have used those interrogatories for

14   the purpose that they were intended for:  One, to explore the

15   connections that the defendant may or may not have established

16   or reestablished in the Palm Beach area when he claims to have

17   established a homestead there; and two, with respect to

18   interrogatory number eight, plaintiffs could have tested the

19   completeness of the defendant's discovery productions thus far.

20        Plaintiff -- excuse me, defendant finally did serve

21   these third amended responses on December 31st, which was four

22   days after the Court had ordered the record closed on December

23   27th.  And I understand that your Honor is still interested in

24   hearing about the relevance of those third responses, so I'll

25   address them.

P16VFRE4

1          Although before I do, I should note that the relevance

2     to the question whether sanctions are appropriate as opposed

3     perhaps to the question of what sanctions are appropriate —

4     although I don't think plaintiffs would take the position that

5     there's any change to that issue either — is constrained.

6          There's a line of cases tracing to the Supreme Court's

7     decision in *National Hockey League v. Metro Hockey Club*, in

8     which the Supreme Court reversed a Court of Appeals which had,

9     in turn, vacated a district court's discovery sanction entered

10    for failure to respond to interrogatories.  And the Supreme

11    Court made clear that even when late compliance makes it appear

12    in hindsight the discovery sanction was too harsh, there are

13    still important purposes underlying Rule 37 that warrant

14    imposing sanctions anyway.  They include the purpose not merely

15    to penalize the violator, but to deter those who might be

16    tempted to such conduct in the absence of such a deterrent.

17    That's at 427 U.S. Reports at page 639.

18          The Supreme Court said it may well be that these

19    respondents would faithfully comply with all future discovery

20    orders, speaking of the particular litigants in that case, and

21    that's a statement I probably would not make myself about the

22    defendant here.  But the point is that that's not the only

23    consideration.  There are considerations of general deterrence

24    that at least in that case and since have warranted harsh

25    discovery sanctions, even where a litigant finally complies

P16VFRE4

1    only at the last minute.  And in this case, the last minute was

2    the last day the depositions were permitted in this case, and

3    with insufficient time for the plaintiffs to serve any

4    discovery requests based on the interrogatory responses that

5    were finally provided.

6         As for the interrogatory responses that were provided,

7    we heard admissions today that although Mr. Giuliani disclosed

8    the last names of several of his doctors, he did not disclose

9    the first names, which I think the Court would agree is

10   essential information that would have permitted the plaintiffs

11   to actually use that information to identify the professionals

12   that he was asked to identify in those interrogatory responses.

13   Mr. Giuliani admitted that there was no reason he couldn't have

14   provided the first names of the doctors, only that he was in a

15   rush.  He was in a rush because of his own failure to respond

16   in a timely fashion, including for two weeks after the Court

17   ordered him to do so.

18        In connection with the failure to comply with the

19   Court's order to answer -- sorry.  Excuse me.  One thing that

20   makes the defendant's refusal to answer those questions

21   especially galling is that the initial interrogatories

22   specifically asked him to furnish all information available to

23   him.  That's at ECF 127-1 at page 3, paragraph 5.  That's a

24   document that's been admitted into evidence.  And the same

25   document required him, if he could not answer in full after due

P16VFRE4

diligence, to so state in his interrogatory responses.

We heard the defendant say a number of times that when he was served with these interrogatories, he thought that they were too broad, in his opinion they were improper, and he relied on his own personal views about -- and his own personal reservations to justify his lack of compliance. That's not a valid basis to refuse to answer a valid discovery request.

We also heard some suggestion that the defendant may have sought clarification or a narrowing of the interrogatories after they were served on him. I don't believe we actually heard any evidence supporting that contention and there isn't any.

The particular remedy that we've asked for in connection with the interrogatories is four adverse inferences.

The first is an inference that the identities of the professionals that the defendant was asked to identify in interrogatory number four would show that the defendant was not treating and did not begin to treat Palm Beach condo as his permanent residence when he says he did or prior to August 8th, 2004.

A second one that would show affirmatively that he instead treated the Palm Beach condo as his second home. And with respect to the answers or the lack thereof to interrogatory number eight, that true answers would show that his discovery responses were incomplete and would show that the

P16VFRE4

1    nonproduced materials contained -- included relevant

2    information.

3            It's plaintiffs' position --

4            THE COURT:  Let me ask you about the first two

5    inferences that you are asking me to draw.

6            It strikes me that you're asking me to draw an

7    inference as to really the ultimate question in the homestead

8    case, or one of the ultimate questions in the homestead case.

9            If I were to draw an inference, wouldn't it be more

10   appropriate for me to draw an inference about what the

11   documents would show; and then from what the documents would

12   show, what conclusion I would reach.  For example, they would

13   show that none of the doctors were in the Florida area or that

14   there was no change in the professionals between the time that

15   the homestead was in New York and the time that the homestead

16   was purportedly moved to Florida.

17           MR. NATHAN:  Plaintiffs absolutely agree that the

18   Court can draw that narrower inference or, I should say, maybe

19   smaller inference.  And I will address this much more when we

20   turn to the RFPs.

21           We think this is a case where the much broader

22   inference is certainly on the table.  And there's no question

23   that the Court can draw an inference about the ultimate fact in

24   the litigation from the defendant's refusal to produce evidence

25   that the plaintiffs requested in relation to that fact.  That

P16VFRE4

1    goes all the way back to the *Hammond Packing* presumption from

2    1909; it's discussed throughout the Supreme Court's cases and

3    the Second Circuit's.  Suffice it to say there's a mountain of

4    case law that says that's exactly why Rule 37 is able to

5    authorize the sanctions it does.  Those include the authority

6    of a court to direct that fact be established against a party

7    who's refused to comply with the discovery order.

8         So while it's true that -- and stepping back, I

9    believe that at least with respect to the specific adverse

10   inferences that we've requested in connection with the

11   interrogatories, they do meet that more particularized

12   structure that your Honor is describing.  And I apologize, I

13   don't have the -- I should have, but I don't have the exact

14   text in front of me.

15        But I believe that our -- the first two adverse

16   inferences we've requested are only that the true answers to

17   interrogatory number four would tend to show.  And then yes, it

18   would tend to show that plaintiffs are correct about

19   Mr. Giuliani's true intentions with respect to the Palm Beach

20   condo, in substance.

21        It's not quite the same as the adverse inference we've

22   requested in connection with the RFPs, which I agree goes a

23   step farther and says that the Court should infer that

24   Mr. Giuliani, in fact, did not intend to establish the Palm

25   Beach condo as permanent residence by the time the plaintiffs

P16VFRE4

1    had established thoroughly in there.  But as I'm happy to

2    address further when we turn to the RFPs, we think that's well

3    within the Court's discretion and certainly, I think,

4    unquestionably authorized by Rule 37.

5          Unless the Court has further questions about the

6    interrogatory responses, I can turn to the request for

7    production now.  I think I've addressed what there is to

8    address there.  I'm not aware of any disputed facts relating to

9    what Mr. Giuliani did or didn't provide in response to those

10   questions; and the answers that he did provide in the third

11   amended responses are insufficient on their face.

12         I guess I should add, in connection with the

13   interrogatory number eight requesting accounts, emails, and so

14   forth, Mr. Giuliani admitted today that he has plenty of

15   accounts apart from the two phone numbers and the single email

16   address that he listed.  He's got a variety of social media

17   accounts, he's got all sorts of stuff that he was obligated to

18   tell us about in response to that interrogatory but did not.

19         THE COURT:  With respect to the motion on the broader

20   RFPs, I'm trying to understand what is served by the contempt

21   sanctions that you're seeking.

22         As you know, as the fact-finder in this case, if

23   you're correct about what you're asking me to infer, I can draw

24   a presumption as the fact-finder.  What you're asking me for as

25   an adverse inference has some impact in a case where there's a

P16VFRE4

1    jury; but where the Court is also the fact-finder, how much is

2    served by framing it as a contempt sanction?

3         MR. NATHAN:  Well, I suppose I would distinguish maybe

4    three different scenarios from your Honor's question.  One

5    would be in a jury trial where there might be an instruction,

6    including an adverse inference.  And I can understand how that

7    would be important in a different way than it would be in a

8    nonjury case, where the same -- the Court is both ordering the

9    adverse inference and then applying it.

10        I would draw further distinction between contempt per

11   se as a sanction and the other sanctions authorized by Rule 37.

12   And we've asked for both.

13        Contempt is obviously a severe sanction warranted by

14   Rule 37, authorized by the Court's inherent power.  But Rule 37

15   also authorizes the more specific evidentiary and preclusive

16   instructions -- excuse me, orders, inferences, that we've

17   requested.

18        In connection with the --

19        THE COURT:  Actually, let me follow up on that.

20        In your view, are the inferences a contempt sanction

21   or is it authorized by one of the other provisions under Rule

22   37?  In other words, do I need to satisfy the standard for a

23   severe sanction that would be required for contempt?

24        MR. NATHAN:  Well, I'll choose my words carefully.

25        So in our view, contempt is among the sanctions

P16VFRE4

1      authorized by Rule 37.  But Rule 37 doesn't require a finding

2      of contempt in order to enter the remedies that are authorized

3      by 37(b), etc.

4              And having said that, the Court, in order to -- the

5      Court should follow the standards that are set forth in the

6      Second Circuit and Supreme Court's case law for Rule 37's

7      sanctions independent of the contempt sanction.  And there is

8      some degree to which they overlap; but I think that's laid out

9      in our papers.  And if the Court has any questions about

10     exactly which aspects of which standard apply here, as we turn

11     to the Rule 37(b)(2) sanctions, that's certainly something I'm

12     happy to address.

13             But stepping back, with respect to the RFPs in this

14     case, there is no dispute that the defendant was subject to a

15     clear and unambiguous order to comply with the RFPs.  That

16     order was entered on November 22nd, 2024, when the Court

17     granted the motion to compel.  The Court set a deadline of

18     November 26th.  There's no dispute that the first time the

19     defendant served anything purporting to be a production

20     complying with the RFPs was on December 8th.  There's no

21     dispute that that production is the only thing he served in

22     response to the plaintiffs' RFPs in this case.

23             There's also no dispute that the production contains

24     no emails, no text messages, no phone records.  And both

25     because it has not ever been disputed and because we heard

P16VFRE4

1    additional admissions today from Mr. Giuliani's testimony,

2    there's no dispute that there were responsive documents missing

3    that plaintiffs already know about.

4         Surely, only the tip of the iceberg, compared to the

5    voluminous emails that could have been searched for, collected,

6    and produced in response to the plaintiffs' requests for

7    productions in this case.  Those included — and these are just

8    the ones we know about — documents in which Mr. Giuliani -- and

9    just limiting to emails only, in which he was copied on an

10   email relating to travel from New York to Florida.

11   Mr. Giuliani agreed on the stand that without -- you know,

12   without having read that email and thought about it, he

13   wouldn't be able to tell one way or the other whether he was

14   part of the team that had to travel from New York to Florida.

15   I mean, that almost states plaintiffs' point exactly.  Without

16   having access to these documents, there was no way that we

17   could have done anything to investigate the weight that they

18   should be given, present them to the Court, make arguments

19   based on them.

20        THE DEPUTY CLERK:  Five minutes.

21        MR. NATHAN:  Thank you.

22        There is an email concerning travel from New Hampshire

23   to New York in the spring of 2024, where Mr. Giuliani was not

24   only copied on the email, but he was mentioned as one of the

25   people who would be traveling back to New York.

P16VFRE4

1          Plaintiffs have also been able to uncover a lease for

2     an apartment that Mr. Giuliani rented in New Hampshire for the

3     period spanning July 14th through August 24th, in which he

4     specifically asks that notices be sent not to the address of

5     the leased apartment, but to his address in New York.

6          Again, this is the tip of the iceberg.

7          If plaintiffs were able to find just by clawing their

8     way to obtaining some nominal discovery from third parties, one

9     can only imagine the universe of responsive documents that were

10    in Mr. Giuliani's emails.

11         At the same time, based on his admissions in court

12    today, it's now clear that he took no steps whatsoever to

13    preserve, collect, search for, or produce any of the documents

14    in his email.  And again, that's to say nothing of

15    Mr. Giuliani's other admissions that he essentially took no

16    steps to search for responsive documents, much less produce

17    them in this case.

18         We think that that is more than enough to grant us all

19    the relief we requested in the motion.

20         There's the icing on the cake of the Caruso

21    declaration.  I know your Honor has mentioned that the matter

22    of the admissibility of that declaration is still under

23    advisement.  I'm happy to address that now; we're also happy to

24    submit briefing later.  But I would say we don't see any reason

25    why the admissibility of that declaration would need to hold up

P16VFRE4

1    granting our motion.

2            The basics, if your Honor is interested, are only that

3    at the time he filed the declaration, Mr. Caruso was still

4    Mr. Giuliani's attorney.  Mr. Giuliani didn't sign the paper

5    consenting to a substitution till the day after the declaration

6    was filed.  But even then, it's undisputed — and the Court has

7    already recognized — that absent a court order, Mr. Caruso

8    could not have been relieved as Mr. Giuliani's attorney under

9    Local Rule 1.4.

10           What's unusual about this case is not that an

11   attorney's out-of-court admission would be offered against a

12   client under 801(d)(2)(D).  What's unusual about this case is

13   that here, the client took steps that, through his own conduct

14   and statements, waived the privilege that would have otherwise

15   protected those statements from disclosure in the first place.

16           Admitting Mr. Caruso's declaration is not going to

17   create some sort of avalanche of attorney admissions offered

18   against clients here or anywhere else.  In most cases, those

19   admissions will be as privileged as they always would be.  And

20   it's Mr. Giuliani's own conduct that has changed the result

21   here.

22           THE COURT:  Is it an adoptive admission?  After all,

23   the motion was served on Mr. Giuliani and he didn't respond by

24   disputing any of the underlying facts.

25           MR. NATHAN:  The short answer is yes, the Court can

P16VFRE4

1   take that path as well.

2            Again, we don't think that there's any reason that the

3   Court would need to be creative in admitting that document.

4   Mr. Caruso was undisputedly Mr. Giuliani's agent at the time it

5   was filed; the statement related to a matter within the scope

6   of the representation.  And what's more, even though the only

7   thing that I think was even in question was whether the

8   statement was made during the course of the representation, we

9   think under clear application of Local Rule 1.4, the answer to

10  that has to be yes.  Otherwise, an attorney could file a

11  withdrawal application and nothing the attorney said from that

12  day forward would be admissible against the client.  And that

13  makes no sense.

14           I will quickly just address the remedies.

15           THE COURT:  You'll also address the argument that's

16  been made that it's all Mr. Caruso's fault, independent of

17  whether I take the declaration into account.

18           MR. NATHAN:  Well, in some ways, the involvement of

19  Mr. Caruso in this factual narrative is a bit of a red herring.

20  Mr. Caruso was granted leave to withdraw on November 26th.

21  It's true that the totality of the productions that were made

22  in response to plaintiffs' RFPs were made after that date.

23  It's also true that those are the productions that are, I would

24  say, inarguably insufficient.

25           The conduct that predated Mr. Caruso's withdrawal

P16VFRE4

```
1    violated -- well, I would say blew the deadline to respond to
2    plaintiffs' RFPs; but the violations of the Court's orders that
3    took place and which merit the sanctions in this case postdate
4    Mr. Caruso's representation of Mr. Giuliani.  So the notion
5    that it's Mr. Caruso's fault that Mr. Giuliani violated court
6    orders requiring him to take steps after Mr. Caruso was his
7    lawyer is a little hard to take.
8         Look, the premise of the sanctions we're requesting in
9    this case is that it would be fundamentally unfair to require
10   the plaintiffs to litigate against a defendant who's permitted
11   to take the stand, give self-serving testimony, without ever
12   having to produce the documents that plaintiffs would be able
13   to then use to test his claims and prove their own case.  It
14   would be fundamentally unfair to let him litigate based on a
15   record of his own choosing.  That's just not how discovery
16   works.
17        Separately, the Court has warned that witnesses who
18   don't make complete document productions won't be permitted to
19   testify at this trial.  That's relief the plaintiffs are going
20   to seek separately.  But in addition to relying on -- excuse
21   me.  In addition to that, we just don't see how the purposes
22   served by Rule 37 could also be served by permitting
23   Mr. Giuliani to rely on a cherry-picked record and force the
24   plaintiffs to try this case with one or two hands tied behind
25   their backs.
```

P16VFRE4

1          I'll save the rest for rebuttal.

2          THE COURT:  Mr. Cammarata.

3          MR. CAMMARATA:  Thank you, your Honor.

4          At the opening of this proceeding, Mr. Nathan gave a

5   statement that the plaintiff -- that the defendant took no

6   steps to complete discovery.

7          I couldn't disagree more.  There's been substantial

8   compliance.

9          The Court would be remiss not to consider the

10  extremely limited time frame --

11         THE COURT:  Do you want a five-minute warning?

12         MR. CAMMARATA:  I'm sorry.  Yes.

13         THE COURT:  Okay.

14         The Court would be remiss not to consider the

15  extremely limited time frame that Mayor Giuliani was required

16  to comply with this magnitude a request that plaintiffs

17  propounded in an enforcement proceeding.

18         From the outset of the case, August 30th, 2024, until

19  present date, is a short time.  Even given the short discovery

20  period, Mayor Giuliani has either fully complied or

21  substantially complied with discovery.  This discovery process

22  should have been, in a typical case, approximately four to six

23  months.  Rather, the short time frame imposed with certain

24  propounded demands must have been replied to in 14 days, had a

25  significant impact on Mayor Giuliani, who is 80 years old.

P16VFRE4

1          The plaintiff propounded discovery and is sitting back

2     saying there's been no compliance, cherry-picking, Well, we

3     have an email that he might not have gave forward, despite

4     multiple people having access to the emails, and whether or not

5     he even knew about this email which was just presented today.

6          In the last one and a half to two weeks, there were

7     six depositions that took place, two in Florida and four in New

8     York.

9          THE COURT:  The first of those depositions was what

10    date?

11         MR. CAMMARATA:  I believe the first deposition was the

12    first week of December, which was Andrew Giuliani.

13         THE COURT:  Okay.  And then the next one was?

14         MR. CAMMARATA:  The next one was December 26 -- I

15    mean, I'm sorry, mid December was Andrew Giuliani, I believe

16    somewhere on the 20th range.

17         THE COURT:  Okay.

18         MR. CAMMARATA:  I don't have the exact date, so please

19    forgive me.  I know in Florida, the deposition where plaintiffs

20    and defendant's counsel were present on December 26th was

21    Monsignor Alan Placa.  On December 27th, the deposition of

22    defendant Rudolph W. --

23         THE COURT:  Was Mr. Giuliani present for Mr. Placa's

24    deposition?

25         MR. CAMMARATA:  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P16VFRE4

1          THE COURT:  Okay.

2          And then there is the 27th, Mr. Giuliani.

3          MR. CAMMARATA:  27th, Mr. Giuliani.

4          THE COURT:  And then there were --

5          MR. CAMMARATA:  31st, there was three depositions on

6     the 31st.

7          THE COURT:  Okay.

8          MR. CAMMARATA:  Theodore Goodman, Dr. Maria Ryan, and

9     Ryan Medrano.

10          THE COURT:  I take it he wasn't present for any of

11     those; is that right?

12          MR. CAMMARATA:  He was not.

13          THE COURT:  Okay.

14          MR. CAMMARATA:  This was an extraordinary short

15     discovery period.  Mayor Giuliani, as he testified in his

16     deposition and in open court, is involved in approximately six

17     criminal and civil cases.

18          THE COURT:  I thought he testified also that at the

19     relevant time there were no other discovery obligations in any

20     of the cases.

21          MR. CAMMARATA:  I think that testimony, if I'm not

22     mistaken, he was referring to within the last month or so.

23          THE COURT:  Right.  That's the time frame we're

24     talking about.

25          MR. CAMMARATA:  The elements for contempt.  The order

P16VFRE4

1    of the contempt are failed to comply with is clear and

2    unambiguous, the proof of noncompliance is clear and

3    convincing, and the contemnor has not diligently attempted to

4    comply in a reasonable manner.

5            Civil contempt sanctions serve two purposes:  One, to

6    coerce a party into compliance; or two, to compensate the

7    adverse parties for any losses as a result of lack of

8    compliance.  Holding the defendant in civil contempt and for

9    sanctions are not appropriate in this case.  Plaintiffs have

10   failed to establish by clear and convincing evidence that the

11   defendant violated the district court edicts and, therefore,

12   based on the Court's inherent authority, sanctions should not

13   be applied.

14           Once my office took over from opposing counsel, there

15   was undisputably substantial compliance with court orders.

16           THE COURT:  When you use the word "indisputably," I

17   think that is very much the subject of dispute --

18           MR. CAMMARATA:  Understood.

19           THE COURT:  -- argue it.

20           MR. CAMMARATA:  Because there has been substantial

21   compliance with orders, and the defendant's -- the defendant's

22   sanctions are not required and should not be imposed to coerce

23   the defendant into complying.  He has complied.

24           Plaintiffs have not suffered losses by any

25   noncompliance, either monetary or other.

P16VFRE4

1          This case should be heard on the merits, your Honor,

2    regarding the homestead of the defendant in Florida.

3          Plaintiffs' counsel is operating *pro bono* on this

4    case, so there is no financial harm to the plaintiffs for any

5    alleged noncompliance.  The defendant does not need to be

6    coerced because he substantially complied.

7          Plaintiffs are asking for adverse inferences, which is

8    the death penalty.  It would end this case today.  This case

9    needs to be decided on the merits.

10          The defendant has complied with all requirements under

11    the Florida Constitution to obtain homestead.  The

12    administrative body of Palm Beach County Clerk and Tax Assessor

13    had made a determination to grant homestead, which should not

14    be overturned by this Court.

15          THE COURT:  But you understand, that, in particular,

16    is not a good argument because the law is 100 percent clear

17    that the determinations by the tax authorities with respect to

18    the homestead tax position is not preclusive of the separate

19    constitutional issue of homestead protection.  In fact, it's

20    not clear to me that it's even relevant, but the fact of the

21    filing probably has some relevance.  But the legal proposition

22    that I would be overturning is just wrong as a matter of

23    Florida law, unless you've got a case that you want to cite to

24    me.

25          MR. CAMMARATA:  I will address further.

P16VFRE4

1          I respectfully submit that there should be no finding

2    of contempt on the imposition of sanctions against the

3    defendant.  I respectfully submit that this was a very fast

4    case from the initial discovery order until today; and that

5    there were many discovery demands propounded by plaintiffs upon

6    the defendant.

7          As stated before, I worked very diligently with the

8    defendant:  Multiple trips to Florida, meetings and conferring

9    and procuring documents.  I hope your Honor sees that the

10   defendant was not interfering with the discovery process as you

11   sit here today.

12         Your Honor can agree that the discovery time frame was

13   very aggressive to get us to trial scheduled for January 16,

14   2025.  And the defendant, as well as myself, made diligent

15   attempts to get items turned over to the plaintiffs, as well as

16   promptly respond to discovery.

17         This is not a case like many others which were before

18   your Honor, where a party completely disregarded discovery

19   obligations, and willfully and intentionally disobeyed court

20   orders.  This is not the case here.

21         In *P.C. v. Driscoll*, case number 24-CV-2496, on

22   December 18, 2024, your Honor declined to impose sanctions

23   where plaintiff moved to compel defendants to supplement

24   discovery responses and produce documents in compliance with

25   court orders at the October 28th, 2024 hearing.

P16VFRE4

```
 1          Your Honor stated:  "Defendant's explanation for the
 2     delayed and incomplete production is underwhelming; and that
 3     defendant's counsel stated that he was traveling on a
 4     preplanned vacation from November 3rd to November 10th, but
 5     provided no explanation as to why he could not have collected
 6     documents during the six days prior to his vacation or why he
 7     failed to arrange for another attorney to assist while he was
 8     away.
 9          In Acmetel USA LLC v. PTGi International, case
10     23-CV-11027, on October 10, 2024, your Honor declined to impose
11     sanctions or awards of attorneys' fees, and declined to strike
12     the answer as requested by plaintiff where plaintiff moved to
13     compel defendant to produce a notice witness for a 30(b)(6)
14     deposition.
15          In Yeul Hong v. Mommy's Jamaican Market, case number
16     20-CV-9612, on September 25th, 2024, your Honor denied
17     defendants' motion for sanctions against their former attorney,
18     but held that defendants were entitled to reimbursement for
19     fees and costs in bringing a motion for sanctions.  Your Honor
20     awarded 37,108.74 in attorneys' fees in that case.
21          THE COURT:  That's not necessarily the best case for
22     you.  Because the reason why I didn't award sanctions had to do
23     with the particular posture of a client asking for sanctions
24     against his attorney.
25          MR. CAMMARATA:  Understood.
```

P16VFRE4

1              In *Accettola v. Linda Mei He*, case number 23 CV 1983,

2    on September 23rd, 2024, your Honor awarded defendant

3    attorneys' fees as a sanction for plaintiff's failure to appear

4    at her noticed deposition.

5              In this case, defendant has provided the following

6    responses to demands:  On November 18, 2024, a letter was sent

7    to Citibank to turn over all exempt assets.  On November 27th,

8    an email was sent to plaintiffs' counsel with a marked-up

9    power-of-attorney from plaintiffs' counsel --

10             THE COURT:  You're now arguing the turnover.  I'm not

11   hearing argument with respect to the turnover.

12             MR. CAMMARATA:  Okay.  I'm just showing compliance

13   with your Honor's orders and that there is no defiance to the

14   Court.  I'm not going to tread into turnover; I just want to

15   substantially show compliance with orders.

16             On November 27th, an email was sent to plaintiffs'

17   counsel with a marked-up power-of-attorney that plaintiffs'

18   counsel requested defendant to sign on November 26, 2024,

19   which, as Mr. Nathan testified, was never responded to by

20   plaintiffs' counsel after I sent it to them on November 27,

21   2024.

22             The declaration of Mr. Nathan sounded that Mayor

23   Giuliani had failed or refused to comply.  That's simply not

24   the case.

25             On December 1st, 2024, defendant's response to

P16VFRE4

1    plaintiffs' first set of interrogatories was provided.  It is

2    in the court docket as docket entry 143 and 165-6.

3              On December 6, defendants' inventory of the items in

4    storage facility was provided.

5              On December 7, 2024, defendant's amended response to

6    plaintiffs' first set of interrogatories was provided.  It is

7    in court docket as docket entry 143 and 165-5.

8              On December 7th, 2024, defendant's response to

9    plaintiffs' first set of interrogatories, with 19 exhibits, it

10   is in the court docket as entry 143 and 165.

11             On December 8th, 2024, defendant's amended initial

12   disclosures pursuant to Federal Rule of Civil Procedure

13   26(a)(1), it is in the court docket as entry 143 and 165-20.

14             On December 17, 2024, defendant's second amended

15   response to plaintiffs' first set of interrogatories was

16   provided.  It's in the court docket as docket entry 143 and

17   165-7.

18             On December 17th, defendant's second amended initial

19   disclosures pursuant to Federal Rules of Civil Procedure

20   26(a)(1), which is in the court docket entry as 143 and 165-21.

21             On December 31st, 2024, the defendant's third amended

22   response to the plaintiffs' first set of interrogatories was

23   provided to plaintiffs, answering interrogatory four and

24   interrogatory eight, after the Court's order directing the

25   defendant to answer interrogatory four and eight.  Defendant

P16VFRE4

1    complied.

2            What is important to know about those responses are

3    the phone numbers and emails were provided as requested, and

4    the names of attorneys, financial advisers, and also doctors

5    were provided.  But once provided, the plaintiffs stand here

6    today and say, Well, we needed the first names.  That should

7    absolutely be -- it shows noncompliance.  That's not the case.

8            I respectfully submit that the defendant's actions in

9    this case do not meet the required legal standard of

10    willfulness and intent to disobey court orders.  Your Honor

11    discussed contempt in — forgive me for not pronouncing it, so

12    I'll spell it.  K-E-A-W-S-R-I v. Ramen-Ya, Inc., 2023 U.S.

13    District Court, Lexus document 204713 at 3-4, Southern District

14    of New York, November 15, 2023, case number 17-CV-026406 LJL,

15    where your Honor stated:  Civil contempt sanctions serve two

16    purposes:  To coerce a party into compliance or to compensate

17    adverse parties for any losses suffered as a result of lack of

18    compliance.

19            Civil contempt sanctions would not be necessary or

20    appropriate in this case, as coercing the defendant is not

21    necessary, as there has been substantial compliance as stated

22    above with the discovery demands and adverse party.  The

23    plaintiffs did not suffer any monetary losses as a result of

24    any lack of alleged compliance -- any alleged lack of

25    compliance by the defendant.

P16VFRE4

1          Under prevailing legal standards, a finding of

2     contempt requires clear and convincing evidence that the

3     alleged contemnor had knowledge of the court order, had the

4     ability to comply with it, and willfully fully close to disobey

5     it.

6          Here, the defendant substantially complied with the

7     Court's orders and never chose to disobey the orders, as

8     reflected by his testimony and actions.  Based on testimony,

9     the Court heard Mr. Nathan testify that he and I were

10    negotiating the power-of-attorney that the plaintiffs' counsel

11    requested for the cooperative apartment that I have the

12    defendant sign, transfer ownership of New York cooperative

13    apartment to the plaintiffs.  Clearly, the defendant was not

14    interfering with the transfer of the New York cooperative

15    apartment or disobeying the Court's order.

16          Mr. Nathan admitted that I sent him proposed changes

17    to the power-of-attorney documents that they requested.

18    Mr. Nathan never got back to me with whether the changes were

19    acceptable or not.

20          The Court also should note that the document that was

21    requested was a power-of-attorney, which is really not

22    necessary to transfer the cooperative apartment to plaintiffs.

23    However, I had no problem giving plaintiffs the

24    power-of-attorney; but the power-of-attorney had to be limited

25    to the transfer of the cooperative, not include real estate --

P16VFRE4

unfettered real estate transfers for Mayor Rudolph Giuliani,

which would have essentially given power to transfer his

primary residence and sole residence, which is his Florida

homestead.

I never received modifications or response to that

power-of-attorney.  However, plaintiffs have tried to craft

their declaration and utilize that as a spear at the defendant,

as if he was not complying with discovery.

Had plaintiffs' counsel really wanted to conclude the

New York cooperative matter, plaintiffs' counsel would have

finalized the power-of-attorney with me.  But Mr. Nathan

admitted to not doing that.

Based on the testimony that the Court heard this,

Court should be able to see that the defendant has

substantially complied with voluminous discovery demands and

has set forth nearly 600-plus pages of documents that were

served on plaintiffs' counsel, and also the defendant fully or

substantially complied with other orders of the Court.

The homestead case is not complicated.  And the

plaintiffs' counsel were seeking extraordinary and voluminous

demands.  We did the best we could to comply with plaintiffs'

discovery demands.

Defendant did substantially comply.  Prior to me

taking over as defendant's counsel, defendant's prior counsel

did not deliver response to discovery demands made by

P16VFRE4

1    plaintiffs, blaming the defendant for nonproduction.  However,

2    I know as a fact when I asked the defendant to cooperate, the

3    defendant cooperates.  When I notify the defendant that I'm

4    flying to Florida to meet and confer, he makes himself

5    available.  Mayor Rudolph Giuliani has a very, very busy

6    schedule, however, has never once told me, No, I cannot speak

7    to you; no, I cannot send something; no, I cannot meet you.

8            He has been fully compliant with me.

9            I do not know the intimate details of the

10   attorney-client breakdown between him and prior counsel, but I

11   can tell you he has fully complied with everything that I have

12   asked for.

13           I do not have a problem with the defendant in his

14   discovery responses, and I respectfully submit to the Court

15   should not hold the defendant in contempt and sanction the

16   defendant for any lack of production of discovery responses.

17   Because documents were produced, interrogatories were answered,

18   and dozens of items in responsive documents were turned over to

19   plaintiffs.

20           It was not the defendant who refused to respond to

21   discovery demands.  It was also not the defendant who was

22   intentionally disobeying any orders of this Court.  The

23   defendant does have respect for this Court and its court

24   orders.

25           Once I began to represent the defendant, the

P16VFRE4

1    plaintiffs received responses to discovery, and received over

2    40 items of additional items turned over in the other

3    proceeding.  I won't get into that.

4            I certainly disagree with the affidavit of Kenneth

5    Caruso, where he said that the defendant was not cooperative,

6    because the defendant was very cooperative with me.  I did not

7    have that type of problem with the defendant, and the

8    defendant's testimony shows that he did not intend to disobey

9    the court orders.

10           The defendant testified today in open court that the

11   attorney-client relationship had broken down for -- since the

12   end of October.  That was the heart of when items were

13   propounded and becoming due.  The defendant testified in front

14   of your Honor that he wasn't receiving phone calls and

15   responses from his attorney; that his attorney may have been

16   reaching out to third parties to pass messages.  Well, the

17   rules of ethics and ethical obligations as an attorney does not

18   permit us to pass messages through a third party.  Certainly if

19   he's not responding to his client, how can his client respond

20   to discovery demands?

21           There was an issue raised by -- hold on.

22           The Kenneth Caruso declaration should not be permitted

23   into evidence.  It's hearsay.  The plaintiffs could have called

24   Mr. Caruso to testify as to the contents.

25           Although I filed a notice of appearance on

P16VFRE4

1    November 15, 2024, a consent to change attorney was executed by

2    both attorneys and forwarded to the Court approximately on

3    November 19th, between the 17th and 19th.  Said consent to

4    change attorney wasn't signed and I was not officially on the

5    case and Mr. Caruso was not officially off the case till

6    November 26, 2024.  Had the consent been changed, the

7    certification and the motion -- the declaration of Mr. Caruso

8    and the motion to be relieved would have been moot.

9        There is an issue raised by plaintiffs regarding

10    interrogatory four and eight.  The defendant responded to

11    interrogatory four and eight as directed by your Honor's order.

12    The responses were provided to plaintiffs' counsel on December

13    31st, 2024 at approximately 7:11 p.m.  The defendant provided

14    names of attorneys, financial professionals and medical

15    providers who the defendant consulted with, along with the

16    defendant's cell phone numbers and personal email numbers.

17    Defendant fully complied with those interrogatories, your

18    Honor.

19        There is no reason to hold the defendant in contempt

20    or sanction the defendant because there is substantial

21    compliance.  There is no need to coerce the defendant because

22    compliance -- by compliance -- for compliance by sanction are

23    contempt.

24        Also, the plaintiff has not shown that they were

25    harmed in any way by the delayed response.  After the Court

P16VFRE4

1    denied the defendant's motion for a protective order, a

2    contempt order issued pursuant to a court's inherent authority,

3    is warranted only where the moving party establishes by clear

4    and convincing evidence that the alleged contemnor violated a

5    district court's edicts, citing *King v. Allied Vision, Ltd.*,

6    65 --

7              THE COURT:  Let me ask you a legal question.

8              In a circumstance where a party fails to search for

9    discovery — I'm asking this on a hypothetical basis, fails to

10   search for discovery — the adversary proves that if there was

11   discovery -- if there were relevant documents -- that if a

12   search had been conducted, there likely would have been

13   relevant documents, and there's no other excuse for the failure

14   to search for documents, are you saying that the party who

15   didn't get the discovery hasn't been injured because they are

16   unable to identify the universe of documents that its

17   adversary, by violating discovery orders, has not turned over?

18   I mean, that's -- can't be a correct legal proposition.

19             MR. CAMMARATA:  I understand.  But every case is

20   case-by-case.  We have to look who the defendant is and what

21   the mechanisms the defendant has and the faculties the

22   defendant has to produce said documents.

23             In a situation like this, putting aside that he is

24   Mayor Rudolph Giuliani, he is an 80-year-old man, he's been

25   displaced, property has been put into facilities, boxes of

P16VFRE4

documents going all the way back from prior to September 11th,

through September 11th, stuff from when he was representing

clients, he lives in Florida, has been restrained from

accessing certain facilities which may have had certain

discovery documents within there, there was an order

restraining him from accessing property.

So we go case-by-case.  And in this particular

situation, my client had testified — and with all due respect

to Mayor Giuliani, the question I asked him was a hard question

to ask a man of his position, but he did testify *menzamenz*.

And I can tell you firsthand that he is not as technologically

savvy as most litigants that come before your Honor.  So I do

understand your Honor's question, but I think it should be

dealt with on a case-by-case basis.

I respectfully submit that the plaintiff, as movants,

have not established the order that the defendant failed to

timely comply with a clear and unambiguous order; that the

proof of the noncompliance is not clear and convincing; and

that the defendant has not diligently attempted -- or defendant

has diligently attempted to comply in a reasonable manner.

Here, the third element was not proven because the defendant

did diligently -- I'm sorry.  Let me correct the record.

Element three is that the defendant has not diligently

attempted to comply in a reasonable manner.

Here, the third element was not proven, because the

P16VFRE4

1  defendant did diligently attempt to comply with all his

2  obligations in a reasonable manner, based on his faculties,

3  based on his current situation, based on the totality of

4  circumstances.

5          THE DEPUTY CLERK:  Five minutes.

6          MR. CAMMARATA:  Thank you.

7          Mayor Giuliani has testified -- Mayor Giuliani has

8  testified before your Honor that he has had the assistance of

9  all this dating back to his days as the chief of staff to the

10  U.S. Attorney's Office, since the 1980s until now.  This is

11  what he's used to.

12          Without sounding in testimony, one can infer that if

13  you have that type of assistance, it may lend itself to having

14  less capability to do certain things yourself because they've

15  been done for you for so long.

16          In the defendant's memorandum of law, we noted that

17  the New York CPLR requires that the receiver --

18          THE COURT:  So it seems to me that argument goes, if

19  anything, to the question of willfulness.  But I don't actually

20  need to find willfulness to find contempt, although it

21  certainly would be relevant.  I mean, the CEO of a company who

22  is served with a discovery response is not relieved from her

23  obligations because she's the CEO, is she?

24          I'm sorry.

25          MR. CAMMARATA:  I don't believe so.  I don't believe

P16VFRE4

1    it would.  But, again, it's a case-by-case.  I wouldn't know

2    what the duties of that particular CEO are at that point.  I'm

3    not trying to mince words with the Court, but without more

4    information...

5            In this case, the evidence demonstrates that any

6    noncompliance, if found, was not intentional or deliberate, but

7    rather result of circumstances beyond the defendant's control

8    or a good-faith misunderstanding.

9            We've heard the testimony.  Ultimately, a voluminous

10   amount of documents was provided by the defendant to the

11   plaintiff in response to plaintiffs' discovery demands.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

P16RFRE5

1           MR. CAMMARATA:  There is no evidence to suggest a

2    deliberate or malicious attempt to violate any directives

3    issued by this Court.  Instead, the record reflects that the

4    defendant has taken reasonable steps to adhere to the Court's

5    instructions to the best of their ability.

6           Any alleged noncompliance was due to factors that were

7    either unforeseen or unavoidable, including problems with the

8    defendant's prior counsel.  If logistical, financial or other

9    practical challenges impeded defense's ability to fulfill the

10   order, those challenges should not be construed as contemptuous

11   behavior.  The defendant has made sincere efforts to address

12   these issues of discovery promptly and has communicated in good

13   faith with plaintiffs through me.

14          Finally, imposing a finding of contempt in this case

15   would not serve the interest of justice.  The purpose of

16   contempt sanctions is to ensure compliance with Court orders,

17   not to punish individuals for inadvertent, unintentional

18   noncompliance.  The defendant's conduct does not reflect the

19   type of deliberate defiance or disregard that contempt

20   proceedings are designed to address.

21          I'm wrapping up.

22          THE COURT:  I'm not rushing you.

23          MR. CAMMARATA:  Okay.  Plaintiffs are trying to

24   sidestep the trial.  Plaintiffs don't want this trial.

25   Plaintiffs are doing everything they can to end this today,

P16RFRE5

1    which would be the most harsh remedy that could be imposed out

2    of any remedy on this planet.  To end the case today and

3    essentially decide the homestead that is in dispute, it would

4    be the death penalty in this case.

5         This case should be heard on the merits regarding the

6    homestead of the defendant in Florida.  Truly, plaintiffs

7    should not even be bringing this case because plaintiffs know

8    that when they filed their judgment in the United States

9    District Court for the Southern District of Florida and the

10   United States District Court for the Southern District of New

11   York, the defendant was at that time, and well before, a

12   citizen domiciled and a permanent resident in the state of

13   Florida.

14        The Court should read between the lines of the

15   plaintiffs' motion and realize that the only reason why the

16   plaintiffs are seeking severe sanctions are because the

17   plaintiffs would like this Court to say the defendant should

18   not be permitted to put on a defense at trial.  Because if this

19   case does proceed to trial, the facts are that the defendant is

20   entitled to claim homestead in Florida in accordance with the

21   Florida constitution.  So the only way the plaintiffs have to

22   victory in this case, the only pathway, is to end this today

23   through a technicality and a sanction that should never have

24   even been imposed.

25        Adverse inferences should not apply in this case.

P16RFRE5

1    Adverse inferences, as Mr. Nathan has stated in his oral

2    argument, is looking for not providing doctors' first names to

3    be an adverse inference that the defendant is not homestead in

4    Florida.  People travel to doctors in New York from Alaska,

5    from Hawaii, and certainly from Florida.  So if the defendant

6    has certain doctors in Florida and has certain doctors in New

7    York, it shouldn't be indicia that there's not homestead, and

8    that's exactly what plaintiffs are trying to do.

9          Your Honor, an email was put forward today, on I

10   believe it was recross by the plaintiffs, that was an email

11   sent to a third party that described potentially where Mayor

12   Rudolph Giuliani was traveling from.  I believe it was from the

13   mountains or forest in New Hampshire to New York, and that's a

14   basis to seek sanctions, and severe sanctions, because that may

15   have not been turned over when he was only cc'd on an email and

16   that's considered quote/unquote travel.

17         Well, I have news for plaintiffs.  I'm going to be

18   traveling when I leave this courtroom to my car in the parking

19   garage.  If I sent an email to my son and said:  I can't talk

20   right now; I'm traveling to the car -- to get the car from

21   court, that's technically considered travel.  As humans, every

22   step we take is travel.  I can't imagine that every email that

23   talks about where we're going is travel and should be a basis

24   to impose severe sanctions on my client.  And your Honor --

25         THE COURT:  Your time is up.

P16RFRE5

1          MR. CAMMARATA:  Can I have one sentence?  The

2     October 28, 2024, case management scheduling order has a

3     discovery end date of January 9, 2025.

4          THE COURT:  The last date for depositions was

5     December 31; is that right?

6          MR. CAMMARATA:  Yes, yes.  And even this weekend, my

7     client has took additional diligent efforts, as he testified

8     today, to procure more documents and ask for assistance in

9     finding other things.  That's the type of compliance that my

10    client has shown this Court and has shown the plaintiffs.

11         I ask the Court to deny sanctions, and

12    certainly──certainly──do not hold him in contempt and apply any

13    adverse inferences that would be the death penalty to my client

14    for his sole and primary residence in the state of Florida.

15    Thank you, your Honor.

16         THE COURT:  Let me ask you one question, which doesn't

17    necessarily go to this contempt motion, but since you mention

18    it and since you mentioned it earlier, has the signed title

19    document for the Mercedes been turned over to the plaintiffs so

20    that the car can be sold?

21         MR. CAMMARATA:  Very good question.  My client has

22    retrieved that.

23         THE COURT:  I gather that.  Do they have it in their

24    possession?

25         MR. CAMMARATA:  I believe it's been transmitted to my

P16RFRE5

1    office from Florida now.  There is -- I believe it's reflected

2    on there that there may be Judy, Judith Giuliani, formerly

3    Mr. Giuliani's wife, is on there.  And my client has indicated

4    to me that he has reached out to DMV to get a supplemental

5    title inherently trying to remove her, so we can get this in

6    compliance.  So even on the weekend he has been doing things,

7    since Friday, since we left here at 5:30 at night, he's doing

8    things to comply with your Honor.  So --

9            THE COURT:  Are you making a representation to the

10   Court in terms of when he reached out to the DMV the most

11   recent time?

12           MR. CAMMARATA:  I can't do that.  I can tell you that

13   it's been communicated to me that that is on the way up here.

14   We're going to stay on top of it, and it's a priority.  We're

15   trying to see if we can get that substitute title with a

16   divorce decree potentially attached to an application to see if

17   we can get it.  So it's not noncompliance.  It's cutting

18   through a lot of red tape in an administrative agency, and we

19   all know how that can be.  I don't think anybody in this

20   courtroom likes to go to the DMV.

21           THE COURT:  It's not hard.

22           Okay.  Mr. Nathan, let me hear from you.

23           MR. NATHAN:  Thank you, your Honor.  Plaintiffs wanted

24   a trial in this case.  Plaintiffs are still prepared to go to

25   trial, but what plaintiffs really wanted was all of the

P16RFRE5

1    evidence that would have been relevant to their claims, as any

2    litigant would be entitled to.  Mr. Giuliani chose not to

3    produce that evidence in response to valid discovery requests

4    and despite numerous orders of this Court compelling his

5    compliance.

6            The reality is that if the facts were what he now says

7    they are, he would have produced the evidence demonstrating

8    that.  That's the core of the *Hammond Packing* presumption, that

9    underwrites Rule 37's authority to enter adverse inferences

10   against a noncompliant party.  As of this moment, we still have

11   not heard an explanation, despite the protestations about why

12   contempt might not be appropriate in this case, contentions

13   which the plaintiffs still dispute, we have not heard an

14   explanation for why Rule 37 inferences are not appropriate in

15   light of Mr. Giuliani's failure to comply with discovery

16   requests.

17           As for the idea that this case should be decided on

18   the merits, again, plaintiffs have always wanted this case to

19   be decided on the merits.  But to be precise, the case still

20   will be decided on the merits if the plaintiffs requested Rule

21   37 sanctions are entered.  The adverse inferences, if they are

22   accepted, would then lead to a judgment on the merits.

23   Plaintiffs, by the way, are also simultaneously seeking summary

24   judgment, which, if granted, would lead to a judgment on the

25   merits on the basis of the undisputed facts in this case.

P16RFRE5

 1    Either path, or both, would lead to a final judgment on the

 2    merits in plaintiffs' favor, as would a verdict, or a bench

 3    verdict, after trial.

 4           Mr. Giuliani's opposition comes down to the argument

 5    that he has made substantial compliance with the Court's

 6    discovery orders.  On that we think the record speaks for

 7    itself.  We heard about 19 exhibits.  The 19 exhibits that are

 8    admittedly the totality of his production in response to the

 9    RFPs, but the RFPs themselves and this Court's motion to compel

10    required Mr. Giuliani to collect and produce all responsive

11    non-privileged documents.  That would include, by the way, an

12    email that mentioned the word "travel."  If the RFPs sought,

13    hypothetically, for all documents and communications relating

14    to travel, that's the type of email that would be captured,

15    collected, and produced in response to RFPs if any rudimentary

16    type of electronic discovery efforts were employed in this

17    case.

18           On top of all that, at this point, Mr. Giuliani is not

19    even arguing that he did make a complete production in response

20    to the RFPs themselves or that he tried to do it.  His own

21    prior counsel testified that he affirmatively refused.  The

22    Court doesn't need to make any findings with respect to

23    Mr. Giuliani's intent to disobey the discovery orders in order

24    to award Rule 37 sanctions, but the record amply supports those

25    findings.  Mr. Giuliani's defense appears to be that he did

P16RFRE5

1    produce 19 exhibits and served three amendments to

2    interrogatories, but that's it.  Aside from that, all we've

3    heard about is more efforts to put the plaintiffs' own law firm

4    on trial about unrelated matters in the turnover proceeding.

5          Fundamentally, this case comes down to the principle

6    that a party cannot benefit from their own failure to comply

7    with court orders.  The standards for Rule 37 sanctions, laid

8    out in the Second Circuit's decision in *Southern New England*

9    *Telephone Company*, that is, 624 F.3d 123, applies squarely

10   here.  Specific deterrence, while it may be something of a lost

11   cause with respect to this specific defendant, is still an

12   important factor.  General deterrence, even more important, and

13   the fundamental fairness considerations involved in protecting

14   parties from -- or ensuring that parties do not benefit from

15   their failure to disobey discovery orders is of paramount

16   importance in this case.

17         Ultimately, as for the adverse inferences, plaintiffs

18   have requested, at a minimum, the *Hammond Packing* style

19   presumption establishing the facts that the plaintiff sought to

20   establish through their discovery requests.  The discovery

21   requests that were not responded to, despite court orders to

22   obey, is the minimum to which the plaintiffs are entitled.

23         Plaintiffs are still prepared to go to trial.

24   Plaintiffs are prepared to go to trial on a level playing field

25   where no party is permitted to offer evidence that is

P16RFRE5

1    cherry-picked or the subject of Court ordered disobedience --

2    the product of disobedience with court orders.  Unless the

3    Court has any other or further questions, that's all.

4             THE COURT:  So one or two questions for you.  Can you

5    remind me the docket number for the request for production?

6             MR. NATHAN:  The requests for production are in

7    evidence.  They are at——I was just looking at them myself——I'm

8    told they are at ECF No. 118-2.

9             THE COURT:  And that's in which matter?

10            MR. NATHAN:  Excuse me.  Those are his objections to

11   the RFPs.  We'll nail this down.  It does appear to be docket

12   118-2 in the homestead case and 6563.

13            THE COURT:  Okay.  I'm going to take about a 15-minute

14   recess.  I'm going to ask you to be back here at five minutes

15   of 3:00, and I think I'll be able to give you some rulings with

16   respect to the matters before me.  I'm also going to ask you,

17   Mr. Nathan, to report to me at the conclusion of today's

18   proceedings whether with respect to the New York apartment, I

19   can anticipate some form of a third-party action to take care

20   of the documents with respect to the ownership of the property.

21            MR. NATHAN:  Certainly.  I was about to say I could

22   tell you that right now, but I'm happy to wait.

23            THE COURT:  I'll see you all back here at five minutes

24   of 3:00.

25            (Recess)

P16RFRE5

THE COURT:  Be seated.  Okay.  Plaintiffs have moved for the Court to imposed Rule 37(a) sanctions on defendant for his refusal to provide complete answers to Interrogatories 4 and 8 and to enter a series of adverse inferences.  Docket No. 168.  The motion is granted.

Interrogatories 4 and 8 were first served two months ago, on November 6, 2024.  Interrogatory 4 required the defendant to "identify any financial, medical or legal professional or firm whom you have consulted during the period of January 1, 2020, through the present."  Interrogatory 8 required the defendant to "identify all email accounts messaging accounts, and phone numbers that You have used during the period January 1, 2023, through the present."

Answers to those interrogatories were due on November 20, 2024, after Mr. Cammarata appeared in this case, pursuant to the Court's order of October 28, 2024, which required discovery responses to be provided within two weeks of service.  Docket No. 53.  Plaintiffs agreed to an extended deadline of November 26, 2024, but defendant failed to respond on either of those dates.

On December 2, 2024, defendant finally served a response to the first set of interrogatories, but did not answer 4 or 8, objecting to 4 on the grounds of attorney-client and doctor-patient privilege and to 8 on the grounds of security.  Plaintiffs responded correctly that those objections

P16RFRE5

1    were waived and were meritless but agreed to defendant's

2    request for two further extensions to supplement defendant's

3    responses to the First Interrogatories. Docket No. 127-5.

4          On December 8, 2024, defendant served amended

5    responses to Interrogatories 4 and 8, but he still did not

6    answer the Interrogatories.  Instead, he asserted a new and

7    different set of objections.  He no longer objected to

8    Interrogatory 4 on grounds of privilege and security, but

9    instead because it sought information that was not relevant and

10   was disproportionate.  Docket No. 127-6.  He objected to

11   Interrogatory 8 on novel grounds of safety and security and on

12   relevance. *Id*.

13         On December 13, 2024, plaintiffs moved under Rule

14   37(a) to compel defendant to respond to the interrogatories.

15   Docket No. 126.  The Court gave the defendant until 5 pm on

16   December 17, 2024, to respond to Plaintiffs' motion.  The

17   defendant responded after 5 pm with one sentence to the effect

18   that responses to 4 and 8 had been transmitted to counsel, such

19   that the motion to compel was moot.  See Docket No. 138.

20         As it turns out, that response was incorrect.  The

21   "responses" that the defendant sent the plaintiffs on December

22   17 simply reiterated his claim of privilege and asserted the

23   infeasibility of complying with 4.  In response to 8, the

24   defendant provided one email address, no messaging accounts,

25   and no phone numbers, on the basis of security.  See Docket No.

P16RFRE5

1    167-7.

2            Having no evidence before it of the completeness of

3    defendant's responses, the Court on December 17, 2024, ordered

4    Mr. Giuliani to respond to Interrogatories 4 and 8.  Docket No.

5    139.  The Court found that defendant waived his objections to

6    the interrogatories and that, in any event, his objections were

7    meritless, and ordered Mr. Giuliani to answer by December 20,

8    2024, or show cause why he should not be held in contempt.

9            Defendant violated the Court's order of December 17.

10   He failed to respond to my December 17 order by December 20.

11   He did not answer the Interrogatory 4 and did not substantially

12   comply with Interrogatory 8 or showed cause why he should not

13   be held in contempt.  Instead, on December 23, 2024, he filed a

14   document styled as a motion for a protective order, but that

15   was in substance a motion for reconsideration.  He still did

16   not answer the interrogatories.  In blithe disregard of the

17   Court's holding that he had waived all objections, for the

18   first time, he argued that Interrogatory 4 was overbroad,

19   choosing a preposterous interpretation of the interrogatory.

20   He asserted without any new argument that he should not have to

21   disclose his cell phone number even confidentially.  See Docket

22   No. 158.  Plaintiff opposed the motion and asked for contempt

23   sanctions.  Docket No. 168.

24           The Court denied defendant's motion on December 27,

25   2024, interpretating it as a motion for reconsideration and

P16RFRE5

1    finding that there was no new information that called for

2    reconsideration.  Docket No. 171.  The Court directed defendant

3    to be prepared to address why, if the Court found defendant in

4    contempt, it should not impose the sanctions requested by

5    Plaintiffs.

6           On December 31, 2024, after the Court closed the

7    record with respect to Interrogatories 4 and 8, the defendant

8    submitted to plaintiffs a Third Amended Response to the two

9    rogs.  These responses are facially incomplete, as the

10   testimony today established.  Furthermore, all of the

11   information provided on December 31 could easily have been

12   provided on a timely basis.

13          Under Rule 37, the Court has the power to impose

14   sanctions for discovery violations.  The applicable rule is

15   Rule 37(b)(2)(A), which permits the Court to craft a sanction

16   that is just and proportional when a party fails to obey an

17   order to provide discovery, including an order to provide

18   discovery under Rule 37(a).  The Court's order of December 17

19   was such an order.  It is within the power of the Court to go

20   so far as dismissing the case altogether, or among other lesser

21   sanctions, to that the matters embraced in the order or other

22   designated facts be taken as established for purposes of the

23   action, as the prevailing party claims or prohibit the

24   disobedient party from supporting or opposing designated claims

25   or defenses, or from introducing designated matters in

P16RFRE5

1  evidence.

2         Sanctions should be proportionate to the degree of

3  willfulness or bad faith, the severity of prejudice to the

4  plaintiffs, and the strength of the relationship between the

5  missing discovery and the merits of the case. *Daval Steel*

6  *Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d

7  1357, 1366-68 (2d Cir. 1991). See also *Chevron Corp. v.*

8  *Donziger,* 833 F.3d 74, 147 (2d Cir. 2016).

9         An adverse inference is a severe sanction, and should

10  be reserved for serious violations which include circumstances

11  "when the failure to comply with a court order is due to

12  willfulness or bad faith, or is otherwise culpable." See

13  *Daval*, 951 F.2d at 1367. However, a finding of willfulness is

14  not necessary to impose Rule 37 sanctions, even adverse

15  inferences, see *Reilly v. Natwest Markets Group Inc.*, 181 F.3d

16  253, 268 (2d Cir. 1999).

17         The Court has a high degree of flexibility in crafting

18  sanctions that are just, and may use as many as necessary to

19  "hold the scales of justice even." See *Wright & Miller,* 8B

20  Federal Practice and Procedure, § 2284 (3d ed.).

21         As then Judge Gorsuch wrote for the Tenth Circuit in

22  affirming a district court's decision to dispose of a case as a

23  Rule 37 sanction, "Discovery is not supposed to be a shell

24  game, where the hidden ball is moved round and round and only

25  revealed after so many false guesses are made and so much money

P16RFRE5

```
1    is squandered." Lee v. Max Int'l, LLC, 638 F.3d 1318, 1322

2    (10th Cir. 2011) (Gorsuch, J.).

3          I have considered the relevant factors, after hearing

4    the testimony of the parties and the argument of counsel, and

5    conclude sanctions are appropriate.

6          Defendant willfully violated a clear and unambiguous

7    order of the Court.  He was directed to answer Interrogatories

8    4 and 8 by December 20, 2024, and willfully failed to do so.

9    Defendant and his counsel knew of their obligation to respond

10   and simply disregarded it.  Instead, he blew past the December

11   20 deadline and then filed a plainly meritless motion for

12   reconsideration.

13         The Court takes judicial notice of the fact that

14   defendant was, until recently, a barred attorney.  It also

15   takes judicial notice that he has committed discovery

16   violations in the past.  The motion comes against the backdrop

17   of defendant ignoring his other discovery obligations in this

18   case.  He knew of his discovery obligations and of the possible

19   consequences of failing to comply with them.

20         There also was no substantial justification for

21   defendant's discovery violations.  The obligation to respond

22   timely or else waive your objections is not some novel

23   principle.  It is applied every day in these courts and is a

24   principle with which defendant and his counsel would be

25   familiar.  As the Court pointed out, there are consequences
```

P16RFRE5

from the failure to follow the discovery rules.  The Court

nonetheless heard him out in full over his objection to the

interrogatories even though those objections were waived.  He

lost on both procedural and on substantive grounds.  The

question, indeed, was not even close.

         He has testified that he did not respond because he

suspected the motives of plaintiffs' counsel.  That is not an

excuse for violating the Court's orders.  The interrogatories

plainly call for relevant information. There is and was no

reason provided to suspect Plaintiffs' counsel.  More

important, as the Court informed defendant, if there was reason

to believe that Plaintiffs' counsel misused discovery, he could

raise that with the Court.  It was not an excuse to take the

law into his own hands.

         The Court also concludes that the violation was

willful.  Defendant could easily have complied.  Interrogatory

4 calls for the "financial, medical, or legal professional or

firm" with whom defendant had consulted since 2020.  Defendant

admitted in his Friday testimony that he could have put

together the list of doctors if he devoted the effort to it.

He had since November 6 to do so.  It would not have been

difficult to do, as his third amended response shows.

         The remainder of the interrogatory was not difficult.

He has never contended that it would be difficult for him to

put together the financial or legal professionals with whom he

P16RFRE5

1    has consulted since 2020.  Even if there were some legitimate

2    reason that the defendant could not answer in full, he was

3    still obliged to answer in part. That was the instruction of

4    the interrogatory.  It also is common sense.

5            The defendant has never contended that he could not

6    put together the answer to Interrogatory 8.  He has leveled

7    purported concerns for his security, but the documents before

8    the Court demonstrate that he has provided the same information

9    to banks with whom he has been dealing.  He could have asked

10   for a confidentiality order.  He did not.  Indeed, on Friday,

11   when a document was displayed inadvertently with a cellphone

12   number for defendant and an email address, it was the

13   Court—rather than defendant—which suggested that such

14   information not be publicly displayed.

15           Instead, he has offered a series of shifting

16   objections to the interrogatories, making one or another

17   objection and then abandoning it when it was pointed out that

18   the objection was plainly meritless, only to make a new

19   objection.  The only conclusion the Court can draw, and the one

20   which it does draw, is that defendant has been attempting to

21   run the clock, thwarting plaintiffs' efforts to get plainly

22   relevant information by stalling until the date of trial, at

23   which point the information might no longer be relevant.  The

24   Court concludes that his objections were simply pretextual, and

25   that his real reason for not providing the information was

P16RFRE5

because its substance would be injurious to him in the
homestead action.

He testified today that his violations were not
willful and that he attempted to comply.  The Court puts very
little weight on that self-serving testimony, which is
conclusory.  He also testified that he had other matters
pending, but there is no evidence that those other matters
would have prevented him from answering these two simple
interrogatories.  If he wanted to comply, he could have. He
simply chose not to do so.

The information sought in Interrogatory 4 is squarely
relevant to the question of homestead.  As this Court has
already found in the order of December 17, the identities, and
correspondingly, locations of the defendant's professional
services providers are relevant to whether he in fact treated
Palm Beach as his permanent residence, as a matter of
subjective intent and actual occupancy, as opposed to a
vacation home.  See, e.g., *In re Bratty,* 202 B.R. 1008, 1010
(Bankr. S.D. Fla. 1996).

Interrogatory 8 is highly relevant to the merits of
this declaratory judgment action because Mr. Giuliani has
insisted, implausibly, that the entire universe of responsive
documents to plaintiffs' RFPs consist of roughly 19 documents
and zero emails or text messages.  Plaintiffs are hobbled from
challenging that contention by defendant's refusal to produce a

P16RFRE5

1    list of the accounts from which he communicates.

2            Plaintiffs have shown prejudice.  The Court informed

3    the parties on September 27 that it intended to move the case

4    along quickly.  On October 17, it set the date for trial of the

5    homestead action for January 16, 2025, ten days from today.

6    Defendant has known of that date since October 17, 2024.  Those

7    deadlines were set because this is a judgment enforcement

8    action and also because the Court's dismissal of defendant's

9    bankruptcy case came with a one-year bar on refiling.  There is

10   a clock ticking on this case.

11           Defendant has offered the Court no confidence that if

12   it granted an extension defendant would suddenly comply with

13   his discovery obligations.  And although the defendant has now

14   provided a third amended response to the interrogatories, he

15   did so only on the last day for depositions.  There is not

16   enough time for plaintiffs to seek the depositions of the

17   advisors and discovery from them, as plaintiffs would be

18   entitled to, nor to meaningfully use any other disclosure to

19   test the completeness of defendant's productions.  Defendant

20   has prevented the Plaintiffs from effectively using this

21   information to investigate where these providers were located,

22   and whether there was any change in professionals and their

23   locations to reflect the alleged change in homestead.

24   Furthermore, it is clearly prejudicial for Plaintiffs not to

25   have these responses in hand prior to conducting their

P16RFRE5

1    depositions of the defendant and the other defense witnesses.

2         At this point, there is no possibility for a

3    continuance.  The request for a declaratory judgment is part of

4    a judgment enforcement action.  Plaintiffs received their

5    judgment on December 18, 2023.  Defendant failed to take any

6    action in D.C. Court to secure plaintiffs their right to

7    payment on that judgment.  Plaintiffs still do not have that

8    security.  This action was filed on August 30, 2024. There has

9    already been delay enough in the case.

10        Moving on to the question of appropriate sanctions,

11   the Court considers it relevant and appropriate to consider

12   that the defendant has submitted a third amended response to

13   Interrogatories 4 and 8, as of December 31.  The Court does

14   take that into account.  It is also relevant that the response

15   was submitted well after the deadline, and, even now, as noted

16   is incomplete.

17        Having considered lesser sanctions, such as directing

18   payment of attorneys' fees, and also having considered the

19   greater sanctions proposed by plaintiff, the Court finds that

20   attorneys' fees would not be an appropriate sanction in a case

21   where plaintiffs claim that defendant's assets should be used

22   for the judgment, in any event, but also finds that the greater

23   sanctions also are not necessary in light of the recent service

24   of an interrogatory response.  Instead, a narrower adverse

25   inference and an order of preclusion is appropriate here to

P16RFRE5

1    vindicate the authority of the Court, to serve the interests of

2    deterrence, and to address the prejudice to the plaintiff.

3          The Court accordingly imposes Rule 37 sanctions with

4    respect to Interrogatories 4 and 8.  With respect to 4, the

5    Court finds that an adverse inference against the defendant is

6    warranted to the effect that the identities, and

7    correspondingly, locations of defendant's professional services

8    providers would show that none of them were located in or near

9    Florida and that he made no change in his professional service

10   providers after and as a result of his purported change in

11   homestead.

12         With respect to 8, the Court finds that an adverse

13   inference against the defendant is warranted to the effect that

14   defendant's true answer to Interrogatory 8 would show that

15   defendant's discovery responses and disclosures were incomplete

16   and that his unproduced and undisclosed discovery would have

17   been relevant to the questions of Mr. Giuliani's homestead.

18         The Court also precludes defendant from offering

19   evidence at trial that he had professional service providers in

20   Florida or that, after he purportedly moved his homestead from

21   New York to Florida, he changed professional service providers,

22   and from offering emails or text messages that have not been

23   provided, or from offering testimony that such emails or text

24   messages establishing his homestead in Florida ever existed.

25         These sanctions are appropriate given the willfulness

P16RFRE5

of defendant's noncompliance, the prejudice to the plaintiffs, and the relationship of the discovery sought to the merits of the case.

The Court further notes that even if the Court did not make the preceding findings as to sanctionable noncompliance under Rule 37, it would be proper for the trier of fact at trial to draw a permissive inference as to the contents of defendant's responses to Interrogatories 4 And 8.  Even in the absence of a formal punishment for discovery misconduct, the Court as fact-finder may take notice of gaps in defendant's discovery, and draw the reasonable inferences that those gaps suggest.

(Continued on next page)

P163FRE6

1          THE COURT:  (Continuing)  *See Mali v. Fed. Ins. Co.*,

2     720 F.3d 387, 393.

3          The Court also finds Mr. Giuliani in contempt for his

4     violations of the October 28 and November 22 orders for his

5     violation of his document production obligations in the

6     homestead proceeding.

7          Defendant does not dispute that the Court's orders of

8     October 28 and November 22 were clear and unambiguous, and they

9     were clear and unambiguous.

10         On October 28, 2024, the Court ordered that "all

11    discovery requests be responded to within 14 days of service,

12    including responses and objections as well as document

13    production" pursuant to Rule 23.  Docket No. 53.

14         On November 22, 2024, after defendant failed to

15    respond to plaintiffs' first set of requests for production

16    within 14 days of service, the Court found that defendant had

17    violated the Court's October 28 order and entered an

18    unambiguous directive: "Defendant shall comply with the first

19    RFPs by no later than October 26, 2024, by producing and

20    serving responses and all documents responsive to the first

21    RFPs in his possession, custody or control, or show cause why

22    he should not be held in contempt for violation of the Court's

23    order of October 28, 2024.  Violation of this order, unless

24    modified, may also be punishable by contempt.  Docket No. 103.

25         The evidence of non-compliance is clear and

P163FRE6

1   convincing.  There was no substantial compliance.  He did not

2   produce any documents as required by November 26.  Plaintiff

3   produced only 17 cherry-picked documents on December 8.  He has

4   not produced a single communication, a single e-mail, text

5   message or phone record in response to plaintiffs' 24 requests

6   for production, not one of which he timely objected to.

7           The evidence before the Court demonstrates that

8   plaintiff had responsive documents in the form of e-mails and

9   other documents going to his travel, and whether Florida was

10  his homestead, but that he failed to produce them.

11          Compliance with the Court's orders was not impossible,

12  and the defendant did not act with reasonable diligence and

13  energy in attempting to comply.  The request, e.g., called for

14  all documents and communications relating to his travel and

15  lodging for the period January 1, 2020 to the present, all

16  credit card statements and tickets relating to travel between

17  January 1, 2020 and the present, and all documents and

18  communications relating to the nature of his use and occupancy

19  of the Palm Beach condo as a permanent home or vacation/second

20  home.  Communications included e-mails, text messages, instant

21  message, social media, and telephone conversations and logs of

22  telephone conversations.

23          There simply is no world and it's implausible that the

24  19 documents produced by defendant are the full universe of

25  responsive documents.  And in fact, as noted, the evidence

P163FRE6

1  before the Court demonstrates that there were responsive

2  documents in the form of e-mails and other documents going to

3  defendant's travel and whether Florida was his homestead.

4          Defendant admitted that he did not search his e-mails,

5  he did not provide them to a vendor for search, he did not ask

6  any of his colleagues who had access to his e-mails and who

7  could have helped him to search to do so.

8          The defendant relies on the fact that he relies on a

9  cadre of employees and implies he should not be held

10  responsible for not knowing or not remembering what he might

11  have asked them to do, what they might have asked him to do, or

12  communications they might or might not have had on his behalf.

13  In short, the defendant offers no affirmative evidence of any

14  efforts that he took to comply with the discovery obligations.

15  The fact that he is a busy person who in the past relied on

16  others is not an excuse for non-compliance.  There is no

17  special exemption for a person who in the past has been able to

18  rely on others.  He had a personal obligation to produce all

19  documents in his possession, custody and control.

20          He insists that he's bogged down in other litigation

21  and that, in the past, he relied on others to satisfy his legal

22  obligations.  But he admitted that there were not discovery

23  obligations in those other cases in the last month, and in any

24  event, that would not be an excuse for his failure to comply

25  with his obligations in this case.

P163FRE6

1            The defendant blames prior counsel, but the violations

2    occurred after current counsel appeared in this case.

3    Mr. Cammarata himself stated at the hearing on substitution of

4    counsel on November 26 that he had met with defendant nine days

5    before.  Regardless, substitution of counsel does not excuse

6    defendant's failure to search for documents either before or

7    after new counsel came in.

8            Defendant complains about the compressed time frame of

9    this action, but that issue is litigated and defendant lost.

10    In any event, he could have made efforts to search.  He made

11    none.

12            He has offered, again, no affirmative efforts, no

13    affirmative evidence of efforts that he made to search for his

14    documents.

15            The defendant points out his compliance with other

16    orders.  That issue is very much disputed, and is in any case

17    subject to another pending contempt motion.  But even assuming

18    he complied in some respects with other orders, even assuming

19    he complied in full with respect to the other orders, that does

20    not mean that he was free to disregard these orders.

21            In short, Mr. Giuliani, defendant has provided no

22    affirmative evidence of his attempts to comply with his

23    discovery obligations that have been reasonably energetic or

24    diligent, or that compliance was impossible.

25            As to plaintiffs' requested sanctions with respect to

P163FRE6

1    this motion, the Court reserves judgment.  Mr. Cammarata has

2    made arguments that the Court should not impose the severe

3    sanctions asked for by the plaintiff, and the Court needs to

4    take that question under advisement and give it more serious

5    thought.

6            So while I find that defendant is in contempt, I am,

7    as noted, reserving judgment on the appropriate sanctions to

8    impose for that contempt.

9            That is the order of the Court.

10           Mr. Nathan, do you want to inform me with respect to

11   third-party actions on the apartment?

12           MR. NATHAN:  Yes, your Honor, and I have a few

13   additional minor housekeeping matters to raise after that.

14           With respect to the New York co-op, there are a

15   handful of moving parties and third parties involved.  As your

16   Honor is aware, as with the Mercedes, Judith Giuliani's name is

17   still on the co-op shares, and the co-op itself obviously has

18   to be involved in transactions relating to shares and the

19   proprietary lease, to say nothing of the documents necessary to

20   obtain title insurance from a company that would then protect

21   future purchasers.  And in these circumstances, that has its

22   own set of complications as your Honor can imagine.

23           We're certainly planning to seek the Court's relief to

24   corral the third parties that need to be corralled.  One

25   thought that has occurred to us is we could seek an order from

P163FRE6

1    the Court directing all third parties claiming any interest in

2    the co-op shares to comply with the receivers' instructions

3    with respect to handling the legal matters that need to be

4    dealt with.  And then we can seek further relief as may be

5    necessary, if that order isn't sufficient to clear the

6    obstacles that we expect to face as we go through the

7    paperwork.

8        THE COURT:  I take it if you followed that course, it

9    would be up to -- I don't know if she still uses the name

10   Giuliani, but the defendant's ex-wife could interpose

11   objections and say that she has rights with respect to the

12   property.  I would not compromise her rights without giving her

13   an opportunity to be heard.

14       MR. NATHAN:  Understood, your Honor.  And to be clear,

15   our understanding is that she has no such claim and wouldn't --

16   as a legal matter, our firm position is she has no such claim.

17   Our practical understanding is that she's not likely to

18   interpose any such claim.  And we wouldn't expect the Court to

19   decide that issue without her presence.

20       Having said that, we anticipate it may be possible to

21   deal with this issue without having to adjudicate the questions

22   that you are alluding to, if we are correct about her

23   intentions.

24       THE COURT:  One reason why I raise this now is because

25   if she does have rights and she intends to assert them, I would

P163FRE6

1  want to make sure that there is enough time for her to appear,

2  appear with counsel, and to do so.

3          MR. NATHAN:  Understood.

4          THE COURT:  I'm leaving it up to you in terms of the

5  right course, but I'm just informing you that before you ask

6  the Court to compromise the rights of any third party, my view

7  is that I would need to give them notice and opportunity to be

8  heard.

9          MR. NATHAN:  Certainly.

10          The other housekeeping matters we have, among the

11  trial exhibits that we're preparing in connection with

12  tomorrow's filings, there are two types of confidential

13  information.  One is just traditional Rule 5.2 personal

14  identification information, and we just wanted to state for the

15  record that with respect to Mr. Giuliani's birth date and the

16  account number on one of his Citibank accounts, that

17  information has been publicly filed by Mr. Giuliani, and we

18  plan to treat that under Rule 5.2(h) as though he has waived

19  his right to redactions with respect to that information.  And

20  that's purely as a logistical matter as we prepare our trial

21  exhibits.

22          There is a somewhat more serious issue relating to

23  some tax returns of Mr. Giuliani's that the plaintiffs have

24  obtained outside the context of the Mazars-related protective

25  order that was entered in this case.  We understand those

P163FRE6

1    documents are sensitive.  They're not currently protected by

2    any confidentiality order, other than obviously the Social

3    Security number that appears on the tax documents.

4         We're prepared to take some steps to treat them

5    confidentially, although we would prefer to seek the Court's

6    guidance first about whether the Court has any views.

7         THE COURT:  So, I do have a section of my individual

8    practices that address this type of issue.  What those

9    contemplate is not squarely on point, but what they contemplate

10   is if a party has confidential information where the claimed

11   confidentiality is that of a third party or of the adversary,

12   that the information is initially filed under seal, and that

13   there is a period of time -- and it's set forth in my

14   individual practices -- for the party who has the privacy

15   interest to then move the Court.

16        That's what I would suggest doing in this case.  I'll

17   hear from Mr. Cammarata also with respect to that.

18        MR. NATHAN:  And absent any other agreement with the

19   defendant, or order from the Court, we'll follow that practice

20   with respect to that material.

21        THE COURT:  Mr. Cammarata, let me ask you.  I don't

22   know if you're familiar with that section of my individual

23   practices, but I commend it to you.  It is intended for a

24   situation very close to this, and what it would do is avoid the

25   need for Mr. Nathan to claim confidentiality, because he

P163FRE6

1    doesn't haven't the interest in it, but it would also give you

2    the opportunity and also impose on you the obligation to

3    support that the information should be maintained under seal.

4              MR. CAMMARATA:  Yes, that would be the application.

5              THE COURT:  Okay.  So you'll follow my individual

6    practices with respect to that.

7              MR. NATHAN:  Thank you, your Honor.

8              Friday there was an issue of a letter addressed or an

9    e-mail addressed to Citibank.  We didn't have copies at the

10   time.  We have copies now.  And I'm happy to provide a copy to

11   the Court and to defense counsel if that -- I think this is

12   something that was discussed on the record and was this -- was

13   this admitted?  No.  But this was an issue then, and we have

14   the documents if that's of interest.

15             THE COURT:  Okay.  You can hand that up.

16             Why don't you hand that up at the conclusion of

17   today's proceedings.

18             MR. NATHAN:  I will do so.

19             The last thing is we've got a flash drive of exhibits

20   that were admitted, but it's already out of date given that two

21   others were admitted.  So we can consult with your chambers on

22   how to submit them to the Court.

23             THE COURT:  I would appreciate that.  And my

24   individual practices provide that it is the obligation of the

25   parties to maintain copies of the exhibits.  So while I

P163FRE6

1    appreciate the courtesy copies, you each have to maintain

2    copies of the exhibits in the event that there are further

3    proceedings in this case, either in this court or another

4    court.

5                MR. NATHAN:  Fair enough.  So, that wraps it up.

6                THE COURT:  I should also say with respect to the

7    contempt motion on the turnover action, I'm still considering

8    what the appropriate schedule is with respect to that.

9                MR. NATHAN:  Okay.  I suppose the last thing is,

10   probably goes without saying that the plaintiffs have an

11   interest in that matter proceeding as expeditiously as

12   possible.

13               THE COURT:  Mr. Cammarata, anything from you?

14               MR. CAMMARATA:  Nothing, your Honor.

15               THE COURT:  Okay.

16               Have a good afternoon everybody.  Thank you very much.

17               (Adjourned)

18

19

20

21

22

23

24

25

1              INDEX OF EXAMINATION

2    Examination  of:                          Page

3     RUDOLPH W. GIULIANI

4    Redirect By Mr. Cammarata  . . . . . . . . . . 249

5    Recross By Ms. Governski . . . . . . . . . . 287

6    Redirect By Mr. Cammarata  . . . . . . . . . . 323

7                 PLAINTIFF EXHIBITS

8    Exhibit No.                           Received

9     13    . . . . . . . . . . . . . . . . . . 312

10    14    . . . . . . . . . . . . . . . . . . 314

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25